HON. TIMOTHY W. DORE
Chapter 7
Location:  Seattle
Hearing Date:  October 4, 2019
Hearing Time: 9:30 a.m.
Response Date:  September 27, 2019

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

In re:

KIM C. KERRIGAN,

        Debtor.

Case No. 19-11828-TWD

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF BAYVIEW LOAN SERVICING'S AMENDED MOTION FOR RELIEF FROM AUTOMATIC STAY**

   Defendant BAYVIEW LOAN SERVICING, LLC hereby requests that the Court take judicial notice of the following, pursuant to Evidence Rule 201(b)(2):

1.  Attached as __Exhibit 1__ is a true and correct copy of Bayview Loan Servicing's Appendix Required by BAP Rule 8018(b)-1 filed in BAP No. WW-18-1341.

2.  Attached as __Exhibit 2__ is a true and correct copy of Bayview Loan Servicing's Request for Judicial Notice in Support of Appellee's Answering Brief filed in BAP No. WW-18-1341.

3.  Attached as __Exhibit 3__ is a true and accurate copy of the Declaration of Scott Stafne In Support Of Extension of Time For Filing Of Kerrigan's Reply and In Support of Panel Resolving *Sua Sponte* The Issue of Whether It Has Subject Matter Jurisdiction Of Bayview's Claim Of Proof dated May 17, 2019 and filed in BAP No. WW-18-1341.

4.  Attached as __Exhibit 4__ is a true and accurate copy of the Order Staying BAP No.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT
OF BAYVIEW LOAN SERVICING'S AMENDED
MOTION FOR RELIEF FROM AUTOMATIC
STAY - 1

Klinedinst PC
701 Fifth Ave., Ste. 1220
Seattle, WA 98104

1    WW-18-1341 dated June 10, 2019.

2

3    DATED this 10 day of September, 2019.

4                                    By:   _s/Gregor Hensrude_____
5                                    Gregor A. Hensrude, WSBA No. 45918
                                     Anthony C. Soldato, WSBA No. 46206
6                                    KLINEDINST PC
                                     701 5th, Ave Suite 1220
7                                    Seattle, WA  98104
                                     Tel: (206) 682-7701
8                                    Email:    ghensrude@klinedinstlaw.com
9                                    Email:    asoldato@klinedinstlaw.com
                                     Attorneys for Bayview Loan Servicing, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
REQUEST FOR JUDICIAL NOTICE IN SUPPORT                    Klinedinst PC
OF BAYVIEW LOAN SERVICING'S AMENDED               701 Fifth Ave., Ste. 1220
MOTION FOR RELIEF FROM AUTOMATIC                      Seattle, WA 98104
STAY - 2

Case 19-11828-TWD    Doc 34    Filed 09/10/19   Ent. 09/10/19 18:03:10   Pg. 2 of 193

**CERTIFICATE OF SERVICE**

I, Riley Curtis-Stroeder, hereby certify that on the date below, I electronically filed the

foregoing with the U.S. Bankruptcy Court, Western District of Washington, using the CM/ECF

system and mailed true copies thereof by United States Mail, enclosed in a sealed envelope, with

postage paid to the following parties of record:

Kim Kerrigan
8011 9th Ave Northwest
Seattle, Washington 98117

DATED this 10 day of September, 2019, at Seattle, Washington.

By: *s/Riley Curtis-Stroeder*
Riley Curtis-Stroeder, Legal Assistant

18077350.1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT
OF BAYVIEW LOAN SERVICING'S AMENDED
MOTION FOR RELIEF FROM AUTOMATIC
STAY - 3
16162002 TWD

Klinedinst PC
701 Fifth Ave., Ste. 1220
Seattle, WA 98104

# Exhibit 1

BAP No. WW-18-1341

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>KIM C. KERRIGAN,<br><br>      Debtor. | Bankr. No. 16-16219-TWD<br>Chapter 13 |
| KIM C. KERRIGAN,<br><br>      Appellant,<br><br>   v.<br><br>BAYVIEW LOAN SERVICING, LLC,<br><br>      Appellee. | |

ANSWERING BRIEF OF APPELLEE

Gregor A. Hensrude, WSBA No. 45918
Stephanie D. Olson, WSBA No. 50100
KLINEDINST PC
701 Fifth Avenue, Suite 1220
Seattle, Washington  98104
ghensrude@klinedinstlaw.com
solson@klinedinstlaw.com
PH: (206) 682-7701
Attorneys for Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................iii

I.    INTRODUCTION AND RELIEF REQUESTED ................................. 1

II.   CORPORATE DISCLOSURE STATEMENT ....................................... 1

III.  STATEMENT OF THE CASE ..................................................... 2

      A.   **Bayview Becomes the Beneficiary of Kerrigan's Mortgage
           After the WaMu Collapse and Receivership ................................... 2**

      B.   Kerrigan Sued Bayview, Alleging Federal Claims ............................ 4

      C.   The District Court and the Ninth Circuit Rejected Kerrigan's
           Arguments ........................................................................... 5

      D.   Kerrigan Attempted to Delay Foreclosure by Filing for
           Bankruptcy .......................................................................... 8

      E.   The Bankruptcy Court and Bankruptcy Appellate Panel Rejected
           Kerrigan's Arguments ............................................................. 9

      F.   The Bankruptcy Court Overruled Kerrigan's Objections to
           Bayview's Claim and Dismissed the Bankruptcy ........................... 11

IV.   SUMMARY OF THE ARGUMENT ..................................................... 13

V.    ARGUMENT ............................................................................... 14

      A.   The Bankruptcy Court Correctly Overruled Kerrigan's Objection
           Based on Claim Preclusion .................................................... 14

           1.   *The Claims Are Undisputedly Identical* ...................... 15

           2.   *The Parties are Undisputedly Identical* ....................... 18

*3.    The Prior Judgments Were Undisputedly on the Merits and Final, and Kerrigan's Collateral Attacks are Prohibited*...........18

B.    Issue Preclusion Also Bars Relitigation of Bayview's Interest in the Note .............................................................................. 20

C.    The Bankruptcy Court Correctly Overruled Kerrigan's Objections as Barred by the Confirmed Chapter 13 Plan ..................................... 22

D.    The Bankruptcy Court Correctly Overruled Kerrigan's Objection as Untimely .......................................................................... 23

E.    Bayview has Standing to Assert a Creditor's Claim ......................... 23

**VI.    CONCLUSION** ......................................................................... 27

-ii-

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Adam v. Dobin (In re Adam)*,
   BAP No. CC-14-1416-Pakita,
   2015 Bankr. LEXIS 1147 (B.A.P. 9th Cir. Apr. 6, 2015) ................................. 19

*Bain v. Metro. Mortg. Group, Inc.*,
   285 P.3d 34, 175 Wn.2d 83 (2012) .................................................................... 25

*Bank of New York Mellon v. Lane (In re Lane)*,
   589 B.R. 399 (9th Cir. B.A.P. 2018) ........................................................... 23, 25

*Barkley v. GreenPoint Mortg. Funding, Inc.*,
   358 P.3d 1204, 190 Wn. App. 58 (2015),
   *review denied*, 184 Wn.2d 1036 (2016) ...................................................... 24-25

*Brown v. Dep't of Commerce*,
   359 P.3d 771, 184 Wn.2d 509 (2015) ............................................................... 24

*Cell Therapeutics, Inc. v. Lash Group, Inc.*,
   586 F.3d 1204 (9th Cir. 2010) .......................................................................... 15

*Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co.*,
   177 F.3d 210 (3rd Cir. 1999) ....................................................................... 19-20

*City of S. Pasadena v. Mineta*,
   284 F.3d 1154 (9th Cir. 2002) .......................................................................... 19

*Deutsche Bank Nat'l Tr. Co. v. FDIC*,
   717 F.3d 189 (D.C. Cir. 2013) ........................................................................... 3

*In re Espinosa*,
   130 S.Ct. 1367 (2010) ...................................................................................... 22

*George v. City of Morro Bay (In re George)*,
   318 B.R. 729 (B.A.P. 9th Cir. 2004) ................................................................ 15

*Gleeson v. Lichty*,
   114 P. 518, 62 Wn. 656 (1911) ........................................................................ 24

-iii-

*Hernandez v. Wells Fargo Bank, N.A. (In re Hernandez)*,
  BAP No. NC-15-1044-TaDJu,
  2015 Bankr. LEXIS 3759 (B.A.P. 9th Cir. Nov. 3, 2015) ................................... 2

*Hoffman v. Pulido*,
  No. 1:18-CV-0209-AWI SKO (PC),
  2018 U.S. Dist. LEXIS 42949,
  2018 WL 1335594 (E.D. Cal. March 15, 2018)................................................. 18

*Int'l Bhd. of Teamsters v. United States DOT*,
  861 F.3d 944 (2017) .......................................................................................... 20

*Jones v. Giles*,
  741 F.2d 245 (9th Cir. 1984) ............................................................................ 20

*Kerrigan v. Bayview Loan Servicing, LLC (In re Kerrigan)*,
  BAP No. WW-17-1271-KuTaB,
  2018 Bankr. LEXIS 3607 (B.A.P. 9th Cir. Nov. 7, 2018) .......... 2, 3, 4, 5, 6, 7, 8

*Kerrigan v. Qualstar Credit Union*,
  728 F. App'x 787 (9th Cir. June 29, 2018),
  *rehearing denied*, 2018 U.S. App. LEXIS 28176 (9th Cir. 2018 Oct. 4, 2018),
  *petition for certiorari denied*, 2019 U.S. LEXIS 3124, __ S.Ct. __, 2019 WL
  955416 (Apr. 29, 2019) .................................................................................. 7, 8

*Lopez v. Raicevic (In re Lopez)*,
  BAP No. SC-15-1335-YJuf,
  2017 Bankr. LEXIS 297 (B.A.P. 9th Cir. Feb. 1, 2017) ................................... 21

*Mpoyo v. Litton Electro-Optical Sys.*,
  430 F.3d 985 (9th Cir. 2005) ...................................................................... 15, 17

*Offley v. Activision, Inc.*,
  273 Fed. Appx. 610 (9th Cir. 2008) ................................................................... 2

*Ross v. Int'l Bhd. of Elec. Workers*,
  634 F.2d 453 (9th Cir. 1980) ............................................................................ 14

*Sandpiper Vill. Condo. Ass'n v. La.-Pacific Corp.*,
  428 F.3d 831 (9th Cir. 2005) ............................................................................ 19

*Snell v. Cleveland*,
  316 F.3d 822 (9th Cir. 2002) ............................................................................ 19

-iv-

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ........................................................................ 15

*United Student Aid Funds, Inc. v. Espinosa*,
   559 U.S. 260, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010) ................................ 20

*Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*,
   450 B.R. 897 (B.A.P. 9th Cir. 2011) .............................................. 23, 24, 25, 27

*W. Radio Servs. Co. v. Glickman*,
   123 F.3d 1189 (9th Cir. 1997) ........................................................... 14

**Statutes**

28 U.S.C. § 1331 ..................................................................................... 7-8

RCW 61.24.005 ....................................................................................... 24

RCW 62A.1-201(b)(21)(A) ..................................................................... 24

RCW 62A.3-201 ...................................................................................... 24

RCW 62A.3-309 ...................................................................................... 24

Wash. Rev. Code § 65.08.030 ................................................................. 11

**Other**

18 Moore's Federal Practice – Civil § 131.02 (2017) ........................................... 18

# I.    INTRODUCTION AND RELIEF REQUESTED

Appellee Bayview Loan Servicing, LLC ("Bayview") appropriately asserted a creditor's claim as the holder of a promissory note ("Note") and on behalf of beneficiary rights to payment on the Note debtor Kim Kerrigan signed, and Kerrigan agreed to pay it in the confirmed plan.  But when her challenge to the Note failed in Federal District Court, the Ninth Circuit Court of Appeals, an adversary proceeding in the Bankruptcy Court, and then this Bankruptcy Appellate Panel of the Ninth Circuit, she returned to the bankruptcy court a second time, *a year too late*, to advance the same arguments under the guise of objecting to a proof of claim.  Bayview asserted a proper claim as a creditor, which has now been upheld by four courts—including this one—and possesses absolute authority pursuant to Kerrigan's note to obtain the secured interest in the Kerrigan bankruptcy estate.  Kerrigan's repeated attempts to advance the arguments have now become vexatious.

# II.    CORPORATE DISCLOSURE STATEMENT

Pursuant to USCS Bankruptcy Rule 8014 and 8012, the undersigned, counsel for non-governmental party Defendant Bayview, submits the following statement: Bayview is a limited liability company.  Bayview's parent company is Bayview Asset Management, LLC.

## III.    STATEMENT OF THE CASE[1]

### A.    Bayview Becomes the Beneficiary of Kerrigan's Mortgage After the WaMu Collapse and Receivership.

Appellant/Debtor Kimberly Kerrigan ("Kerrigan") was the owner of certain real property commonly known as 8011 9th Ave NW, Seattle, Washington ("Property").[2]  On February 13, 2008, Kerrigan obtained a loan from Washington Mutual Bank ("WaMu") for $417,000.[3]  She also executed a Multistate Fixed Rate

---

[1] In her opening brief, Kerrigan fails to cite to the record whatsoever, in violation of USCS Bankruptcy R 8014(a)(6) ("a concise statement of the case setting out the facts…with appropriate references to the record"), **which alone justifies dismissal of her appeal**.  *See Offley v. Activision, Inc.*, 273 Fed. Appx. 610, 611 (9th Cir. 2008) ("Plaintiffs' failure to cite to the record alone violates Fed. R. App. P. 28(a)(9)(A) and Circuit Rule 28-2.8 and justifies dismissal of the appeal.") (citing *Han v. Stanford Univ.,* 210 F.3d 1038, 1040 (9th Cir. 2000)); *see also Hernandez v. Wells Fargo Bank*, N.A. *(In re Hernandez)*, BAP No. NC-15-1044-TaDJu, 2015 Bankr. LEXIS 3759 (9th Cir. B.A.P. Nov. 3, 2015) ("An appeal may be involuntarily dismissed based on an appellant's failure to comply with the procedural rules governing the presentation of briefs on appeal.").  Further, she fails to provide any excerpts of the records and omits several documents necessary for the Court's understanding of the facts in her Designation of the Record.  *See* APPENDIX attached herewith (hereinafter, "APP.") 363 (Dkt. No. 116 - Appellant's Designation of the Record).  Therefore, Bayview respectfully requests dismissal of Kerrigan's appeal in its entirety.  Alternatively, Bayview requests supplementation of the record in accordance with the attached request pursuant to USCS Bankruptcy R 8009(e)(2)(c).

[2] *See Kerrigan v. Bayview Loan Servicing, LLC (In re Kerrigan)*, BAP No. WW-17-1271-KuTaB, 2018 Bankr. LEXIS 3607 at *1 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* APP. 173 (Dkt. No. 97 - Soldato Decl. Ex. A ¶ 4).

[3] *See* APP. 264 (Dkt. No. 98 - Haberlan Decl. ¶ 4); APP. 25-41 (Dkt. 44-1, Ex. A, p. 2-18 - Deed of Trust); APP. 43-45 (Dkt. 44-1, Ex. B, p. 20-22 - Note); *see also In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *1.

Note ("Note") with the original lender, WaMu,[4] which was secured by a Deed of

Trust ("Deed") listing Kerrigan as the borrower and WaMu as the lender.[5]

   "In September 2008, the U.S. Office of Thrift Supervision seized [WaMu]

and placed it into receivership with the FDIC." *Deutsche Bank Nat'l Tr. Co. v.

FDIC*, 717 F.3d 189, 190 (D.C. Cir. 2013). "At the same time, the FDIC entered

into a Purchase and Assumption Agreement with J.P. Morgan, under which J.P.

Morgan ["Chase"] agreed to purchase all of Washington Mutual' s assets,

including its subsidiaries, and certain of its liabilities." *Deutsche Bank Nat'l Trust

Co.*, 717 F.3d at 190.  Chase assigned the Deed to Bayview via a Corporate

Assignment, which was recorded on January 15, 2014.[6]

---

[4] APP. 114-117 (Dkt. No. 92-7 - Paatalo Decl. Ex. 7); APP. 127-129 (Dkt. No. 92-12 - Paatalo Decl. Ex. 12, p. 10-12 (Note)); *see also* Bayview RJN Ex. 3 (Dkt. No. 1-3 at p. 10 in Case No. 2:16-cv-01528-JCC).

[5] APP. 92-109 (Dkt. No. 92-5 - Paatalo Decl. Ex. 5); APP. 131-146 (Dkt. No. 92-12 - Paatalo Decl. Ex. 12, p. 14-29 (Deed)); APP. 264 (Dkt. No. 98 - Haberlan Decl. ¶ 4) *see also* Bayview RJN Ex. 2 (Dkt. No. 1-2 at 12 in Case No. 2:16-cv-01528-JCC).

[6] APP. 110-113 (Dkt. No. 92-6 - Paatalo Decl. Ex. 6); APP. 147-149 (Dkt. No. 92-12 - Paatalo Decl. Ex. 12, p. 30-32 (Recorded Assignment)); *see also In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *1 (B.A.P. 9th Cir. Nov. 7, 2018) ("Bayview is the assignee of the WAMU deed of trust."); Bayview RJN Ex 4 (Dkt. No. 1-4 in Case No. 2:16-cv-01528-JCC at p. 8 ("Assignment of Deed of Trust")).

On March 12, 2015, Bayview appointed Quality as successor trustee,[7] and

Quality subsequently recorded a Notice of Trustee's Sale (NOTS) for April 21,

2016.[8]  In the "Notice of Foreclosure," attached to the Notice of Trustee's sale, the

trustee identified Bayview as the holder and beneficiary of obligation secured by

the Deed.[9]

## B.    Kerrigan Sued Bayview, Alleging Federal Claims.

To avoid the inevitable foreclosure, Kerrigan filed her first lawsuit in King

County Superior Court on August 23, 2016, and alleged that Bayview's attempt to

enforce the NOTS and collect payments was barred by the statute of limitations.[10]

Kerrigan further alleged that attempts to enforce the NOTS violated the

Washington Collection Agency Act ("WCAA"); the federal Fair Debt Collection

---

[7] Bayview RJN Ex 4, p. 5. (Dkt. No. 1-4 in Case No. 2:16-cv-01528-JCC
(Appointment of Successor Trustee)).  While Kerrigan submits a Request For
Judicial Notice as to certain Ninth Circuit briefing in conjunction with her opening
brief, that supplementation of the record paints an incomplete picture.
Accordingly, Bayview hereby submits a more complete Request for Judicial
Notice of those documents the Ninth Circuit briefing was based upon, both in the
District and Ninth Circuit.

[8] APP. 174 (Dkt. No. 97 - Soldato Decl. Ex. A, ¶¶ 5.4, 5.2); *see also* Bayview RJN
Ex 3 (Dkt. No. 1-3 in Case No. 2:16-cv-01528-JCC at p. 27-30 (Notice of
Trustee's Sale)).

[9] Bayview RJN Ex 4 (Dkt. No. 1-4 in Case No. 2:16-cv-01528-JCC at p. 3
("Notice of Foreclosure") ("The attached Notice of Trustee's Sale is a consequence
of default(s) in the obligation to…Freddie Mac…owner of the obligation secured
by your Deed of Trust, ***which is currently held on behalf of the owner by Bayview
Loan Servicing, LLC, the current Beneficiary***.")) (emphasis added).

[10] APP. 172-190 (Dkt. No. 97 - Soldato Decl. Ex A) ("Complaint")); *In re
Kerrigan*, 2018 Bankr. LEXIS 3607 at *1-2 (B.A.P. 9th Cir. Nov. 7, 2018).

Practices Act ("FDCPA"), and the Washington Consumer Protection Act

("CPA").[11]  Notably, Kerrigan did not argue that the foreclosure sale itself was

time-barred, but that the foreclosure was an error because it sought three months of

payments that Kerrigan believed to be time-barred.[12]  She also claimed that the

Deed of Trust should be deemed "outlawed" and argued that Bayview might not be

the proper beneficiary.[13]

## C.    The District Court and the Ninth Circuit Rejected Kerrigan's Arguments.

On September 30, 2016, Defendants timely removed the case to District

Court ("District Court/Ninth Circuit Action") and then moved to dismiss with

prejudice, arguing that Washington law undisputedly tolled the statute of

limitations during the pendency of non-judicial foreclosures.[14]  In response,

Kerrigan did not dispute the tolling or request leave to amend, and only argued

that the District Court should certify the Washington appellate case law holding

that the six-year limitations was tolled to the Washington Supreme Court.[15]  On

---

[11] APP. 176-187 (Dkt. No. 97 - Soldato Decl. Ex A ¶¶ 6.1-6.55).

[12] APP. 176 (Dkt. No. 97 - Soldato Decl. Ex A, ¶ 6.3).

[13] APP. 185, 188 (Dkt. No. 97 - Soldato Decl. Ex A, ¶ 6.41; 'Relief Requested' ¶ 2).

[14] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *1 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* Bayview RJN Ex 6 (ER 58-64 in Ninth Circuit Case No. 17-35174 (Bayview Loan Servicing's Motion to Dismiss)).

[15] Bayview RJN Ex 5 (ER 6 in Ninth Circuit Case No. 17-35174 (Order Granting Defendants' Motion to Dismiss)).

December 6, 2016, the District Court rejected her arguments and dismissed all

claims against Bayview with prejudice.[16]  It also took Judicial Notice of three

documents because "their accuracy cannot be reasonably questioned:"

1. "Notice of Discontinuance of Trustee's Sale" dated October 8, 2014;
2. "Notice of Trustee's Sale" recorded on June 1, 2015, stating that Washington Mutual Bank's "beneficial interest…was assigned by Washington Mutual Bank (or by its successors-in-interest and/or assigns, if any), to Bayview Loan Servicing, LLC"; and
3. "Notice of Discontinuance of Trustee's Sale" dated October 12, 2015[17]

Accordingly, that same day, the District Court entered judgment in favor of

Defendants.[18]

Shortly thereafter, on January 3, 2017, Kerrigan moved for an altered

judgment.[19]  Kerrigan attached an expert declaration that contained new argument

that "the loan was never sold to the FDIC or then sold again to JP Morgan

---

[16] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *1 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* Bayview RJN Ex 5 (ER 2-9 in Ninth Circuit Case No. 17-35174 (Order Granting Defendants' Motion to Dismiss)).

[17] Bayview RJN Ex 5 (ER 3 fn. 2 in Ninth Circuit Case No. 17-35174); *see also* Kerrigan's RJN Ex. 3 at p. 8.

[18] Bayview RJN Ex 7 (ER 106 in Ninth Circuit Case No. 17-35174 (Judgment in a Civil Case)).

[19] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *3-4 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* Bayview RJN Ex 8 (ER 107-117 in Ninth Circuit Case No. 17-35174 (Motion for Post Judgment Relief)).

Chase,"[20] and that "everything following this statement [that Chase was successor in interest by purchase from the FDIC as receiver of WaMu] in the chain of title is fictitious and the documents are of no effect."[21] Kerrigan also requested leave to amend the complaint, for the first time, to add issues of alleged fraud raised in her expert's declaration.[22] On January 27, 2017, the District Court rejected Kerrigan's motion, reasoning that Kerrigan's untimely introduction of new evidence "to create an entirely new liability is improper and does not warrant an amended judgment."[23]

Kerrigan then appealed to the Ninth Circuit.[24] After a full appellate briefing, on June 29, 2018, the Ninth Circuit affirmed the dismissal of claims against Bayview and held that Kerrigan had no claims under the Note or DOT.[25] It also explicitly "reject[ed] as meritless Kerrigan's contention that the district court lacked subject matter jurisdiction over this case. *See* 28 U.S.C. § 1331 (granting

---

[20] Bayview RJN Ex 9 (ER 123-24 in Ninth Circuit Case No. 17-35174 (Expert Report of Cyndee Rae Estrada) at ¶ 8).

[21] Bayview RJN Ex 9 (ER 126 in Ninth Circuit Case No. 17-35174 (Expert Report of Cyndee Rae Estrada) at ¶ 20).

[22] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *3-4 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* Bayview RJN Ex 8 (ER 116-117 in Ninth Circuit Case No. 17-35174 (Motion for Post Judgment Relief)).

[23] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *4 (B.A.P. 9th Cir. Nov. 7, 2018); *see also* Bayview RJN Ex 10 (ER 152 in Ninth Circuit Case No. 17-35174 (Order Denying Plaintiff's Motion for Post-Judgment Relief)).

[24] *Kerrigan v. Qualstar Credit Union*, 728 Fed. Appx. 787 (9th Cir. June 29, 2018).

[25] *Kerrigan v. Qualstar Credit Union*, 728 Fed. Appx. 787 (9th Cir. June 29, 2018).

jurisdiction over civil actions arising under federal law)."[26] Kerrigan petitioned for a panel rehearing, which the Ninth Circuit denied on October 4, 2018.[27] Kerrigan then petitioned the United States Supreme Court for certiorari, which was denied on April 29, 2019.[28]

**D.** **Kerrigan Attempted to Delay Foreclosure By Filing for Bankruptcy.**

Shortly after Kerrigan filed her initial complaint, and in another attempt to stop the pending foreclosure sale, Kerrigan filed a bankruptcy action on September 8, 2016 ("First Bankruptcy Action").[29] On November 14, 2016, the Bankruptcy Court dismissed the case for failure to participate or follow court deadlines,[30] and closed it on December 8, 2016.

Just a week later, on December 15, 2016—also mere days after the dismissal of the District Court Action—Kerrigan filed her second bankruptcy action to stop the newly-noted trustee's sale (16-16219-TWD) ("Second Bankruptcy Action").[31]

---

[26] *Kerrigan v. Qualstar Credit Union*, 728 Fed. Appx. 787 (9th Cir. June 29, 2018).

[27] *Kerrigan v. Qualstar Credit Union*, No. 17-35174, 2018 U.S. App. LEXIS 28176 (9th Cir. Oct. 4, 2018).

[28] *Kerrigan v. Qualstar Credit Union*, 2019 U.S. LEXIS 3124, __ S.Ct. __, 2019 WL 955416 (Apr. 29, 2019).

[29] *In re Kerrigan*, 2018 Bankr. LEXIS 3607 at *2 fn. 2 (B.A.P. 9th Cir. Nov. 7, 2018) ("On September 8, 2016, Ms. Kerrigan filed a bankruptcy case to stop the pending foreclosure sale (Bankr. Case No. 16-14638-TWD). The case was dismissed on November 14, 2016, due to Ms. Kerrigan's failure to participate or follow the court deadlines.").

[30] *Id.*

[31] APP. 1-10 (Dkt. No. 1 - Voluntary Pet. for Individuals Filing for Bankr.).

In doing so, Kerrigan listed her "purported creditors" as "WAMU / Chase / Bayview."[32] Kerrigan's original plan also listed Bayview as a creditor, and stated that the remaining funds available after the designated monthly payments would go to Bayview.[33] In response, Bayview timely filed a Proof of Claim on April 6, 2017.[34] On May 19, 2017, Kerrigan filed a Second Amended Plan stating that she would file an adversary complaint against Bayview.[35] On June 7, 2017, the Bankruptcy Court confirmed Kerrigan's Second Amended Chapter 13 Plan.[36]

## E. The Bankruptcy Court and Bankruptcy Appellate Panel Rejected Kerrigan's Arguments.

On May 12, 2017, during the pendency of the Ninth Circuit appeal of the District Court Action, Kerrigan filed an adversary action in the Bankruptcy Court ("Adversary Action").[37] Kerrigan alleged that Bayview unlawfully attempted to collect on her Note and enforce the attendant DOT in a number of ways, all of which were because the DOT was allegedly unenforceable.[38] The thrust of the "new" complaint and its causes of action were entirely duplicative of the District

---

[32] APP. 1-10 (Dkt. No. 1 - Voluntary Pet. for Individuals Filing for Bankr.) at p. 9.

[33] APP. 11-15 (Dkt. No. 27 - Original Chapter 13 Plan) at p. 2, 5.

[34] APP. 118-151 (Dkt. No. 92-12 - Paatalo Decl. Ex. 12).

[35] APP. 62-66 (Dkt. No. 50 - Second Amended Plan) at p. 5.

[36] Dkt. No. 55 (Order Confirming Chapter 13 Plan).

[37] APP. 16-23 (Dkt. No. 44 – (Complaint for Rescission of Loan and Avoidance of Lien as to the Bankruptcy Estate) ("Adversary Complaint")).

[38] APP. 20-22 (Dkt. No. 44, ¶¶ 26-44 (Adversary Complaint)).

Court Action.[39]  The Bankruptcy Court found that the causes of action were indeed duplicative of the District Court Action and dismissed the Adversary Action on the basis of res judicata.[40]  In doing so, the court noted the following related to the underlying Note and DOT (as alleged by Kerrigan):

- Ms. Kerrigan owns a parcel of real property in Seattle.  In February of 2008 she refinanced the loan secured against the Seattle property with Washington Mutual.  Bayview Loan Servicing, LLC, which I'll refer to as "Bayview," is the assignee of the WAMU deed of trust.[41]
- M&T Bank is alleged to be a potential servicer of the loan.  The Federal Home Loan Mortgage Corporation is alleged to be the owner of the note and deed of trust.[42]
- To the extent M&T Bank or the Federal Home Loan Mortgage Corporation are the servicer or the owner of the WAMU note and deed of trust, their interests are substantially aligned with, if not identical to, Bayview's.[43]

Kerrigan proceeded to file another appeal, this time of the Adversary Action to this Court, Case No. 17-1271.

On November 7, 2018, this Court affirmed the dismissal the Adversary Action as proper.[44]  In doing so, it affirmed a lawful foreclosure process by

---

[39] *See* Bayview RJN Exs. 1-4.

[40] APP. 231-244 (Dkt. No. 97 - Soldato Decl. Ex C, Tr. of Adversary Hearing 27:24-40:3).

[41] APP. 232-233 (Dkt. No. 97 - Soldato Decl. Ex C, Tr. of Adversary Hearing 28:21-29:1).

[42] APP. 237 (Dkt. No. 97 - Soldato Decl. Ex C, Tr. of Adversary Hearing 33:23-25).

[43] APP.  239 (Dkt. No. 97 - Soldato Decl. Ex C, Tr. of Adversary Hearing 34:1-5).

[44] APP. 245-262 (Dkt. No. 97 - Soldato Decl. Ex. E ("Memorandum")).

Bayview.[45]  It also noted that "Kerrigan did not point to any Bankruptcy Code section or applicable state law that would allow her to void WAMU's lien using § 544."[46]  With respect to the underlying facts of the WAMU note and DOT, any such avoidance claims "failed because the WAMU deed of trust was recorded and therefore constructive notice was given under Wash. Rev. Code § 65.08.030."[47]

## F.     The Bankruptcy Court Overruled Kerrigan's Objections to Bayview's Claim and Dismissed the Bankruptcy.

On October 24, 2018—after Kerrigan's challenge to the Note failed in in the District Court/Ninth Circuit Action (and very shortly after the Ninth Circuit denied a rehearing), the First Bankruptcy Action, and the Adversary Action—she reverted back to the Second Bankruptcy Action and filed an objection to Bayview's Proof of Claim, *566 days* after Bayview filed its Proof of Claim.  In her objection, she essentially raised the same standing objections as she did before the four other

---

[45] APP. 253-254 (Dkt. No. 97 - Soldato Decl. Ex. E ("Memorandum")), p. 8-9 ("The court reasoned that the district court's dismissal of the claims in the state court complaint with prejudice established that Bayview and Quality's notice of trustee's sale did not violate the FDCPA, the WCAA, or CPA. Moreover, *inherent in the district court's judgment was the determination that Bayview and Quality's foreclosure was lawful.*  The bankruptcy court stated that if Ms. Kerrigan believed that Bayview's foreclosure was problematic, either because it lacked the right to enforce the WAMU deed of trust and note or because the WAMU deed of trust and note was void since it had been rescinded, those claims should have been raised in the previous lawsuit.") (emphasis added).

[46] APP. 255 (Dkt. No. 97 - Soldato Decl. Ex. E ("Memorandum")) at p. 10.

[47] APP. 256 (Dkt. No. 97 - Soldato Decl. Ex. E ("Memorandum")) at p. 11.

courts.[48]  In excuse for her untimeliness, Kerrigan argued that the "standing issues

which…form[ed] the basis for this declaration only came to light after

Ms. Kerrigan undertook a 2004 examination of the claimant earlier this year"—

which Kerrigan did not request until November 15, 2017 (over a year after filing

the Second Bankruptcy Action),[49] but the Bankruptcy Court ordered on November

20, 2017,[50] and Kerrigan did not take it until June 28, 2018.  Further, Kerrigan

ignored the material fact that she had been litigating and losing the standing issue

since the District Court Action.

On December 7, 2018, the Bankruptcy Court overruled Kerrigan's

objection.[51]  In doing so, it held:

> But in significant part, it largely boils down to the fact the
> debtor has been litigating these issues for years in
> multiple courts and has been universally unsuccessful.
> The debtor lost in the district court and lost her appeal of
> that decision at the Ninth Circuit.  The debtor then started
> over in this court in Adversary Proceeding No. 17-01075,
> which I will refer to as "the adversary."  The debtor lost
> the adversary, which was dismissed with prejudice, and
> lost her appeal of that decision at the Ninth Circuit
> Bankruptcy Appellate Panel.  Now the debtor raises
> essentially the same type of standing issue that was

---

[48] APP. 72-77 (Dkt. No. 90 - Amended Objection to Proof of Claim Number 1).

[49] APP. 67-69 (Dkt. No. 68 - Ex Parte Application for Rule 2004 Examination And
Production of Documents).

[50] APP. 70-71 (Dkt. No. 70 - Ex Parte Order Authorizing 2004 Examination of
Bayview).

[51] APP. 353 (Dkt. No. 99 - Order Overruling Debtor's Objection to Claim No. 1).

included in the adversary as a claims objection.  That can't
be permitted.

On December 7, 2018, the Trustee moved to dismiss the bankruptcy because of

Kerrigan's material default with regard to a plan term,[52] and the Bankruptcy Court

dismissed the case on February 8, 2019 and issued a Notice of Dismissal.[53]  While

Kerrigan filed a Notice of Appeal to appeal the overruling of her objection on

December 21, 2018,[54] and explained in her briefing that her "appeal is grounded

solely in the bankruptcy court's lack of subject matter jurisdiction" App. Br. at 1,

she did not appeal the dismissal of the entire case, which is now final.[55]  Bayview

responds herewith.

## IV.    SUMMARY OF THE ARGUMENT

The law precludes Kerrigan's attempt to invalidate Bayview's interest in the

underlying debt, and gives full force and effect to rulings on issues made in prior

cases.  Numerous federal courts have repeatedly ruled in Bayview's favor on the

only issue in this appeal; *i.e.*, "subject-matter jurisdiction" to reject Kerrigan's

repeated attempts to avoid enforcement of the Note.  The Bankruptcy Court

correctly denied Kerrigan's latest attempt to re-package her standing argument as

---

[52] APP. 354-356 (Dkt. No. 100 - Trustee's Motion to Dismiss Case).

[53] APP. 360 (Dkt. No. 113 Order Dismissing Case); APP. 361 (Dkt. No. 114 -
Notice of Dismissal).

[54] APP. 357-358 (Dkt. No. 107 - Notice of Appeal).

[55] As such, even if Kerrigan were to prevail on appeal, she failed to appeal the dismissal
of the bankruptcy in its entirety and thus there is nothing to remand to.

-13-

an objection to a claim for five reasons. **First**, claim preclusion bars relitigation of Kerrigan's subject-matter jurisdiction claims. **Second**, issue preclusion bars relitigation of issues pertaining Bayview's interest in the Note. **Third**, Kerrigan lost the ability to object after her Chapter 13 plan was confirmed. **Fourth**, Kerrigan's untimely objection precludes its consideration. **Fifth**, the reason Bayview has won this argument repeatedly is because Kerrigan's argument is simply wrong: Bayview has repeatedly shown standing to file a creditor's claim.

## V.    ARGUMENT

### A.    The Bankruptcy Court Correctly Overruled Kerrigan's Objection Based on Claim Preclusion.

The doctrine of *res judicata*, more accurately titled claim preclusion, "bars litigation in a subsequent action of any claims that were raised ***or could have been raised in the prior action***." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) (emphasis added); *Ross v. Int'l Bhd. of Elec. Workers*, 634 F.2d 453, 457 (9th Cir. 1980) ("The doctrine operates to bar all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties (or their privies) on the same cause of action…").  In other words, if the plaintiff "had a fair opportunity to litigate that claim before a competent court prior to bringing it to the court below" it is barred.  *Id.* at 458.

It applies when an earlier suit (1) involved the same claim or cause of action as the later suit; (2) the earlier suit reached a final judgment on the merits; and (3)

-14-

the earlier suit involved identical parties or their privies. *Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204, 1212 (9th Cir. 2010); *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985 (9th Cir. 2005). If those three elements are satisfied, then successive litigation on the very same claim is barred, regardless of whether relitigation of that claim raises different issues as the earlier suit. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). While the standard of review for the availability of res judicata doctrines is de novo, once the courts determine that that doctrines can apply, the decision to apply them is left to the trial court's discretion. *George v. City of Morro Bay (In re George)*, 318 B.R. 729, 732-33 (B.A.P. 9th Cir. 2004).

Here, the Bankruptcy Court correctly ruled that all three res judicata elements are met—***most of which Kerrigan does not dispute***—barring Kerrigan's subject-matter jurisdiction claim.

### 1. *The Claims Are Undisputedly Identical.*

As to identity of the claims, Kerrigan repeatedly agrees, and even argues, that her sole standing claim in the instant appeal is identical to her standing claim she lost in the District Court Action, and then before the Ninth Circuit, and then before the Bankruptcy Court in First Bankruptcy Action, and then before the Bankruptcy Court in the Adversary Action, and then before this Court pertaining to

-15-

the Adversary Action.[56] In arguing against dismissal of her Adversary Action,

Kerrigan even referred to her Adversary Action as an objection to the claim, the

exact objection that she now attempts relitigate:

> [Kerrigan's Counsel]: And so with regard to the third
> cause of action, we're asking the Court, as we indicate in
> our response, *to consider the present adversary complaint*
> *as nothing more than an objection to claim as to the*
> *amount owed to Bayview* and the other defendants…
> And so even if Your Honor has problems with the role of
> the debtor as a bona fide purchaser for value in the second
> cause of action, *I think the third cause of action certainly*
> *stands as merely our garden variety objection to claim in*
> *a Chapter 13 proceeding*, dealing not so much with the
> validity of the deed of trust as it deals specifically with
> what's the amount owed to this creditor.[57]

Kerrigan must concede this, because each standing claim in the various cases arises

out of the same transaction and occurrence. "Whether the two suits involve the

same claim or cause of action requires us to look at four criteria, which we do not

---

[56] "On appeal to the Ninth Circuit, Kerrigan challenged Bayview's standing and
hence the district court's and that court of appeal's subject matter jurisdiction to
resolve the merits of her lawsuit and appeal[,]" Br. at 5; "In opposing attempts to
take her home, Kerrigan challenged Bayview's standing both before the district
court and the bankruptcy court." Br. at 6; "Kerrigan then filed a motion and
declarations in support of post judgment relief which presented facts documenting
Bayview had no economic interest in the loan" Br. at 10; "After the District
Court's decision Kerrigan sought bankruptcy to protect her home. Bayview moved
to set aside the stay. Kerrigan again challenged Bayview's standing." Br. at 11;
"[Kerrigan] raised her standing arguments over and over again because the federal
courts ignored them" Br. at 12.

[57] APP. 231 (Dkt. No. 97 - Soldato Decl. Ex. D (Tr. of Adversary Hearing 27:2-6,
12-19 (Aug. 2, 2017))) (emphasis added).

-16-

apply mechanistically: (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions." *Mpoyo*, *supra*, 430 F.3d at 987.

Here, the instant appeal and all prior proceedings arise out of Kerrigan's agreement to the Note and Deed, her ceased payments, the subsequent foreclosure proceedings to enforce the Note, and Kerrigan's attempt to halt foreclosure proceedings through various court proceedings. *See Mpoyo*, 430 F.3d at 987. Additionally, Bayview's interests as adjudicated in the prior actions would be impaired by prosecution of subsequent actions because it would disturb or delay Bayview's right to continue with enforcement of the Note. *Id.* The subsequent suits and Kerrigan's objection to Bayview's proof of claim below all involve infringements on Bayview's right to enforce the Note, or Kerrigan's alleged right to quiet title to a free house. *Id.* Finally, and as discussed above, all the cases depend on substantially identical evidence. *Id.* It is beyond dispute that an identity of claims sufficient for claim preclusion exists.[58]

---

[58] But even if Kerrigan did not make these exact arguments on standing in the prior proceedings, she could have, as it arose out of the same nucleus of facts, none of which have changed since the start of Second Bankruptcy Action.

-17-

### 2. *The Parties are Undisputedly Identical.*

As to identity of the parties, Kerrigan does not dispute that the same parties or their privies litigated the First and Second Bankruptcy Actions, the Adversary Action, and the District Court/Ninth Circuit Action.

### 3. *The Prior Judgments Were Undisputedly on the Merits and Final, and Kerrigan's Collateral Attacks are Prohibited.*

As to prior judgements on the merits, Kerrigan does not dispute the prior judgments' finality or substance.  Indeed, this Court previously affirmed the Bankruptcy Court in holding that the District Court Action led to a final judgment on the merits.  *In re Kerrigan*, BAP No. WW-17-1271-KuTAB ("The court also correctly found that the district court's order dismissing Ms. Kerrigan's complaint was a final judgment on the merits.").

Instead, Kerrigan's only argument against claim preclusion appears to amount to a collateral attack on the prior judgments based, again, on lack of subject matter jurisdiction.[59]  But "a [final] judgment…may not be attacked for

---

[59] *See* Kerrigan Br. at 16 ("The order was never a decision on the merits because the retired, senior judge had no subject matter jurisdiction to adjudicate the merits of the case or controversy before him."); *Hoffman v. Pulido*, No. 1:18-CV-0209-AWI SKO (PC), 2018 U.S. Dist. LEXIS 42949 at *fn 2, 2018 WL 1335594 (E.D. Cal. March 15, 2018) ("Moore's Federal Practice describes a 'collateral attack' as follows: "While a direct attack on a judgment involves a motion or an independent action brought specifically for the purpose of seeking relief from the judgment, a collateral attack is an attack on the validity of a judgment made as part of an action seeking other relief."); *see also* 18 Moore's Federal Practice - Civil § 131.02 (2017).

lack of subject matter jurisdiction in a collateral proceeding." *Snell v. Cleveland*, 316 F.3d 822, 827 (9th Cir. 2002).[60] "Case law makes it clear that the presumption of jurisdiction over the subject matter and over the persons involved in the action, is an inherent characteristic of a [final] judgment." *Snell*, 316 F.3d at 827.

Thus, a presumption of subject-matter jurisdiction cloaks the District Court Action and the Adversary Action, which immunizes it from Kerrigan's attacks here. The presumption to honor the finality of judgments is so strong that *even if* Bayview somehow lacked standing to *defend itself* in federal court against federal claims, which is clearly not the case, then those standing arguments could *still* not be raised. *See Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 219-20 (3d Cir. 1999) ("The general rule is that where non-waivable subject matter jurisdiction is lacking but not raised, a final judgment has res judicata effect in a subsequent proceeding, and a collateral attack based on the want of subject

---

[60] *See also Adam v. Dobin (In re Adam)*, BAP No. CC-14-1416-Pakita, 2015 Bankr. LEXIS 1147 (B.A.P. 9th Cir. Apr. 6, 2015) ("It has long been established that final judgments are not subject to collateral attack."); *Sandpiper Vill. Condo. Ass'n v. La.-Pacific Corp.*, 428 F.3d 831, 841 n.13 (9th Cir. 2005) ("We reject Lester's implied collateral attack on subject matter jurisdiction over the class action itself."); *City of S. Pasadena v. Mineta*, 284 F.3d 1154, 1157 (9th Cir. 2002) ("Even objections to subject matter jurisdiction — which may be raised at any time, even on appeal — must be raised while the lawsuit is still pending; they may not be raised for the first time by way of collateral challenge in a subsequent action.").

matter jurisdiction is barred…").[61]  The final judgments on the merits stand regardless of Kerrigan's collateral attacks, thus satisfying claim preclusion's third and final element.

## B.  Issue Preclusion Also Bars Relitigation of Bayview's Interest in the Note.

Even if this Court were to somehow find that the jurisdictional/standing claim may be relitigated for the umpteenth time, Kerrigan is estopped from retrying the *issue* of Bayview's interest in the Note.  "[I]ssue preclusion bars successive litigation of an issue or fact of law actually litigated and resolved in a valid court determination essential to [a] prior judgment, even if the issue recurs in the context of a different claim."  *Int'l Bhd. of Teamsters v. United States DOT*, 861 F.3d 944, 955 (2017) (internal quotation marks omitted) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).  "Issue preclusion will be applied to federal court judgments where: (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom issue preclusion is asserted in the present action was a party or in

---

[61] The only exception is for "the *exceptional* case in which the court that rendered judgement lacked even an arguable basis for jurisdiction, which is not the case here.  *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010); *see also Jones v. Giles*, 741 F.2d 245, 248 (9th Cir. 1984) ("An error in interpreting a statutory grant of jurisdiction is not, however, equivalent to acting with total want of jurisdiction and does not render the judgment a complete nullity.").

privity with a party in the previous action." *Lopez v. Raicevic (In re Lopez)*, BAP

No. SC-15-1335-YJuf, 2017 Bankr. LEXIS 297 (B.A.P. 9th Cir. Feb. 1, 2017)

(citing *U.S. Internal Revenue Serv. v. Palmer (In re Palmer)*, 207 F.3d 566, 568

(9th Cir. 2000)).

Here, Kerrigan had a full and fair opportunity to litigate the issue of

Bayview's interest in Note in the District Court/Ninth Circuit Action.  This is

proven by the fact that she actually litigated it before the Ninth Circuit.[62]  Kerrigan

then lost those issues as a result of the Ninth Circuit's affirmance of the District

Court, where it explicitly disregarded Kerrigan's jurisdictional/standing claim as

---

[62] *See, e.g.*, Kerrigan's RJN at p. 22 (Kerrigan's Issue Statements before the Ninth Circuit Court of Appeals asking, "(1) ***Did the notice of removal sufficiently allege Bayview Servicing had a concrete and particularized interest in the loan*** documents to establish a case or controversy where the complaint and exhibits attached thereto contended otherwise?"…(4) Did the district court err as a matter of law by granting a 12(b)(6) dismissal against Kerrigan where she alleged and attached exhibits to her complaint (and then presented evidence pursuant to her motion to amend the judgment) ***that neither Bayview Servicing nor Qualstar Credit Union had any interest sufficient to allow them to foreclose on her property***?") (emphasis added).  Further, as the Bankruptcy Court ruled in dismissing the Adversary Action (and this Court affirmed), "[t]he District Court's dismissal with prejudice of the claims in the State Court complaint establishes that Bayview and Quality's notice of trustee's sale did not violate the FDCPA or the Washington CAA or CPA.  Inherent in the [District Court] judgement is the determination that Bayview and Quality's foreclosure was lawful."  APP. 241 (Dkt. No. 97 - Soldato Decl. Ex C, Tr. of Adversary Hearing 37:17-23).

-21-

meritless.[63]  Every element of issue preclusion as to Bayview's interest in the Note

is satisfied, and this issue is barred from relitigation.[64]

## C.    The Bankruptcy Court Correctly Overruled Kerrigan's Objections as Barred by the Confirmed Chapter 13 Plan.

An order confirming a Chapter 13 plan is a final order that 13 binds the

parties.  *In re Espinosa*, 130 S.Ct. 1367, 1376 (2010) ("The Bankruptcy Court's

order confirming Espinosa's proposed plan was a final judgment...").  Here, the

Bankruptcy Court correctly recognized that Kerrigan's plan provided a very

specific treatment for Bayview's claim that did not leave open the option of an

untimely claim objection.[65]  Section IV.C.I of the confirmed plan provided for

monthly payments to Bayview on its claim,[66] and Section XII of the confirmed

plan had a specific directive for the debtor to file an adversary proceeding against

Bayview and noted the result of that adversary proceeding may alter the amount of

Bayview's claim or the extent of its lien.[67]  Much like the final judgments discussed

---

[63] APP. 192-199 (Dkt. No. 97 - Soldato Decl. Ex. B (Order Granting Defendants' Motions to Dismiss)).

[64] Further, if this Court were to find otherwise, this would not only disrupt the prior District Court/Ninth Circuit, it would completely ignore the underlying factual admissions and finding on those issues.  APP. 192-199 (Dkt. No. 97 - Soldato Decl. Ex. B (Order Granting Defendants' Motions to Dismiss); APP. 201-203 (Dkt. No. 97 - Soldato Decl. Ex. C (Memorandum affirming District Court)).

[65] Dkt. No. 55 in Case No. 16-16219-TWD.

[66] APP. 63 (Dkt. No. 50 - Second Amended Plan) at p. 2.

[67] App. 66 (Dkt. No. 50 - Second Amended Plan) at p. 5.

above, the Confirmed Chapter 13 Plan bars Kerrigan from attempting to re-open and attack the creditor of the plan.

**D.  The Bankruptcy Court Correctly Overruled Kerrigan's Objection as Untimely.**

Further, Kerrigan's objection is untimely as a matter of law, and her own tactical delay to try to play the issue out in two other forums first is not good cause, especially when she fails to even submit any purported good cause.  An objection must be filed within 270 days.  Local Bankruptcy Rule 3007-1.  Kerrigan undisputedly objected at least 296 days too late, and she failed to provide any valid legal or factual justification for this unnecessary delay.  The Bankruptcy Court correctly rejected her objection as untimely.

**E.  Bayview has Standing to Assert a Creditor's Claim.**

Aside from the preclusive doctrines and Kerrigan's untimely objection, Bayview clearly has standing to assert a creditor's claim.  A federal court has jurisdiction over a litigant when that litigant meets constitutional and prudential standing requirements.  *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 906 (9th Cir. B.A.P. 2011); *see also Bank of New York Mellon v. Lane (In re Lane)*, 589 B.R. 399, 408 (9th Cir. B.A.P. 2018) (affirmatively discussing *In re Veal*).  "In the context of a claim objection, both the injury-in-fact requirement of constitutional standing and the real party in interest requirement of prudential standing hinge ***on who holds the right to payment under the Note and hence the***

-23-

*right to enforce the Note*.”  *In re Veal*, 450 B.R. at 920 (emphasis added).  Here, because Bayview has the right to enforce the Note, it meets both standing requirements.

Bayview has prudential standing because it was entitled to enforce the Note. *In re Veal*, 450 B.R. at 913.  “Washington law defines a “person entitled to enforce an instrument”…. as (i) *the holder of the instrument*, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to RCW 62A.3-309 or 62A.3-418(d).”  *Brown v. Dep't of Commerce*, 359 P.3d 771, 778, 184 Wn.2d 509, 524-25 (2015) (quoting RCW 62A.3-301) (emphasis added); *see also* RCW 61.24.005(2) (defining “beneficiary” of deed of trust as “the holder of the instrument or document evidencing the obligations secured by the deed of trust.”); RCW 62A.1-201(b)(21)(A) (“holder” of a note includes the person in possession of a note payable to bearer).  The holder of the note may have actual or constructive possession.  *See* RCW 62A.3-201 U.C.C. cmt. 1 (a holder may possess a note “directly or through an agent”); *Gleeson v. Lichty*, 114 P. 518, 519, 62 Wn. 656, 659 (1911) (“But, if we assume that the note was not in [the defendant's] actual possession, it was clearly under his control, and therefore constructively in his possession.”); *Barkley v. GreenPoint Mortg. Funding, Inc.*, 358 P.3d 1204, 1211, 190 Wn. App. 58, 69 (2015), *review denied*, 379 P.3d 953,

184 Wn.2d 1036 (2016) (bank was holder of the note through its agent).  This

constructive control may occur through an agent.  *Bain v. Metro. Mortg Group,*

*Inc.*, 285 P.3d 34, 45, 175 Wn.2d 83, 106 (2012).

    Attaching copies of the deed of trust, promissory note, and recorded

assignment to the creditor establish standing.  *See Bank of New York Mellon v.*

*Lane (In re Lane)*, 589 B.R. 399, 403, 410 (B.A.P. 9th Cir. 2018) ("BONY then

filed a $676,361.19 secured proof of claim…Attached to the Claim were copies of

the original deed of trust and promissory note in favor of the original lender,

Countrywide Home Loans, Inc., and a recorded assignment of the note and deed of

trust to BONY…The documents attached to the Claim established BONY's

standing.").[68]

    Here, numerous of courts have found that Bayview lawfully enforced the

Note, meaning that it had actual possession of the Note and was therefore its

"holder" or "person entitled to enforce" the Note and, consequently, the real party

---

[68] Though in *Lane*, BONY failed to respond to the debtor's objection based on
standing, and consequentially its claim was dismissed.  Thus, while the court
recognized BONY's standing, it affirmed the dismissal of the claim based on
BONY's own failure to act, which is not the case here.  *See Lane*, 589 B.R. at 411
("Thus, the first-position lien remains against the Property, notwithstanding the
final determination that BONY could not enforce it.  We realize this outcome puts
the parties in a bit of a quandary, albeit one of their own making.  The outcome
here is dictated by their conduct or lack thereof and the unique facts of the case,
including Lane's objection to a claim that included evidence of BONY's standing,
BONY's failure to defend its claim and the entry of a default order sustaining the
claim objection on these facts.").

in interest for purposes of filing a proof of claim.  *In re Veal*, 450 B.R. at 920.

Evidence revealing Bayview's holder status includes the "Notice of Foreclosure"

attached to the Notice of Trustee's sale, where the trustee identified Bayview as the

beneficiary and holder:

> The attached Notice of Trustee's Sale is a consequence of
> default(s) in the obligation to Federal Home Loan
> Mortgage Corporation ("Freddie Mac"), a corporation
> organized and existing under the laws of the United
> States of America., ***owner of the obligation secured by
> your Deed of Trust, which is currently held on behalf of
> the owner by Bayview Loan Servicing, LLC, the current
> Beneficiary***.  Unless the default(s) is/are cured, your
> property will be sold at auction on 8/26/2016.[69]

Bayview also submitted sworn testimony regarding its holder status,[70] and the

assignment of Washington Mutual's "beneficial interest" to Bayview has been

undisputedly established per Judicial Notice.  Bayview also established standing by

---

[69] Bayview RJN Ex 4 (Dkt. No. 1-4 in Case No. 2:16-cv-01528-JCC at p. 3
("Notice of Foreclosure")).

[70] *See* APP. 264 (Dkt. No. 98 - Haberlan Decl. ¶ 4) ("Based upon my review of the
records and files, Kerrigan's promissory note is currently in the possession of
Bayview's note custodian, Lakeview Loan Servicing, LLC.  Bayview Loan
Servicing, LLC is the holder/beneficiary of the original Promissory Note dated
February 13, 2008, in the principal amount of $417,000.00, which is secured by a
Deed of Trust encumbering the Property.  I am informed that the Note has not been
subsequently assigned or transferred to any other person or entity since assignment
and transfer to Bayview Loan Servicing.").

attaching copies of the Deed, Note, and Assignment to Bayview to its proof of claim.[71]

Indeed, Kerrigan does not dispute that she executed the Note and Deed in connection with a home mortgage loan, or that she still owes an amount on that loan, or that clearly *some* entity holds a secured claim in the bankruptcy case on account of that loan.  Neither does she dispute that no other entity has filed a proof of claim in the Second Bankruptcy Action, or that she has not provided notice of her bankruptcy to any other lender.  And finally, she cannot dispute that she herself *agreed to pay Bayview* in the Confirmed Plan, with full knowledge of the current "dispute" as she was litigating it in parallel with her confirmation of plan.  Thus, while conceding the existence and right of a creditor, she failed to identify who other than Bayview would be entitled to collect, and indeed, all her actions belie her acknowledgement that Bayview is entitled to file the creditor's claim.

For the same reasons that Bayview has prudential standing, it also satisfies the "relatively minimum" requirements of constitutional standing, in that is entitled to enforce the note but cannot proceed given the bankruptcy stay.  *In re Veal*, 450 B.R. at 906.  Thus, based upon the transmission of the Note by Bayview Loan Servicing, the assignment of the Note and DOT, and the testimony provided that

---

[71] *See* APP. 118-151 (Dkt. No. 92-12- Paatalo Decl. Ex. 12)

Bayview has possession, numerous courts have correctly found that the Note, as submitted in the proof of claim, is properly submitted and Bayview has standing.

## VI.    CONCLUSION

Kerrigan's repeated attempts to re-litigate her standing claim fail as a matter of law.  The Bankruptcy Court correctly overruled Kerrigan's objection to Bayview's proof of claim based on claim preclusion and untimeliness, and Kerrigan has presented no legal, factual, or equitable reason to question that ruling. This Court should affirm the Bankruptcy Court.

Respectfully submitted,

KLINEDINST PC

Dated: May 3, 2019          By: *s/ Gregor A. Hensrude*
                                      Gregor A. Hensrude, WSBA No. 45918
                                      Stephanie D. Olson, WSBA No. 50100
                                      Attorneys for Appellees

-28-

## <u>CERTIFICATION AS TO INTERESTED PARTIES</u><br><u>REQUIRED BY BAP RULE 8015(a)-1(a)</u>

BAP DOCKET NO. WW-18-1341<br>
Bankruptcy Case No. 16-16219-TWD<br>
[CHAPTER 13]

### In re KIM C. KERRIGAN

The undersigned certifies that the following parties have an interest in the outcome of this appeal. These representations are made to enable judges of the Panel to evaluate possible disqualification or recusal:

Bayview Loan Servicing, LLC's parent company is Bayview Asset Management, LLC.

There are no other parties with an interest in this appeal other than those set forth in the caption. Federal Home Loan Mortgage Corporation is a private corporation founded by federal law.

KLINEDINST PC

Dated: May 3, 2019          By: *s/ Gregor A. Hensrude*
                            Gregor A. Hensrude, WSBA No. 45918
                            Stephanie D. Olson, WSBA No. 50100
                            Attorneys for Appellees

## CERTIFICATION OF RELATED CASES
## REQUIRED BY BAP RULE 8015(a)-1(b)

BAP DOCKET NO. WW-18-1341
Bankruptcy Case No. 16-16219-TWD
[CHAPTER 13]

### In re KIM C. KERRIGAN

The undersigned certifies that the following are known related cases and appeals:

- *Kerrigan v. Qualstar Credit Union*, No. C16-01528-JCC, 2016 U.S. Dist. LEXIS 168597, 2016 WL 7103750 (W.D. Wash. Dec. 6, 2016), *post-judgment relief denied*, 2017 U.S. Dist. LEXIS 11872 (W.D. Wash. Jan. 27, 2017)

- *Kerrigan v. Qualstar Credit Union*, 728 F. App'x 787 (9th Cir. 2018), *rehearing denied*, 2018 U.S. App. LEXIS 28176 (9th Cir. 2018 Oct. 4, 2018), *petition for certiorari denied*, 2019 U.S. LEXIS 3124, __ S.Ct. __, 2019 WL 955416 (Apr. 29, 2019).

- *In re Kerrigan*, Bankr. Case No. 16-14638-TWD

- *Kerrigan v. Bayview Loan Servicing, LLC (In re Kerrigan)*, BAP No. WW-17-1271-KuTaB, 2018 Bankr. LEXIS 3607 (B.A.P. 9th Cir. Nov. 7, 2018)

KLINEDINST PC

Dated: May 3, 2019          By: *s/ Gregor A. Hensrude* _____
                                 Gregor A. Hensrude, WSBA No. 45918
                                 Stephanie D. Olson, WSBA No. 50100
                                 Attorneys for Appellees

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to USCS Bankruptcy R 8014 and 8015(a)(7), this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) and USCS Bankruptcy R 8015(a)(7) because this brief contains 28 pages and 7,462 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, font size 14 point, Times New Roman type style.

KLINEDINST PC

Dated: May 3, 2019          By: *s/ Gregor A. Hensrude*
                                 Gregor A. Hensrude, WSBA No. 45918
                                 Stephanie D. Olson, WSBA No. 50100
                                 Attorneys for Appellees

## <u>CERTIFICATE OF SERVICE</u>

I, Sharon K. Hendricks, certify that on May 3, 2019, I filed the foregoing

Answering Brief of Appellee's with the Clerk of the Court for the United States

Bankruptcy Appellate Panel of the Ninth Circuit by using the appellate CM/ECF

system.

*s/ Sharon K. Hendricks*
Sharon K. Hendricks, Legal Assistant

17588480v3

## APPENDIX REQUIRED BY BAP RULE 8018(b)-1

BAP DOCKET NO. WW-18-1341
Bankruptcy Case No. 16-16219-TWD
[CHAPTER 13]

In re KIM C. KERRIGAN

Pursuant to 9th Cir. BAP R. 8018(b)-1, Bayview submits the following

excerpts of the records, attached in accordance to the following table of contents:

| Bankr. Dkt. No. | Filing Date | Document Description | Page No. |
|---|---|---|---|
| 1 | 12/15/2016 | Voluntary Petition for Individuals Filing for Bankruptcy | APP 1-10 |
| 27 | 04/14/2017 | Original Chapter 13 Plan | APP 11-15 |
| 44 | 05/12/2017 | Complaint for Recission of Loan and Avoidance of Lien as to the Bankruptcy Estate (Adversary Complaint) | APP 16-23 |
| 44-1 | 05/12/2017 | Adversary Complaint, Exhibits A-H | APP 24-61 |
| 50 | 05/19/2017 | Second Amended Chapter 13 Plan | APP 62-66 |
| 68 | 11/15/2017 | Ex Parte Application For Rule 2004 Examination And Production of Documents | APP 67-69 |
| 70 | 11/20/2017 | Ex Parte Order Authorizing 2004 Examination of Bayview Loan Servicing, LLC, M&T Bank, and Federal Home Loan Mortgage Corporation | APP 70-71 |
| 90 | 10/24/2018 | Amended Objection To Proof of Claim Number 1 | APP 72-77 |
| 92 | 10/31/2018 | Declaration of William J. Paatalo | APP 78-91 |
| 92-5 | 10/31/2018 | Declaration of William J. Paatalo, Exhibit 5 (Deed of Trust) | APP 92-109 |
| 92-6 | 10/31/2018 | Declaration of William J. Paatalo, Exhibit 6 (Assignment of Deed of Trust) | APP 110-113 |

| 92-7 | 10/31/2018 | Declaration of William J. Paatalo, Exhibit 7 (Note) | APP 114-117 |
|---|---|---|---|
| 92-12 | 10/31/2018 | Declaration of William J. Paatalo, Exhibit 12 (Bayview's Proof of Claim) | APP 118-151 |
| 94 | 11/19/2018 | Trustee's Response to Debtor's Objection to Proof of Claim | APP 152-153 |
| 96 | 11/28/2018 | Response of Bayview Loan Servicing, LLC's to Proof of Claim | APP 154-167 |
| 97 | 11/28/2018 | Declaration of Anthony C. Soldato In Support of Bayview Loan Servicing's Response In Opposition To Debtor's Objection To Claim | APP 168-262 |
| 98 | 11/28/2018 | Declaration of Lauren Haberlan In Support Of Bayview Loan Servicing's Response In Opposition To Debtor's Objection to Claim | APP 263-352 |
| 99 | 12/07/2018 | Order Overruling Debtor's Objection to Claim #1 | APP 353 |
| 100 | 12/07/2018 | Notice of Trustee's Motion To Dismiss Case and Hearing | APP 354-356 |
| 107 | 12/20/2018 | Notice of Appeal and Statement of Election | APP 357-358 |
| 107-1 | 12/20/2018 | Exhibit: Order Overruling Debtor's Objection to Claim 1 | APP 359 |
| 113 | 02/08/2019 | Order Dismissing Case | APP 360 |
| 114 | 02/08/2019 | Notice of Dismissal | APP 361 |
| 116 | 02/15/2019 | Appellant's Designation of Record And Statemnt of Issues on Appeal | APP 362-370 |
| 118 | 03/01/2019 | Supplemental Designation of Record | APP 371-373 |
| 119 | 03/01/2019 | Certificate of Transcript Order Notice | APP 374-378 |
| 119-1 | 03/01/2019 | Certificate of Transcript Order Notice Ex. 1 | APP 379-380 |

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

Western District of Washington

Case number (*if known*): 16 - 16215    Chapter you are filing under:
- ☐ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☑ Chapter 13

FILED

2016 DEC 15 PM 1:49

M. L. HATCHER, CLK
U.S. BANKRUPTCY COURT
W.D. OF WA. AT ...
BY _____ DEP. CLK.

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy    12/15

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be yes if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:    Identify Yourself

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **1. Your full name**<br><br>Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br><br>Bring your picture identification to your meeting with the trustee. | Kim<br>First name<br>C.<br>Middle name<br>Kerrigan<br>Last name<br><br>Suffix (Sr., Jr., II, III) | First name<br><br>Middle name<br><br>Last name<br><br>Suffix (Sr., Jr., II, III) |
| **2. All other names you have used in the last 8 years**<br><br>Include your married or maiden names. | First name<br><br>Middle name<br><br>Last name<br><br>First name<br><br>Middle name<br><br>Last name | First name<br><br>Middle name<br><br>Last name<br><br>First name<br><br>Middle name<br><br>Last name |
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx – xx – 8 6 6 3<br>OR<br>9 xx – xx – ___ ___ ___ | xxx – xx – ___ ___ ___ ___<br>OR<br>9 xx – xx – ___ ___ ___ |

APP 000002

Debtor 1    **Kim C. Kerrigan** _____

First Name    Middle Name    Last Name

Case number (if known)_____

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years** | ☐ I have not used any business names or EINs. | ☐ I have not used any business names or EINs. |

**4. Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**

Include trade names and *doing business as* names

About Debtor 1:

☐ I have not used any business names or EINs.

Inner Resources
_____
Business name

_____
Business name

EIN __ __ – __ __ __ __ __ __ __

EIN __ __ – __ __ __ __ __ __ __

About Debtor 2 (Spouse Only in a Joint Case):

☐ I have not used any business names or EINs.

_____
Business name

_____
Business name

EIN __ __ – __ __ __ __ __ __ __

EIN __ __ – __ __ __ __ __ __ __

**5. Where you live**

8011 9th Ave NW
_____
Number    Street

_____

Seattle                    WA    98117
_____
City                      State    ZIP Code

King
_____
County

**If your mailing address is different from the one above, fill it in here. Note that the court will send any notices to you at this mailing address.**

_____
Number    Street

_____
P.O. Box

_____
City                      State    ZIP Code

If Debtor 2 lives at a different address:

_____
Number    Street

_____

_____
City                      State    ZIP Code

_____
County

**If Debtor 2's mailing address is different from yours, fill it in here. Note that the court will send any notices to this mailing address.**

_____
Number    Street

_____
P.O. Box

_____
City                      State    ZIP Code

**6. Why you are choosing this district to file for bankruptcy**

*Check one:*

☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason. Explain.
(See 28 U.S.C. § 1408.)

_____
_____
_____
_____

*Check one:*

☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.

☐ I have another reason. Explain.
(See 28 U.S.C. § 1408.)

_____
_____
_____
_____

Debtor 1 <u>Kim C. Kerrigan</u>

First Name  Middle Name  Last Name

Case number (if known)_____

---

## Part 2: Tell the Court About Your Bankruptcy Case

**7. The chapter of the Bankruptcy Code you are choosing to file under**

*Check one. (For a brief description of each, see Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)). Also, go to the top of page 1 and check the appropriate box.*

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

☑ Chapter 13

---

**8. How you will pay the fee**

☑ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

---

**9. Have you filed for bankruptcy within the last 8 years?**

☑ No

☐ Yes. District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

---

**10. Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☑ No

☐ Yes. Debtor _____ Relationship to you _____

District _____ When _____ Case number, if known _____
MM / DD / YYYY

Debtor _____ Relationship to you _____

District _____ When _____ Case number, if known _____
MM / DD / YYYY

---

**11. Do you rent your residence?**

☑ No. Go to line 12.

☐ Yes. Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?

☐ No. Go to line 12.

☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

---

Debtor 1 __Kim C. Kerrigan_____     Case number (if known)_____
        First Name    Middle Name    Last Name

---

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☐ No. Go to Part 4.

☑ Yes. Name and location of business

__Inner Resources_____
Name of business, if any

__8011 9th Ave NW_____
Number     Street

__Seattle_____ __WA__ __98117_____
City                          State   ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☑ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines. If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).*

☑ No. I am not filing under Chapter 11.

☐ No. I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes. I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

---

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No

☐ Yes.   What is the hazard? _____

_____

If immediate attention is needed, why is it needed? _____

_____

Where is the property? _____
                      Number     Street

_____

_____ _____ _____
City                        State   ZIP Code

---

Official Form 101     Voluntary Petition for Individuals Filing for Bankruptcy     page 4

| Debtor 1 | Kim C. Kerrigan | | | Case number (if known) | |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

## Part 5: Explain Your Efforts to Receive a Briefing About Credit Counseling

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☑ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ I am not required to receive a briefing about credit counseling because of:

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1   __Kim C. Kerrigan_____  Case number *(if known)*_____

     First Name     Middle Name       Last Name

---

**Part 6:**    **Answer These Questions for Reporting Purposes**

**16. What kind of debts do you have?**

**16a. Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.
☑ Yes. Go to line 17.

**16b. Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.
☐ Yes. Go to line 17.

**16c.** State the type of debts you owe that are not consumer debts or business debts.

_____

---

**17. Are you filing under Chapter 7?**

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☑ No.   I am not filing under Chapter 7. Go to line 18.

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

     ☐ No
     ☐ Yes

---

**18. How many creditors do you estimate that you owe?**

| | | |
|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

---

**19. How much do you estimate your assets to be worth?**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☑ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

**20. How much do you estimate your liabilities to be?**

| | | |
|---|---|---|
| ☑ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

**Part 7:**    **Sign Below**

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✖ Kim C. Kerrigan   *Kim C. Kerrigan* ✖      ✖ _____
   Signature of Debtor 1    12/15/2016        Signature of Debtor 2

Executed on __12/15/2016__          Executed on _____
      MM / DD / YYYY               MM / DD / YYYY

---

Debtor 1 __Kim C. Kerrigan_____     Case number (if known)_____
First Name    Middle Name    Last Name

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible. I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

✖ __Scott Stafne_____     Date    __12/15/2016_____
Signature of Attorney for Debtor                                  MM   /   DD  /YYYY

__Scott Stafne_____
Printed name

__Stafne Law Firm_____
Firm name

__239 North Olympic Avenue_____
Number    Street

_____

__Arlington_____  __WA__  __98233_____
City                                          State      ZIP Code

Contact phone  __(360) 403-8700_____     Email address Scott@StafneLawFirm.com

_____  __WA__
Bar number                                    State

Official Form 101                **Voluntary Petition for Individuals Filing for Bankruptcy**                page 7

Debtor 1 __Kim C. Kerrigan__     Case number (if known)_____
First Name    Middle Name    Last Name

| For you if you are filing this bankruptcy without an attorney | The law allows you, as an individual, to represent yourself in bankruptcy court, but **you should understand that many people find it extremely difficult to represent themselves successfully. Because bankruptcy has long-term financial and legal consequences, you are strongly urged to hire a qualified attorney.** |
|---|---|

**If you are represented by an attorney, you do not need to file this page.**

To be successful, you must correctly file and handle your bankruptcy case. The rules are very technical, and a mistake or inaction may affect your rights. For example, your case may be dismissed because you did not file a required document, pay a fee on time, attend a meeting or hearing, or cooperate with the court, case trustee, U.S. trustee, bankruptcy administrator, or audit firm if your case is selected for audit. If that happens, you could lose your right to file another case, or you may lose protections, including the benefit of the automatic stay.

You must list all your property and debts in the schedules that you are required to file with the court. Even if you plan to pay a particular debt outside of your bankruptcy, you must list that debt in your schedules. If you do not list a debt, the debt may not be discharged. If you do not list property or properly claim it as exempt, you may not be able to keep the property. The judge can also deny you a discharge of all your debts if you do something dishonest in your bankruptcy case, such as destroying or hiding property, falsifying records, or lying. Individual bankruptcy cases are randomly audited to determine if debtors have been accurate, truthful, and complete. **Bankruptcy fraud is a serious crime; you could be fined and imprisoned.**

If you decide to file without an attorney, the court expects you to follow the rules as if you had hired an attorney. The court will not treat you differently because you are filing for yourself. To be successful, you must be familiar with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules of the court in which your case is filed. You must also be familiar with any state exemption laws that apply.

Are you aware that filing for bankruptcy is a serious action with long-term financial and legal consequences?

☐ No
☑ Yes

Are you aware that bankruptcy fraud is a serious crime and that if your bankruptcy forms are inaccurate or incomplete, you could be fined or imprisoned?

☐ No
☑ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?

☑ No
☐ Yes. Name of Person_____.
    Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

By signing here, I acknowledge that I understand the risks involved in filing without an attorney. I have read and understood this notice, and I am aware that filing a bankruptcy case without an attorney may cause me to lose my rights or property if I do not properly handle the case.

✖ Kim C. Kerrigan  *Kim C. Kerrigan*  ✖ _____
    Signature of Debtor 1    12/15/2016    Signature of Debtor 2

Date __12/15/2016__    Date _____
    MM / DD / YYYY    MM / DD / YYYY

Contact phone **(206) 525-9119**    Contact phone _____

Cell phone _____    Cell phone _____

Email address __KimKerrigan@comcast.net__    Email address _____

16-16219

*DECEMBER 15, 2016*

*KIM C. KERRIGAN*

*8011 9TH AVE NW – SEATTLE, WA. 98117*

*206-525-9119*

*kimkerrigan@comcast.net*

RECEIVED

2016 DEC 15  PM 2: 18

U.S. BANKRUPTCY COURT
AT SEATTLE
BY_____DEP. CLK

*KIM C. KERRIGAN LIST OF CREDITORS*

*1)  KERRIGAN CREDITORS = NONE*

*2) KERRIGAN "PURPORTED CREDITORS"= ONLY ONE:*
   *WAMU/CHASE/BAYVIEW LLC*
   *3000 DESCHUTES WAY SW*
   *TUMWATER, WA. 98501*

*THANK YOU,*

*Kim C. Kerrigan*     *12/15/2016*

*SINCERELY, KIM C. KERRIGAN*

*12/15/2016*


RECEIVED
2016 DEC 15 PM 1:49
U.S. BANKRUPTCY COURT
W.D. OF WA AT SEATTLE
BY_____DEP. CLK

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| In re:<br><br>KIM C. KERRIGAN,<br><br>                                Debtor. | Case No. 16-16219<br><br>CHAPTER 13 PLAN<br><br>_x_Original  __Amended<br><br>Date: ___April 14, 2017_____ |

**I.  Means Test Result:**
Debtor is (check one):
___X__ a below median income debtor with a 36 month applicable commitment period
_____ an above median income debtor with a 60 month applicable commitment period

**II.  Plan Payments:**
No later than 30 days after the filing of the plan or the order for relief, whichever date is earlier, the debtor
will commence making payments to the Trustee as follows:
    A.  AMOUNT: $ _3,500_____
    B.  FREQUENCY (check one):
    _X_Monthly
    ___Twice per month
    ___Every two weeks
    ___Weekly
    C.  TAX REFUNDS: Debtor (check one): ___COMMITS; _X_DOES NOT COMMIT; all tax refunds
        to funding the plan. Committed refunds shall be paid in addition to the plan payment stated above. If
        no selection is made, tax refunds are committed.
    D.  PAYMENTS: Plan payments shall be deducted from the debtor's wages unless otherwise agreed to
        by the Trustee or ordered by the Court.
    E.  OTHER: Tax returns, to the extent that they exceed $2,500, shall be committed to the plan.

**III.  Plan Duration:**
The plan's length shall not be less than the debtor's applicable commitment period as defined under 11
U.S.C. §§ 1322(d) and 1325(b)(4) unless the plan either provides for payment in full of allowed unsecured
claims over a shorter period or is modified post-confirmation.  A below median debtor's plan length shall
automatically be extended up to 60 months after the first payment is due if necessary to complete the plan.

**IV.  Distribution of Plan Payments:**
Upon confirmation, the Trustee shall disburse funds received in the following order and creditors shall apply
them accordingly, PROVIDED THAT disbursements for domestic support obligations and federal taxes shall
be applied according to applicable non-bankruptcy law:
    A.  ADMINISTRATIVE EXPENSES:
        1.  Trustee. The percentage set pursuant to 28 USC §586(e).
        2.  Other administrative expenses. As allowed pursuant to 11 USC §§ 507(a)(2) or 707(b).
        3.  Attorney's Fees: Pre-confirmation attorney fees and/or costs and expenses are estimated to be
        $3,500.  $1,000 was paid.  To the extent pre-confirmation fees and/or costs and expenses exceed
        $3,500, an appropriate application, including a complete breakdown of time and costs, shall be filed
        with the Court within 21 days after confirmation.
        Approved attorney compensation shall be paid as follows (check one):
        a. ____ Prior to all creditors;
        b. ____ Monthly payments of $_____;
        c _X_ All remaining funds available after designated monthly payments to the following
        creditors: monthly contractual payments to residential first deed of trust holder (Bayview Loan
        Servicing LLC).
        d. ____ Other: _____.
        If no selection is made, fees will be paid after monthly payments specified in Sections IV.B and
        IV.C.

[Local Bankruptcy Form 13-4, eff. 12/16]

B.   CURRENT DOMESTIC SUPPORT OBLIGATION: Payments to creditors whose claims are filed and allowed pursuant to 11 USC § 502(a) or court order as follows (if left blank, no payments shall be made by the Trustee):

| Creditor | Monthly amount |
|---|---|
| _____ | $_____ |
| _____ | $_____ |

C.    SECURED CLAIMS: Payments will be made to creditors whose claims are filed and allowed pursuant to 11 USC § 502(a) or court order, as stated below.  Unless ranked otherwise, payments to creditors will be disbursed at the same level.  Secured creditors shall retain their liens until the payment of the underlying debt, determined under nonbankruptcy law, or discharge under 11 USC § 1328, as appropriate.  Secured creditors, other than creditors holding long term obligations secured only by a security interest in real property that is the debtor's principal residence, will be paid the principal amount of their claim or the value of their collateral, whichever is less, plus per annum uncompounded interest on that amount from the petition filing date.

Interest rate and monthly payment in the plan control unless a creditor timely files an objection to confirmation. If a creditor timely files a proof of claim for an interest rate lower than that proposed in the plan, the claim shall be paid at the lower rate.  Value of collateral stated in the proof of claim controls unless otherwise ordered following timely objection to claim. The unsecured portion of any claim shall be paid as a nonpriority unsecured claim unless entitled to priority by law.

**Only creditors holding allowed secured claims specified below will receive payment from the Trustee.**  If the interest rate is left blank, the applicable interest rate shall be 12%.  If overall plan payments are sufficient, the Trustee may increase or decrease post-petition installments for ongoing mortgage payments, homeowner's dues and/or real property tax holding accounts based on changes in interest rates, escrow amounts, dues and/or property taxes.

1.   Continuing Payments on Claims Secured Only by Security Interest in Debtor's Principal Residence and Non-Escrowed Postpetition Property Tax Holding Account (Interest included in payments at contract rate, if applicable):

| Rank | Creditor | Nature of Debt | Property | Monthly Payment |
|---|---|---|---|---|
| 1 | Bayview | 1st Deed of Trust | Residence | $ 3,055.26 |
| \_\_\_\_ | _____ | _____ | _____ | $_____ |
| \_\_\_\_ | _____ | _____ | _____ | $_____ |

2.   Continuing Payments and Non-Escrowed Postpetition Property Tax Holding Account on Claims Secured by Other Real Property (Per annum interest as set forth below):

| Rank | Creditor | Nature of Debt | Property | Monthly Payment | Interest Rate |
|---|---|---|---|---|---|
| \_\_\_\_ | _____ | _____ | _____ | _____ | \_\_\_% |
| \_\_\_\_ | _____ | _____ | _____ | _____ | \_\_\_% |
| \_\_\_\_ | _____ | _____ | _____ | _____ | \_\_\_% |
| \_\_\_\_ | _____ | _____ | _____ | _____ | \_\_\_% |

3.   Cure Payments on Mortgage/Deed of Trust/Property Tax/Homeowner's Dues Arrearage:

| Rank | Periodic Payment | Creditor | Property | Arrears to be Cured | Interest Rate |
|---|---|---|---|---|---|
| \_\_\_\_ | $_____ | _____ | _____ | $_____ | \_\_\_% |
| \_\_\_\_ | $_____ | _____ | _____ | $_____ | \_\_\_% |
| \_\_\_\_ | $_____ | _____ | _____ | $_____ | \_\_\_% |
| \_\_\_\_ | $_____ | _____ | _____ | $_____ | \_\_\_% |

[Local Bankruptcy Form 13-4, eff. 12/16]

4.  <u>Payments on Claims Secured by Personal Property</u>:

a.  <u>910 Collateral</u>.

The Trustee shall pay the contract balance as stated in the allowed proof of claim for a purchase-money security interest in any motor vehicle acquired for the personal use of the debtor(s) **within 910 days** preceding the filing date of the petition or in other personal property acquired within **one year** preceding the filing date of the petition as follows.  Debtor stipulates that pre-confirmation adequate protection payments shall be paid by the Trustee as specified upon the creditor filing a proof of claim.  If no amount is specified, the Trustee shall pay the amount stated as the "Equal Periodic Payment".

| Rank | Equal Periodic Payment | Creditor | Description of Collateral | Pre-Confirmation Adequate Protection Payment | Interest Rate |
|------|------------------------|----------|---------------------------|----------------------------------------------|---------------|
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |

b.  <u>Non-910 Collateral</u>.

The Trustee shall pay the value of collateral stated in the proof of claim, unless otherwise ordered following timely objection to the claim, for a purchase-money security interest in personal property which is non-910 collateral.  Debtor stipulates that pre-confirmation adequate protection payments shall be paid by the Trustee as specified upon the creditor filing a proof of claim.  If no amount is specified, the Trustee shall pay the amount stated as the "Equal Periodic Payment".

| Rank | Equal Periodic Payment | Creditor | Debtor(s) Value of Collateral | Description of Collateral | Pre-Confirmation Adeq. Protection Payment | Interest Rate |
|------|------------------------|----------|-------------------------------|---------------------------|-------------------------------------------|---------------|
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |

D.  PRIORITY CLAIMS: Payment in full, on a pro rata basis, of filed and allowed claims entitled to priority in the order stated in 11 USC § 507(a).

E.  NONPRIORITY UNSECURED CLAIMS: From the balance remaining after the above payments, the Trustee shall pay filed and allowed nonpriority unsecured claims as follows:

1.  Specially Classified Nonpriority Unsecured Claims. The Trustee shall pay the following claims prior to other nonpriority unsecured claims as follows:

| Rank | Creditor | Amount of Claim | Percentage To be Paid | Reason for Special Classification |
|------|----------|-----------------|-----------------------|-----------------------------------|
| ____ | _____ | $_____ | _____% | _____ |
| ____ | _____ | $_____ | _____% | _____ |

2.  Other Nonpriority Unsecured Claims (check one):
    a.  ____ 100% paid to allowed nonpriority unsecured claims. **OR**
    b.  __X__ Debtor shall pay at least $ _0_____ to allowed nonpriority unsecured claims over the term of the plan. Debtor estimates that such creditors will receive approximately ___0__ % of their allowed claims.

[Local Bankruptcy Form 13-4, eff. 12/16]

**V.** **Secured Property Surrendered**:
The secured property described below will be surrendered to the following named creditors on confirmation. Upon confirmation, all creditors (including successors and assigns) to which the debtor is surrendering property pursuant to this section are granted relief from the automatic stay to enforce their security interest against the property including taking possession and sale.

<u>**Creditor**</u>                                   <u>**Property to be Surrendered**</u>

**VI**. **Executory Contracts and Leases**:
The debtor will assume or reject executory nonresidential contracts or unexpired leases as noted below. Assumption will be by separate motion and order, and any cure and/or continuing payments will be paid directly by the debtor under Section VII, unless otherwise specified in Section XII with language designating that payments will be made by the Trustee, the amount and frequency of the payments, the ranking level for such payments with regard to other creditors, the length of the term for continuing payments and the interest rate, if any, for cure payments. Any executory contract or unexpired lease not assumed pursuant to 11 USC § 365(d) is rejected. If rejected, the debtor shall surrender any collateral or leased property and any duly filed and allowed unsecured claim for damages shall be paid under Section IV.E.2.

<u>**Contract/Lease**</u>                               <u>**Assumed or Rejected**</u>
Mazda Capital Services **-** 2014 Mazda CX-5               Assume

**VII.** **Payments to be made by Debtor and not by the Trustee:**
The following claims shall be paid directly by the debtor according to the terms of the contract or support or withholding order, and shall receive no payments from the Trustee. (Payment stated shall not bind any party.)

A. DOMESTIC SUPPORT OBLIGATIONS: The claims of the following creditors owed domestic support obligations shall be paid directly by the debtor as follows:

| <u>Creditor</u> | <u>Current Monthly Support Obligation</u> | <u>Monthly Arrearage Payment</u> |
|---|---|---|
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |

B. OTHER DIRECT PAYMENTS:

| <u>Creditor</u> | <u>Nature of Debt</u> | <u>Amount of Claim</u> | <u>Monthly Payment</u> |
|---|---|---|---|
| Mazda Capital Services | Auto lease_____ | $___N/A_____ | $_____250_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |

**VIII.** **Property of the Estate**
Property of the estate is defined in 11 USC § 1306(a). Unless otherwise ordered by the Court, property of the estate in possession of the debtor on the petition date shall vest in the debtor upon confirmation. However, the debtor shall not lease, sell, encumber, transfer or otherwise dispose of any interest in real property or personal property without the Court's prior approval, except that the debtor may dispose of unencumbered personal property with a value of $10,000.00 or less without the Court's approval. Property (including, but not limited to, bonuses, inheritances, tax refunds or any claim) acquired by the debtor post-petition shall vest in the Trustee and be property of the estate. The debtor shall promptly notify the Trustee if the debtor becomes entitled to receive a distribution of money or other property (including, but not limited to, bonuses, inheritances, tax refunds or any claim) whose value exceeds $2,500.00, unless the plan elsewhere specifically provides for the debtor to retain the money or property.

**IX.** **Liquidation Analysis Pursuant to 11 USC § 1325(a)(4)**
The liquidation value of the estate is $ 82,854 . In order to obtain a discharge, the debtor must pay the liquidation value or the total of allowed priority and nonpriority unsecured claims, whichever is less. Under 11 USC §§ 1325(a)(4) and 726(a)(5), interest on allowed unsecured claims under Section IV.D and IV.E shall be paid at the rate of __0____% per annum from the petition filing date (no interest shall be paid if left blank).

[Local Bankruptcy Form 13-4, eff. 12/16]

**X.  Other Plan Provisions:**

A.  No funds shall be paid to nonpriority unsecured creditors until all secured, administrative and priority unsecured creditors are paid in full, provided that no claim shall be paid before it is due.

B.   Secured creditors shall not assess any late charges, provided payments from the plan to the secured creditor are current, subject to the creditor's rights under state law if the case is dismissed.

C.  The holder of a secured claim shall file and serve on the Trustee, debtor and debtor's counsel  a notice itemizing all fees, expenses or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed , and (2) that the holder asserts are recoverable against the debtor or the debtor's principal residence.  The notice shall be served within 180 days after the date on which the fees, expenses or charges are incurred, per Fed. R. Bankr. P. 3002.1(c).

D.  Mortgage creditors shall file and serve on the Trustee, debtor and debtor's counsel a notice of any change in the regular monthly payment amount, including any change that results from an interest rate or escrow adjustment, no later than 21 days before a payment in the new amount is due, per Fed. R. Bankr. P. 3002.1(b).

E.   Provision by secured creditors or their agents or attorneys of any of the notices, statements or other information provided in this section shall not be a violation of the 11 USC § 362 automatic stay or of privacy laws.

**XI.  Certification:**

A.   The debtor certifies that all post-petition Domestic Support Obligations have been paid in full on the date of this plan and will be paid in full at the time of the confirmation hearing. Debtor acknowledges that timely payment of such post-petition Domestic Support Obligations is a condition of plan confirmation pursuant to 11 USC § 1325(a)(8).

B.   By signing this plan, the debtor and counsel representing the debtor certify that this plan does not alter the provisions of Local Bankruptcy Form 13-4, except as provided in Section XII below. Any revisions to the form plan not set forth in Section XII shall not be effective.

**XII.  Additional Case-Specific Provisions:** (must be separately numbered)

1. Debtor will seek a loan modification and/or refinance on her first mortgage within no later than 180 days following confirmation. If no modification or refinance is finalized by that date, then the stay imposed by the plan would be waived as to the first deed of trust holder, and Debtor would list and seek to sell her property for sale.

2.  Debtor will file an adversary action to determine what amount, if any, is owed on the second position deed of trust of Qualstar Credit Union on the residence.

| | | | |
|---|---|---|---|
| _/s/ Jeffrey B. Wells_ | /s/ Kim C. Kerrigan | 8663 | 4/5/2017 |
| Attorney for Debtor(s) | DEBTOR | Last 4 digits SS# | Date |
| 4-5-2017 | | | |
| Date | DEBTOR | Last 4 digits SS# | Date |

[Local Bankruptcy Form 13-4, eff. 12/16]

The Honorable Timothy W. Dore
Chapter 13

1

2

3

4

5

6

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7   In re:

8   KIM C. KERRIGAN,

9          Debtor.

10

11  KIM C. KERRIGAN,

12          Plaintiff,

13     v.

14  BAYVIEW LOAN SERVICING, LLC, M&T
    BANK, and FEDERAL HOME LOAN
15  MORTGAGE CORPORATION,

16          Defendants.

17

Bankruptcy No. 16-16219
Chapter 13

Adversary No.

**COMPLAINT FOR RECISSION OF
LOAN AND AVOIDANCE OF LIEN AS
TO THE BANKRUPTCY ESTATE**

18       COMES NOW Plaintiff/Debtor Kim C. Kerrigan, by and through her attorneys of

19  record, Wells and Jarvis, P.S., and for her complaint against the Defendants, alleges as follows:

20                                    <u>**PARTIES**</u>

21       1.       Plaintiff Kim C. Kerrigan is the Debtor in the above-referenced bankruptcy case

22  and the owner of real property commonly known as 8011 9th Avenue NW, Seattle, WA 98117.

23       2.       Defendant Bayview Loan Servicing ("Bayview") filed a proof of claim on behalf

24  of itself and/or Defendant M&T Bank in the above-referenced bankruptcy case, asserting a

25

26

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 1

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

1

2    claim based on a promissory note and deed of trust that allegedly encumbers Debtor's real

3    property commonly known as 8011 9th Avenue NW, Seattle, WA 98117.

4        3.    On information and belief, Federal Home Loan Mortgage Corporation ("Freddie

5    Mac") may be the holder of the promissory note and deed of trust that covers Debtor's above

6    stated real property.

7                            **JURISDICTION AND VENUE**

8        4.    This is a core proceeding over which this court has jurisdiction under 28 U.S.C.

9    § 157(b)(2)(A)(B)(C) and (O).

10       5.    Venue is properly placed in this court under 28 U.S.C. § 1409(a).

11                            **FACTUAL BACKGROUND**

12       6.    The Plaintiff/Debtor filed her petition in the underlying Chapter 13 bankruptcy

13   case on December 15, 2016.

14       7.    Debtor's plan filed April 5, 2017 is pending confirmation by the Court.

15       8.    Plaintiff is a single person who owns real property that is the subject of this

16   action. The property is located in King County, Washington, at 8011 9th Avenue NW, Seattle,

17   WA 98117, and legally described as:

18
19       South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4,
         Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page
20       21, records of King County, Washington; and the South 15 feet of Lot 43, All of
         Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City
21       of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of
         King County, Washington.
22
         Parcel Number: 292270071007
23
         With the appurtenances thereto.
24
     (hereinafter "the Kerrigan Property").
25

26

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 2

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

9.     Title to the Property is solely in the name of Kim C. Kerrigan. The property was purchased in January 1986, and financed thru WAMU, using the Plaintiff's maiden name, Kim E. Burg. She legally changed her name to Kim C. Kerrigan in November 2002.

10.    Title to the Property is solely in the name of Kim C. Kerrigan. The property was purchased when Plaintiff used her maiden name, Kim E. Burg. She legally changed her name to Kim C. Kerrigan in November of 2002.

11.    Prior to February 13, 2008, the Kerrigan Property was encumbered by a deed of trust with Washington Mutual Bank. Plaintiff desired to refinance said deed of trust and to that end, contacted Wells Fargo Bank and commenced the application process.

12.    Wells Fargo Bank, as part of the refinance process, contacted Washington Mutual Bank and requested a payoff amount on the existing deed of trust.

13.    Plaintiff received an unprecedented Saturday morning phone call from a purported Washington Mutual Bank employee from the "WAMU Retention Department, in Jacksonville, Florida," late January 2008. He indicated that Washington Mutual desired to retain Plaintiff's mortgage loan portfolio and business. This individual aggressively solicited Ms. Kerrigan's business and proposed a "streamline re-fi" over the phone, due to Ms. Kerrigan's excellent credit and her 25 years as a WAMU customer.  This person identified himself as Steve Jaquay, WAMU "loan processor, expedited the refinance of Plaintiff's existing mortgage.

14.    Mr. Jacquay indicated that the entire process of refinancing the existing deed of trust could be done by mail and further indicated, in response to an inquiry from Plaintiff, that Plaintiff was not to go to, or involve, any local branch office of Washington Mutual.

15.    On or about February 13, 2008, the Plaintiff signed a deed of trust in favor of Washington Mutual Bank securing a promissory note in the principle amount of $417,000. As instructed, the Plaintiff signed said deed of trust at her residence without any notary present.

COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM – Page 3

WELLS AND JARVIS, P.S.
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

The deed of trust was mailed back to Washington Mutual Bank c/o 2210 Enterprise Drive Florence, SC. 29501. An altered version of this deed of trust, which now contained the purported signature of Michael Paul Warnemuende, was recorded in King County on February 26, 2008 under recording number 20080226002217 ("the Deed of Trust"). A true and correct copy of the Deed of Trust is attached as **Exhibit A** and incorporated herein.

16.    The notary public whose signature appears on the Deed of Trust, Michael Paul Warnemuende, was not present when she signed that document.

17.    A true and correct copy of the note secured by the Deed of Trust is attached as **Exhibit B** ("hereinafter, the Note"). A true and correct copy of the settlement statement executed in connection with the closing of the loan with Washington Mutual Bank is attached as **Exhibit C**.

18.    Plaintiff became uneasy about the validity and terms of the refinance through the purported "Washington Mutual Retention Department in Jacksonville, Florida" because of the unusual manner in which the entire process was handled, its departure from all previous WAMU loan products, and because of many uncertainties about the terms of the loan itself.

19.    Plaintiff, because of her concerns, decided to rescind the refinance. Attached hereto as **Exhibit D** is Plaintiff's original notice of rescission dated October 1, 2008. When Plaintiff did not receive any response from Washington Mutual Bank, a second rescission notice, dated October 11, 2009, was prepared. That notice is attached as **Exhibit E**.

20.    Because of Plaintiff's concerns about the unorthodox circumstances surrounding the refinancing, Plaintiff took each signed rescission notices to her local Washington Mutual branch office where the managers and loan officers reassured her that her rescission notice would be immediately forwarded to the appropriate local Seattle WAMU mortgage department, for a response within 30 days.

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 4

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

21.     Washington Mutual Bank never responded to either of the two rescission notices.

22.     Washington Mutual Bank subsequently filed for bankruptcy, and the Plaintiff's loan with Washington Mutual was subsequently transferred or sold.

23.      Defendant Freddie Mac claims to be the owner and the holder of the Note according to the printout from its webpage attached hereto as **Exhibit F**.

24.     At one point, in November and December 2013, M&T Bank and Bayview alternatively claimed to be the servicer of the promissory note, according to the two letters attached hereto as **Exhibit G.**

25.     Defendant Bayview claims to be the owner and holder of the Note and Deed of Trust, according to its motion for relief from stay filed in the underlying bankruptcy case. A true and correct copy of that motion is also attached hereto as **Exhibit H** (see page 2, lines 1-3).

### First Cause of Action

26.     Plaintiff incorporates by reference all prior paragraphs of this complaint.

27.     As a result of various assertions from each of the three Defendants, Plaintiff is unsure as to who is entitled to enforce the original note dated February 13, 2008.

### Second Cause of Action

28.     Plaintiff incorporates by reference all prior paragraphs of this complaint.

29.     The Plaintiff, as a debtor in Chapter 13 bankruptcy, may use the powers of a trustee to benefit the bankruptcy estate.

30.     The not properly acknowledged Deed of Trust is void as to the Chapter 13 bankruptcy estate and its creditors, and can be set aside by the Plaintiff.

### Third Cause of Action

31.     Plaintiff incorporates by reference all prior paragraphs of this complaint.

COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM – Page 5

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

32.     On information and belief, in soliciting Plaintiff to borrow moneys from it to refinance the Kerrigan Property, Washington Mutual Bank violated the Truth In Lending Act ("TILA"), 15 U.S.C. 1601 et. seq.

33.     Pursuant to TILA, Plaintiff exercised her right to rescind the loan with Washington Mutual Bank.

34.     The notices of rescission were timely and Plaintiff properly notified Washington Mutual Bank of her election to rescind her loan with Washington Mutual.

35.     Washington Mutual Bank failed and/or refused to discharge the Deed of Trust and cancel the Note.

36.     As a result of the Plaintiff's lawful notice of rescission, and the failure of Washington Mutual Bank to take any action in response, the Deed of Trust became void.

37.     Unless and until the successors in interest to Washington Mutual Bank, namely Freddie Mac, Bayview Loan Servicing, LLC, and/or M&T Bank, acknowledge Plaintiff's right to rescind her loan, Plaintiff's obligation to tender a refund of the monies borrowed has not ripened into an obligation to repay the funds.

38.     As a result of her lawful rescission, Plaintiff is not liable to Defendants for any finance or other charges associated with the loan from the date of the first rescission and is entitled to recover all fees incurred in the transaction.

### Fourth Cause of Action

39.     Plaintiff incorporates by reference all prior paragraphs of this complaint.

40.     Pursuant to the attorney's fees provision of the Note and Deed of Trust, Plaintiff is entitled to an award of attorneys' fees against Defendant(s) for requiring the Plaintiff to pursue the present adversary complaint to determine which Defendant is the true party in interest entitled to enforce the Note and determine the continued validity of the deed of trust.

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 6

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

**Fifth Cause of Action**

41.    Plaintiff incorporates by reference all prior paragraphs of this complaint.

42.    Defendants as successors in interest to Washington Mutual Bank violated the FDCPA as described above, with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as set forth in Section 5(m)(l)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A).

43.    Each instance within five (5) years preceding the filing of this Complaint, in which Defendants failed to comply with the FDCPA in one or more of the ways described above, constitutes a separate violation for which Plaintiff seeks monetary civil penalties.

44.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(l)(A), Section 814(a) of the FDCPA, 15 U.S.C. § 1692/(a), and Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, authorizes the Court to award monetary civil penalties of not more than $11,000 for each violation of the FDCPA before February 10, 2009, and not more than $16,000 for each violation of the FDCPA after that date.

**Relief Requested**

Wherefore, Plaintiff requests that the Court:

1.    Enter judgment determining the Defendant who is entitled to enforce the original Note; and

2.    Enter judgment determining that the existing Deed of Trust is not a properly acknowledged document and is void as to the bankruptcy estate and its creditors; and

3.    Enter judgment determining that Plaintiff has validly exercised her right of rescission and that the existing Deed of Trust is void upon Plaintiff tendering to the proper party a refund of the funds borrowed; and

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 7

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

    4.     Award Plaintiff/Debtor monetary civil penalties for each violation of the FCDPA; and

    5.     Award Plaintiff/Debtor the cost of bringing this action, including reasonable attorneys'' fees, as well as such other and additional relief as the Court may determine is just and proper.

    Dated this 12th day of May, 2017.

Wells and Jarvis, P.S.

By: */s/ Jeffrey B. Wells*
Jeffrey B. Wells, WSBA #6317
Attorneys for Kim C. Kerrigan

**COMPLAINT TO AVOID LIEN AND DISALLOW CLAIM** – Page 8

**WELLS AND JARVIS, P.S.**
502 LOGAN BUILDING
500 UNION STREET
SEATTLE, WA 98101
PHONE(206) 624-0088 FAX (206) 624-0086

Case 19-41823-TWD  Doc 34  Filed 09/10/19  Ent. 09/10/19 18:38:42  Pg 67 of 193
Case 16-16219-TWD  Doc 44  Filed 05/12/17  Ent. 05/12/17 16:38:42  Pg 8 of 8

# Exhibit A

**Electronically Recorded**

**20080226002217**

ACS-ERX                                    DT    59.00
Page 001 of 017
02/26/2008 04:22
King County, WA

RECORDING REQUESTED BY: LSI
WHEN RECORDED RETURN TO:
CUSTOM RECORDING SOLUTIONS
2550 N. REDHILL AVE.
SANTA ANA, CA 92705

**CRS#** 4106465

## Document Title(s)

DEED OF TRUST

## Grantor(s) (Last, First and Middle Initial)

Kerrigan, Kim C.

Additional grantors on page

## Grantee(s) (Last, First and Middle Initial)

WASHINGTON MUTUAL BANK, F.A.

Additional grantees on page

## Trustee(s) (Last, First and Middle Initial)

HITT, MICHAEL D.

Additional trustees on page

## Legal Description (abbreviated form: i.e. lot, block, plat or section, township, range, quarter)

FULL LEGAL DESCRIPTION ON EXHIBIT A

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, Volume
18 of Plats, Page 21,

Additional legal is on page

## Assessor's Property Tax Parcel/Account Number

292270071007

Additional parcel #s on page

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the
document to verify the accuracy or completeness of the indexing information provided herein.

I am requesting an emergency nonstandard recording for an additional fee as provided in RCW 36.18.010. I
understand that the recording processing requirements may cover up or otherwise obscure some part of the
text of the original document.

Signature of Requesting Party

**Recording requested by: LSI**
**When recorded return to :**
**Custom Recording Solutions**
**2550 N. Redhill Ave.** 4100405
**Santa Ana, CA. 92705**

Assessor's Parcel or Account Number: 292270071007
Abbreviated Legal Description:

[Include lot, block and plat or section, township and range]    Full legal description located on page 3

Trustee: Michael D. Hitt    Exhibit A

―――――――――――――[Space Above This Line For Recording Data]―――――――――――――

# DEED OF TRUST

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated    February 13, 2008
together with all Riders to this document.
(B) "Borrower" is Kim C Kerrigan, A Single Person

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Washington Mutual Bank

▬▬▬317

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3048 1/01

VMP®-6(WA) (0012)
Page 1 of 15    Initials: KCK

VMP MORTGAGE FORMS - (800)521-7291

Lender is a federal association
organized and existing under the laws of The United States of America
Lender's address is 2273 N. Green Valley Parkway, Suite 14 , Henderson, NV
89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is Michael D. Hitt

(E) "Note" means the promissory note signed by Borrower and dated     February 13, 2008
The Note states that Borrower owes Lender Four Hundred Seventeen Thousand and No/100
                                                                                                    Dollars
(U.S. $417,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     March 1, 2038
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _KCK_

6317

VMP®-6(WA) (0012)          Page 2 of 15          Form 3048  1/01

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
County                                    of King                                        :
     [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]
See attached exhibit A

Parcel ID Number: 292270071007                        which currently has the address of
8011 9th Ave Nw                                                                        [Street]
Seattle                                          [City] , Washington  98117      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _KCK_                                   ████6317

VMP®-6(WA) (0012)                Page 3 of 15                        Form 3048  1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community

6317

Initials: _KCK_

Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _KCK_    317

-6(WA) (0012)    Page 5 of 15    Form 3048  1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to

Initials: _KCK_

6317

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _KCK_ 6317

Form 3048 1/01

-6(WA) (0012)     Page 7 of 15

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: _KCK_

███████6317

Form 3048 1/01

███-6(WA) (0012)

Page 8 of 15

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials: _KCX_      ██████6317

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's

Initials: _KCK_   6317

VMP®-6(WA) (0012).01     Page 10 of 15     Form 3048  1/01

2008022600221701

notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

6317

Initials: _KCK_

VMP®-6(WA) (0012).01

Page 11 of 15

Form 3048 1/01

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

Initials: _JCJC_

6317

-6(WA) (0012).01        Page 12 of 15        Form 3048   1/01

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

Initials: _K.C.K_     6317

VMP -6(WA) (0012).01     Page 13 of 15     Form 3048  1/01

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                        Kim C Kerrigan  (2/13/2008)  -Borrower

_____     _____ (Seal)
                                                                      -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                             -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                             -Borrower

_____ (Seal)       _____ (Seal)
                -Borrower                                             -Borrower

STATE OF WASHINGTON
County of King
    On this day personally appeared before me  Kim C Kerrigan

} ss:

to me known to be the individual(s) described in and who executed the within and foregoing instrument,
and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the
uses and purposes therein mentioned.
    GIVEN under my hand and official seal this  _13_  day of _Febry_ _2008_ .

_____

Notary Public in and for the State of Washington, residing at

My Appointment Expires on

_10/14/08_

_Michael Paul Warnemuende_

Notary Public
State of Washington
MICHAEL PAUL WARNEMUENDE
My Appointment Expires Oct 14, 2008

_Prepared By: melanie Dew_
_9457 Corbin Ave._
_Northridge CA 91324_

66317

Initials: _KCK_
2/

-6(WA) (0012).01      Page 15 of 15      Form 3048   1/01

APN: 292270071007

Order ID: 4106465

Loan No.: ██████6317

## EXHIBIT A
## LEGAL DESCRIPTION

The land referred to in this policy is situated in the State of WA, County of KING, City of SEATTLE and described as follows:

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page 21, records of King County, Washington; and the South 15 feet of Lot 43, All of Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of King County, Washington.

APN 292270071007

WITH THE APPURTENANCES THERETO.

APN: 292270071007

# Exhibit B

# NOTE

February 13, 2008        Seattle                          Washington
[Date]                   [City]                           [State]

8011 9th Ave Nw. Seattle, WA 98117

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 417,000.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is Washington Mutual Bank

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of          5.500 %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.
I will make my monthly payment on the First      day of each month beginning on April 1, 2008          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on     March 1, 2038      , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."
I will make my monthly payments at P. O. Box 78148,                   or at a different place if required by the Note Holder.
Phoenix, AZ 85062-8148

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,367.69

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

6317

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP®-5N (0207)              Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3                          Initials: _____

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

6317

**Form 3200 1/01**
Initials: _____

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)          _____(Seal)
Kim C Kerrigan                          -Borrower                                                   -Borrower

_____(Seal)          _____(Seal)
                                        -Borrower                                                   -Borrower

_____(Seal)          _____(Seal)
                                        -Borrower                                                   -Borrower

_____(Seal)          _____(Seal)
                                        -Borrower                                                   -Borrower

*[Sign Original Only]*




-5N (0207)

Form 3200 1/01

# Exhibit C

OMB NO. 2502-0265

| A. | B. TYPE OF LOAN: |
|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. |
| **SETTLEMENT STATEMENT** | 6. FILE NUMBER:  4106465  7. LOAN NUMBER: ██████6317 |
| | 8. MORTGAGE INS CASE NUMBER: |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*
1.0    3/93    (4106465/PFD/4106455/6)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| Kim C. Kerrigan<br>8011 9th Avenue NW<br>Seattle, WA 98117 | | Washington Mutual: BP<br>2000 Oxford Drive, 2nd Floor<br>Bethel Park, PA 15102 |

| G. PROPERTY LOCATION:<br>8011 9th Avenue NW<br>Seattle, WA 98117<br>King County, Washington | H. SETTLEMENT AGENT:   56-2468956<br>LSI, a division of Chicago Title Insurance Company<br><br>PLACE OF SETTLEMENT<br>8011 9th Avenue NW<br>Seattle, WA 98117 | I. SETTLEMENT DATE:<br><br>February 13, 2008<br><br>Disburse:02/19/08 |
|---|---|---|

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 4,380.03 | 403. | |
| 104. Payoff/Close Account to Washington Mutual ██████0079 | 162,029.64 | 404. | |
| 105. Payoff/Close Account to Washington Mutual ██████3376 | 189,205.14 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes         to | | 406. City/Town Taxes          to | |
| 107. County Taxes            to | | 407. County Taxes             to | |
| 108. Assessments             to | | 408. Assessments              to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 355,614.81 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 417,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff First Mortgage | |
| 205. | | 505. Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes         to | | 510. City/Town Taxes          to | |
| 211. County Taxes            to | | 511. County Taxes             to | |
| 212. Assessments             to | | 512. Assessments              to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 417,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 355,614.81 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By Borrower (Line 220) | (417,000.00) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| **303. CASH ( FROM ) ( X TO ) BORROWER** | 61,385.19 | **603. CASH ( TO ) ( FROM ) SELLER** | 0.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.

Borrower _____     Seller _____

## L. SETTLEMENT CHARGES

| 700. TOTAL COMMISSION Based on Price | $ | @ | % | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| *Division of Commission (line 700) as Follows:* | | | | | | |
| 701. $ | to | | | | | |
| 702. $ | to | | | | | |
| 703. Commission Paid at Settlement | | | | | | |
| 704. | to | | | | | |

**800. ITEMS PAYABLE IN CONNECTION WITH LOAN**

| | | | | |
|---|---|---|---|---|
| 801. Loan Origination Fee    0.2500 % | to  Washington Mutual Bank, FA | POCL 3127.50 | 1,042.50 | |
| 802. Loan Discount    % | to | | | |
| 803. Appraisal Fee | to  LSI | POCL 385 POCB 100 | -100.00 | |
| 804. Tax Service Fee | to  Zcrets | POC:L 10.00 | | |
| 805. Tas Research Fee | to  Washington Mutual Bank, FA | POC:L 71.00 | | |
| 806. Flood Inspect Fee | to  Land America | POC:L 8.00 | | |
| 807. Wire Transfer Fee | to  Washington Mutual Bank, FA | POC:L 35.00 | | |
| 808. Loan Review Fee | to  Washington Mutual Bank, FA | POC:L 505.00 | | |
| 809. | | | | |
| 810. | | | | |
| 811. | | | | |

**900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE**

| | | | | |
|---|---|---|---|---|
| 901. Interest From  02/19/08   to  03/01/08   @  $  62.840000/day  02/19/08  to  03/01/08 | | | 691.24 | 0.00 |
| 902. Mortgage Insurance Premium  for    months to | | | | |
| 903. Hazard Insurance Premium for    1.0  years  to | | | | |
| 904. | | | | |
| 905. | | | | |

**1000. RESERVES DEPOSITED WITH LENDER**

| | | |
|---|---|---|
| 1001. Hazard Insurance    4.000 months  @  $    55.83 per  month | 223.33 | |
| 1002. Mortgage Insurance    months  @  $    per  month | | |
| 1003. City/Town Taxes    months  @  $    per  month | | |
| 1004. County Taxes    7.000 months  @  $    370.83 per  month | 2,595.79 | |
| 1005. Assessments    months  @  $    per  month | | |
| 1006.    months  @  $    per  month | | |
| 1007.    months  @  $    per  month | | |
| 1008. Aggregate Adjustment    months  @  $    per  month | -167.53 | |

**1100. TITLE CHARGES**

| | | | |
|---|---|---|---|
| 1101. Settlement or Closing Fee | to  LSI, a division of Chicago Title Insurance Company | POC:L 350.00 | |
| 1102. Abstract or Title Search | to  LSI, a division of Chicago Title Insurance Company | | |
| 1103. Title Examination | to  LSI, a division of Chicago Title Insurance Company | | |
| 1104. Tax Search Fee | to  LSI, a division of Chicago Title Insurance Company | | |
| 1105. Document Preparation | to  LSI, a division of Chicago Title Insurance Company | | |
| 1106. Notary Fees | to  LSI, a division of Chicago Title Insurance Company | | |
| 1107. Signing Fee | to  LSI, a division of Chicago Title Insurance Company | | |
| *(includes above item numbers:* | ) | | |
| 1108. Title Insurance | to  LSI | POC:L 1064.00 | |
| *(includes above item numbers:* | ) | | |
| 1109. Lender's Coverage | $    417,000.00 | | |
| 1110. Owner's Coverage | $ | | |
| 1111. Endorsements | LSI, a division of Chicago Title Insurance Company | | |
| 1112. | LSI, a division of Chicago Title Insurance Company | | |
| 1113. | LSI, a division of Chicago Title Insurance Company | | |
| 1114. | LSI, a division of Chicago Title Insurance Company | | |
| 1115. | LSI, a division of Chicago Title Insurance Company | | |
| 1116. | LSI, a division of Chicago Title Insurance Company | | |
| 1117. Sales Tax | to  LSI, a division of Chicago Title Insurance Company | | 94.70 |
| 1118. | LSI, a division of Chicago Title Insurance Company | | |

**1200. GOVERNMENT RECORDING AND TRANSFER CHARGES**

| | | | |
|---|---|---|---|
| 1201. **Recording Service Fee: Deed $    ; Mortgage $    70.00;   Releases $ | POC:L 70.00 | | |
| 1202. City/County Tax/Stamps:    Deed    ; Mortgage | | | |
| 1203. State Tax/Stamps:    Revenue Stamps    ; Mortgage | | | |
| 1204. Recording Service Fee | to  LSI, a division of Chicago Title Insurance Company | POC:L 25.00 | |
| 1205. | LSI | | |

**1300. ADDITIONAL SETTLEMENT CHARGES**

| | | | |
|---|---|---|---|
| 1301. Survey | to | | |
| 1302. Pest Inspection | to | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |

| 1400. TOTAL SETTLEMENT CHARGES  (Enter on Lines 103, Section J and 502, Section K) | 4,380.03 | |
|---|---|---|

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

LSI
Settlement Agent

Certified to be a true copy

# Exhibit D

APP 000050

**NOTICE TO CUSTOMERS REQUIRED BY FEDERAL LAW FEDERAL RESERVE REGULATION Z**
**NOTICE OF RIGHT TO RESCIND (GENERAL)**

**NOTICE OF RIGHT TO CANCEL**

8011 9th Ave Nw. Seattle, WA 98117                                                   ACCOUNT NO. ▓▓▓6317
(Identification of Transaction)

### 1. Your Right to Cancel

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

    (1)    The date of the transaction, which is February 13, 2008    ;

    (2)    The date you received your Truth in Lending disclosures;
                or

    (3)    The date you received this notice of your right to cancel.

If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### 2. How to Cancel

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

Washington Mutual Bank
2000 Oxford Drive
Bethel Park, PA 15102

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of _____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_Kim C. Kerrigan_                                                   _Oct. 1, 2008_
SIGNATURE                                                            DATE

The undersigned each acknowledge receipt of two copies of <u>NOTICE of RIGHT TO CANCEL</u> and one copy of the Federal Truth in Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_Kim C. Kerrigan_ 10/1/2008
BORROWER/OWNER  Kim C Kerrigan      DATE        BORROWER/OWNER          DATE

BORROWER/OWNER          DATE        BORROWER/OWNER          DATE

VMP -68 (0305)                                           12/97
    VMP Mortgage Solutions (800)521-7291



# Exhibit E

APP 000052

## NOTICE TO CUSTOMERS REQUIRED BY FEDERAL LAW FEDERAL RESERVE REGULATION Z
## NOTICE OF RIGHT TO RESCIND (GENERAL)

### NOTICE OF RIGHT TO CANCEL

8011 9th Ave Nw, Seattle, WA 98117        ACCOUNT NO. ▮▮▮6317
<br>_____(Identification of Transaction)_____

### 1. Your Right to Cancel

> You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:
>
>     (1)      The date of the transaction, which is February 13, 2008      ;
> <br>                 or
> <br>    (2)      The date you received your Truth in Lending disclosures;
> <br>                 or
> <br>    (3)      The date you received this notice of your right to cancel.
>
>      If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the (mortgage/lien/security interest) (on/in) your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.
>
>      You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

### 2. How to Cancel

> If you decide to cancel this transaction, you may do so by notifying us in writing, at:
>
> Washington Mutual Bank
> <br>2000 Oxford Drive
> <br>Bethel Park, PA 15102
>
>      You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.
>
>      If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
> <br>                 (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.
> <br>**I WISH TO CANCEL**

_Kim C. Kerrigan_                           _Oct. 11, 2009_
<br>SIGNATURE                                                     DATE

The undersigned each acknowledge receipt of two copies of <u>NOTICE of RIGHT TO CANCEL</u> and one copy of the Federal Truth in Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective to all borrowers/owners.

_Kim C. Kerrigan_ 10/11/2009                                  
<br>BORROWER/OWNER Kim C Kerrigan      DATE             BORROWER/OWNER                      DATE

_____                 _____
<br>BORROWER/OWNER                   DATE             BORROWER/OWNER                      DATE

VMP -68 (0305)                  12/97
<br>       VMP Mortgage Solutions (800)521-7291



# Exhibit F

# Yes. Our records show that Freddie Mac owns your mortgage and your note date (the date you closed your loan) – is February 13, 2008.

En español

## What to Do Next

Please reach out to your lender (also referred to as your mortgage servicer) to discuss options that may be available to you, including the federal Home Affordable Refinance Program® (HARP).  Their telephone number and mailing address should be listed on your monthly statement.

## Steps to Get Started with HARP

You may be eligible for HARP if your note date is on or before May 31, 2009.

1. See if Freddie Mac Owns Your Loan
2. Learn More About HARP
3. Check Your Eligibility for HARP
4. Get Prepared and Call Your Lender
5. Find a HARP Lender

Visit My Home by Freddie Mac ® for information and guidance on options to stay in your home, options to leave your home, working with a housing counselor or your lender, avoiding fraud and more.

© 2017 Freddie Mac

# Exhibit G

## M&T Bank

P.O. Box 1288
Buffalo, NY 14240-1288

Rec 11/11/13

E Fax: 1.305 260 1310

November 18, 2013

8-750-72726-0000489-001-01-011-011-000-000
KIM C KERRIGAN
8011 9TH AVE NW
SEATTLE WA  98117-4120

Re: New Mortgage Account Number ████████2502

### NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

We are writing to advise you that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred to Bayview Loan Servicing, LLC from JPMorgan Chase Bank, N.A. effective November 16, 2013. Bayview Loan Servicing, LLC has chosen M&T Bank to service your loan on their behalf.

The assignment, sale, or transfer of the servicing of your mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer (JPMorgan Chase Bank, N.A.) send you this notice at least 15 days before the effective day of transfer. Your new servicer must also send you this notice no later than 15 days after this effective date.

Your present servicer is JPMorgan Chase Bank, N.A.. If you have any questions relating to the transfer of servicing from your present servicer, please contact their Customer Service Department at 1-800-848-9136 or 1-800-582-0542 (TTY) between the hours of 8:00 a.m. and 12:00 a.m. (EST) Monday through Friday and 8:00 a.m. to 8:00 p.m. (EST) Saturday.

Your new servicer is **M&T Bank**. Our business address is: **P.O. Box 1288, Buffalo, NY 14240-1288**. Our toll-free number is **1-866-462-1156**. If you have any questions relating to the transfer of servicing to your new servicer, please contact our Customer Service Department between **8:30 a.m. and 8:00 p.m. (EST) Monday through Friday**.

JPMorgan Chase Bank, N.A. will stop accepting payments **November 15, 2013**. M&T Bank will begin accepting payments from you effective **November 16, 2013**. Please send all payments on or after that date to **M&T Bank**.

The transfer of servicing rights may affect the terms of or the continued availability of the optional insurance coverage you may have. This coverage will not transfer.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to the following address:

> **M&T Bank**
> **Attn: Lending Services, Customer Support**
> **P.O. Box 1288**
> **Buffalo, New York 14240-1288**

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During the 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any over due payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of a business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

**IF YOU ARE IN BANKRUPTCY, OR RECEIVED A BANKRUPTCY DISCHARGE OF DEBT, THIS IS NOT AN ATTEMPT TO COLLECT A DEBT AGAINST YOU PERSONALLY, BUT IS BEING SENT FOR INFORMATIONAL PURPOSES ONLY.**

750-2004-1007F

*[handwritten: 12/23/13 ... December 23, 2013]*

APP 000057



**BAYVIEW**
LOAN SERVICING

Bayview Loan Servicing, LLC
4425 Ponce de Leon Blvd. 5th Floor
Coral Gables, FL 33146

*[handwritten: Rec 12/24/2013 (Xmas Eve) Response Faxed 1/8/13 KCK]*

December 23, 2013

KIM KERRIGAN
8011 9TH AVE NW
SEATTLE, WA 98117



**Loan Number:** ▮▮▮▮502          **Property Address:** 8011 9TH AVE NW
                                                            SEATTLE, WA 98117-0000

Dear Customer:          *[handwritten: Agent?]*

*[handwritten: ?]* Bayview Loan Servicing, LLC is acting as agent for your servicer, M&T Bank. We have received your loan workout package.

We will review the documentation provided and notify you by mail if further information is needed.

*[handwritten arrow]* Within 30 days of receipt of all the required documentation, we endeavor to provide you with a written decision regarding your eligibility for one of our assistance programs.

If your loan is delinquent, collection/foreclosure activity currently in progress will continue to proceed during the review process of your request for a workout. This letter and the loan workout review process shall not waive any of our rights or your obligations under the note and other loan documents. In other words, you are responsible to continue making your loan payments.

Sincerely,

*Natasha Davis*

Natasha Davis, Asset Manager
Bayview Loan Servicing, LLC
Phone Number:   18778134685 Monday - Friday 9:00 a.m. - 6:00 p.m., ET
Fax Number:     (305) 260-1310

Bayview Loan Servicing, LLC is attempting to collect a debt and any information will be used for that purpose. If you are in Bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the property.

**The following mailing address must be used for all Error Notices & Information Requests: Bayview Loan Servicing, LLC, Customer Support, 4425 Ponce de Leon Boulevard, 5th Floor, Coral Gables, FL 33146.**

AM208  V 1.3 Loan No.: 0091412502

# Exhibit H

The Honorable Timothy W. Dore
Chapter 13
Hearing Location: United States Bankruptcy
Court, Courtroom 8106, 700 Stewart St., 8th
Floor, Seattle, WA 98101
Hearing Date: May 3, 2017
Hearing Time: 9:30 a.m.
Response Date: April 26, 2017

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>Kim C Kerrigan<br>dba Inner Resources<br><br>Debtor | Case No.: 16-16219-TWD<br><br>Chapter   13<br><br>MOTION FOR RELIEF FROM STAY AND<br>MEMORANDUM IN SUPPORT THEREOF |

COMES NOW, Bayview Loan Servicing, LLC ("Creditor") and moves the Court pursuant to 11 USC §362(d) for an Order Terminating the Automatic Stay, allowing Creditor to proceed with any and all contractual and statutory remedies incident to the interest held by virtue of the note and deed of trust described below and attached as exhibits to this motion and memorandum.

## I.  RELEVANT FACTS

### A.  The Property

On or about February 13, 2008, Kim C Kerrigan executed a note in favor of Washington Mutual Bank in the original principal amount of $417,000.00 ("Note").  The debt described by the Note is secured by a deed of trust ("Deed of Trust") properly recorded and creating a lien against property commonly described as 8011 9th Ave NW, Seattle, WA 98117 (the "Property").

Motion for Relief - 1
MH# WA-17-135216

McCarthy & Holthus, LLP
108 1st Avenue South, Ste. 300
Seattle, WA 98104
(206) 319-9100

Case 16-16219-TWD    Doc 23    Filed 03/31/17    Ent. 03/31/17 15:39:57    Pg. 1 of 4

Case 18-16219-TWD    Doc 34-1    Filed 09/01/17    Ent. 09/01/17 16:33:42    Pg 103 of 193

## II. ARGUMENT AND AUTHORITY

### A. Standing

To prosecute a motion for relief from the automatic stay as to enforcement of a note and deed, a movant must establish that it has an interest in the note, either as a holder, or as a party entitled to enforce the note. See *In re Veal*, 450 B.R. 897 (9th Cir. BAP 2011). In the case at bar, the declaration and exhibits supporting the motion establish that Creditor is the holder of the Note and thus has standing to prosecute the present motion.

### B. Basis for Relief from Stay

Under 11 U.S.C. 362 (d)(1), the court shall grant relief from the stay for cause. The Chapter 13 Plan has not yet been filed and thus there is no provision for payment to the Creditor and in fact no payment has been made to Creditor. Absent the timely filing of a plan and resumption of payment on the secured debt, there is cause to terminate the stay.

## III. RELIEF REQUESTED

For the reasons stated above, Creditor requests:

1.    An Order Terminating the Automatic Stay.

2.    Alternatively, for an Order requiring adequate protection of Movant's interest in the Property.

3.    For such other relief as the Court deems proper.

Dated: March 31, 2017                    McCarthy & Holthus, LLP


                                         /s/  Lance Olsen, Esq.
                                         Lance E. Olsen, Esq. WSBA# 25130
                                         Joseph T. McCormick III, Esq. WSBA# 48883
                                         Attorney for Movant
                                         (206) 319-9100

Motion for Relief - 3
MH# WA-17-135216

McCarthy & Holthus, LLP
108 1st Avenue South, Ste. 300
Seattle, WA 98104
(206) 319-9100

Case 16-16219-TWD    Doc 23    Filed 03/31/17    Ent. 03/31/17 15:39:57    Pg. 3 of 4

Case 18-16219-TWD    Doc 44-1 Filed 09/05/19 17 Ent. 09/05/19 17:16:33 42 Pg. 104 of 193

**CERTIFICATE OF SERVICE**

On 3/31/2017, I served the foregoing **NOTICE OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY; MOTION FOR RELIEF FROM AUTOMATIC STAY; DECLARATION IN SUPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY AND ALL EXHIBITS SUPORTING THE MOTION AND DECLARATION** on the following individuals by electronic means through the Court's ECF program:

| | |
|---|---|
| **TRUSTEE** | **DEBTOR'S COUNSEL** |
| K Michael Fitzgerald | Jeffrey B Wells |
| courtmail@seattlech13.com | paralegal@wellsandjarvis.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Salvador Arroyo
Salvador Arroyo

On 3/31/2017, I served the foregoing **NOTICE OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY; MOTION FOR RELIEF FROM AUTOMATIC STAY; DECLARATION IN SUPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY AND ALL EXHIBITS SUPORTING THE MOTION AND DECLARATION** on the following individuals by depositing true copies thereof in the United States mail, enclosed in a sealed envelope, with postage paid, addressed as follows:

**DEBTOR**
Kim C Kerrigan, 8011 9th Ave NW, Seattle, WA 98117

**US TRUSTEE**
700 Stewart St Ste 5103, Seattle, WA 98101

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Christian Aguilar
Christian Aguilar

Certificate of Service - 4
MH#WA-17-135216

McCarthy & Holthus, LLP
108 1st Avenue South, Ste. 300
Seattle, WA 98104
(206) 319-9100

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| In re:<br><br>KIM C. KERRIGAN,<br><br>                 Debtor. | Case No. 16-16219<br><br>CHAPTER 13 PLAN<br><br>__Original  _Second_ Amended<br><br>Date: _May 19, 2017_ |
|---|---|

**I.  Means Test Result:**
Debtor is (check one):
__X__ a below median income debtor with a 36 month applicable commitment period
_____ an above median income debtor with a 60 month applicable commitment period

**II.  Plan Payments:**
No later than 30 days after the filing of the plan or the order for relief, whichever date is earlier, the debtor will commence making payments to the Trustee as follows:
   A.  AMOUNT: $ _3,900_____
   B.  FREQUENCY (check one):
   _X_Monthly
   ___Twice per month
   ___Every two weeks
   ___Weekly
   C.  TAX REFUNDS: Debtor (check one): ___COMMITS; _X_DOES NOT COMMIT; all tax refunds to funding the plan. Committed refunds shall be paid in addition to the plan payment stated above. If no selection is made, tax refunds are committed.
   D.  PAYMENTS: Plan payments shall be deducted from the debtor's wages unless otherwise agreed to by the Trustee or ordered by the Court.
   E.  OTHER: _Tax returns, to the extent that they exceed $2,500, shall be committed to the plan._

**III.  Plan Duration:**
The plan's length shall not be less than the debtor's applicable commitment period as defined under 11 U.S.C. §§ 1322(d) and 1325(b)(4) unless the plan either provides for payment in full of allowed unsecured claims over a shorter period or is modified post-confirmation.  A below median debtor's plan length shall automatically be extended up to 60 months after the first payment is due if necessary to complete the plan.

**IV.  Distribution of Plan Payments:**
Upon confirmation, the Trustee shall disburse funds received in the following order and creditors shall apply them accordingly, PROVIDED THAT disbursements for domestic support obligations and federal taxes shall be applied according to applicable non-bankruptcy law:
   A.  ADMINISTRATIVE EXPENSES:
     1.  _Trustee_. The percentage set pursuant to 28 USC §586(e).
     2.  _Other administrative expenses_. As allowed pursuant to 11 USC §§ 507(a)(2) or 707(b).
     3.  _Attorney's Fees_: Pre-confirmation attorney fees and/or costs and expenses are estimated to be $3,500. $1,000 was paid. To the extent pre-confirmation fees and/or costs and expenses exceed $3,500, an appropriate application, including a complete breakdown of time and costs, shall be filed with the Court within 21 days after confirmation.
     Approved attorney compensation shall be paid as follows (check one):
     a. ____ Prior to all creditors;
     b. ____ Monthly payments of $_____;
     c _X_  All remaining funds available after designated monthly payments to the following creditors: _monthly contractual payments to residential first deed of trust holder (Bayview Loan Servicing LLC) and second deed of trust holder (Qualstar Credit Union)._
     d. ____ Other: _____.
     If no selection is made, fees will be paid after monthly payments specified in Sections IV.B and IV.C.

[Local Bankruptcy Form 13-4, eff. 12/16]

B.   CURRENT DOMESTIC SUPPORT OBLIGATION: Payments to creditors whose claims are filed and allowed pursuant to 11 USC § 502(a) or court order as follows (if left blank, no payments shall be made by the Trustee):

| Creditor | Monthly amount |
|---|---|
| _____ | $_____ |
| _____ | $_____ |

C.    SECURED CLAIMS: Payments will be made to creditors whose claims are filed and allowed pursuant to 11 USC § 502(a) or court order, as stated below.  Unless ranked otherwise, payments to creditors will be disbursed at the same level.  Secured creditors shall retain their liens until the payment of the underlying debt, determined under nonbankruptcy law, or discharge under 11 USC § 1328, as appropriate.  Secured creditors, other than creditors holding long term obligations secured only by a security interest in real property that is the debtor's principal residence, will be paid the principal amount of their claim or the value of their collateral, whichever is less, plus per annum uncompounded interest on that amount from the petition filing date.

Interest rate and monthly payment in the plan control unless a creditor timely files an objection to confirmation. If a creditor timely files a proof of claim for an interest rate lower than that proposed in the plan, the claim shall be paid at the lower rate.  Value of collateral stated in the proof of claim controls unless otherwise ordered following timely objection to claim. The unsecured portion of any claim shall be paid as a nonpriority unsecured claim unless entitled to priority by law.

**Only creditors holding allowed secured claims specified below will receive payment from the Trustee.**  If the interest rate is left blank, the applicable interest rate shall be 12%.  If overall plan payments are sufficient, the Trustee may increase or decrease post-petition installments for ongoing mortgage payments, homeowner's dues and/or real property tax holding accounts based on changes in interest rates, escrow amounts, dues and/or property taxes.

1.   <u>Continuing Payments on Claims Secured Only by Security Interest in Debtor's Principal Residence and Non-Escrowed Postpetition Property Tax Holding Account</u> (Interest included in payments at contract rate, if applicable):

| Rank | Creditor | Nature of Debt | Property | Monthly Payment |
|---|---|---|---|---|
| 1 | Bayview | 1st Deed of Trust | Residence | $ 3,055.26 |
| 1 | Qualstar Credit Union | 2nd Deed of Trust | Residence | $ 378.56 |
| ____ | _____ | _____ | _____ | $ _____ |

2.   <u>Continuing Payments and Non-Escrowed Postpetition Property Tax Holding Account on Claims Secured by Other Real Property</u> (Per annum interest as set forth below):

| Rank | Creditor | Nature of Debt | Property | Monthly Payment | Interest Rate |
|---|---|---|---|---|---|
| ____ | _____ | _____ | _____ | _____ | ___% |
| ____ | _____ | _____ | _____ | _____ | ___% |
| ____ | _____ | _____ | _____ | _____ | ___% |
| ____ | _____ | _____ | _____ | _____ | ___% |

3.   <u>Cure Payments on Mortgage/Deed of Trust/Property Tax/Homeowner's Dues Arrearage</u>:

| Rank | Periodic Payment | Creditor | Property | Arrears to be Cured | Interest Rate |
|---|---|---|---|---|---|
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |

[Local Bankruptcy Form 13-4, eff. 12/16]

4.  <u>Payments on Claims Secured by Personal Property</u>:

   a.  <u>**910 Collateral**</u>.

The Trustee shall pay the contract balance as stated in the allowed proof of claim for a purchase-money security interest in any motor vehicle acquired for the personal use of the debtor(s) **within 910 days** preceding the filing date of the petition or in other personal property acquired within **one year** preceding the filing date of the petition as follows.  Debtor stipulates that pre-confirmation adequate protection payments shall be paid by the Trustee as specified upon the creditor filing a proof of claim.  If no amount is specified, the Trustee shall pay the amount stated as the "Equal Periodic Payment".

| Rank | Equal Periodic Payment | Creditor | Description of Collateral | Pre-Confirmation Adequate Protection Payment | Interest Rate |
|---|---|---|---|---|---|
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | _____ | $_____ | ___% |

   b.  <u>**Non-910 Collateral**</u>.

The Trustee shall pay the value of collateral stated in the proof of claim, unless otherwise ordered following timely objection to the claim, for a purchase-money security interest in personal property which is non-910 collateral.  Debtor stipulates that pre-confirmation adequate protection payments shall be paid by the Trustee as specified upon the creditor filing a proof of claim.  If no amount is specified, the Trustee shall pay the amount stated as the "Equal Periodic Payment".

| Rank | Equal Periodic Payment | Creditor | Debtor(s) Value of Collateral | Description of Collateral | Pre-Confirmation Adeq. Protection Payment | Interest Rate |
|---|---|---|---|---|---|---|
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |
| ____ | $_____ | _____ | $_____ | _____ | $_____ | ___% |

D.  PRIORITY CLAIMS: Payment in full, on a pro rata basis, of filed and allowed claims entitled to priority in the order stated in 11 USC § 507(a).

E.  NONPRIORITY UNSECURED CLAIMS: From the balance remaining after the above payments, the Trustee shall pay filed and allowed nonpriority unsecured claims as follows:

1.  Specially Classified Nonpriority Unsecured Claims. The Trustee shall pay the following claims prior to other nonpriority unsecured claims as follows:

| Rank | Creditor | Amount of Claim | Percentage To be Paid | Reason for Special Classification |
|---|---|---|---|---|
| ____ | _____ | $_____ | _____% | _____ |
| ____ | _____ | $_____ | _____% | _____ |

2.  Other Nonpriority Unsecured Claims (check one):
   a.  ____ 100% paid to allowed nonpriority unsecured claims. **OR**
   b.  __X__ Debtor shall pay at least $ _0_____ to allowed nonpriority unsecured claims over the term of the plan. Debtor estimates that such creditors will receive approximately ___0__ % of their allowed claims.

[Local Bankruptcy Form 13-4, eff. 12/16]

## V.  Secured Property Surrendered:
The secured property described below will be surrendered to the following named creditors on confirmation. Upon confirmation, all creditors (including successors and assigns) to which the debtor is surrendering property pursuant to this section are granted relief from the automatic stay to enforce their security interest against the property including taking possession and sale.

| Creditor | Property to be Surrendered |
|----------|---------------------------|
|          |                           |

## VI.  Executory Contracts and Leases:
The debtor will assume or reject executory nonresidential contracts or unexpired leases as noted below. Assumption will be by separate motion and order, and any cure and/or continuing payments will be paid directly by the debtor under Section VII, unless otherwise specified in Section XII with language designating that payments will be made by the Trustee, the amount and frequency of the payments, the ranking level for such payments with regard to other creditors, the length of the term for continuing payments and the interest rate, if any, for cure payments. Any executory contract or unexpired lease not assumed pursuant to 11 USC § 365(d) is rejected. If rejected, the debtor shall surrender any collateral or leased property and any duly filed and allowed unsecured claim for damages shall be paid under Section IV.E.2.

| Contract/Lease | Assumed or Rejected |
|----------------|---------------------|
| Mazda Capital Services **-** 2014 Mazda CX-5 | Assume |

## VII.    Payments to be made by Debtor and not by the Trustee:
The following claims shall be paid directly by the debtor according to the terms of the contract or support or withholding order, and shall receive no payments from the Trustee. (Payment stated shall not bind any party.)

A. DOMESTIC SUPPORT OBLIGATIONS: The claims of the following creditors owed domestic support obligations shall be paid directly by the debtor as follows:

| Creditor | Current Monthly Support Obligation | Monthly Arrearage Payment |
|----------|-----------------------------------|---------------------------|
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |

B. OTHER DIRECT PAYMENTS:

| Creditor | Nature of Debt | Amount of Claim | Monthly Payment |
|----------|----------------|-----------------|-----------------|
| Mazda Capital Services | Auto lease_____ | $___N/A_____ | $_____250_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |

## VIII.    Property of the Estate
Property of the estate is defined in 11 USC § 1306(a).  Unless otherwise ordered by the Court, property of the estate in possession of the debtor on the petition date shall vest in the debtor upon confirmation.  However, the debtor shall not lease, sell, encumber, transfer or otherwise dispose of any interest in real property or personal property without the Court's prior approval, except that the debtor may dispose of unencumbered personal property with a value of $10,000.00 or less without the Court's approval.  Property (including, but not limited to, bonuses, inheritances, tax refunds or any claim) acquired by the debtor post-petition shall vest in the Trustee and be property of the estate.  The debtor shall promptly notify the Trustee if the debtor becomes entitled to receive a distribution of money or other property (including, but not limited to, bonuses, inheritances, tax refunds or any claim) whose value exceeds $2,500.00, unless the plan elsewhere specifically provides for the debtor to retain the money or property.

## IX.  Liquidation Analysis Pursuant to 11 USC § 1325(a)(4)
The liquidation value of the estate is $_535,000_.  In order to obtain a discharge, the debtor must pay the liquidation value or the total of allowed priority and nonpriority unsecured claims, whichever is less.  Under 11 USC §§ 1325(a)(4) and 726(a)(5), interest on allowed unsecured claims under Section IV.D and IV.E shall be paid at the rate of _0.91_% per annum from the petition filing date (no interest shall be paid if left blank).

[Local Bankruptcy Form 13-4, eff. 12/16]

Case 19-11828-TWD    Doc 34-50    Filed 09/10/19    Ent. 09/10/19 18:03:32    Pg. 109 of 193
Case 16-16219-TWD    Doc 45    Filed 05/19/17    Ent. 05/19/17 18:30:32    Pg. 4 of 5

**X.**  **Other Plan Provisions:**

    A.  No funds shall be paid to nonpriority unsecured creditors until all secured, administrative and priority unsecured creditors are paid in full, provided that no claim shall be paid before it is due.

    B.  Secured creditors shall not assess any late charges, provided payments from the plan to the secured creditor are current, subject to the creditor's rights under state law if the case is dismissed.

    C.  The holder of a secured claim shall file and serve on the Trustee, debtor and debtor's counsel  a notice itemizing all fees, expenses or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed , and (2) that the holder asserts are recoverable against the debtor or the debtor's principal residence.  The notice shall be served within 180 days after the date on which the fees, expenses or charges are incurred, per Fed. R. Bankr. P. 3002.1(c).

    D.  Mortgage creditors shall file and serve on the Trustee, debtor and debtor's counsel a notice of any change in the regular monthly payment amount, including any change that results from an interest rate or escrow adjustment, no later than 21 days before a payment in the new amount is due, per Fed. R. Bankr. P. 3002.1(b).

    E.  Provision by secured creditors or their agents or attorneys of any of the notices, statements or other information provided in this section shall not be a violation of the 11 USC § 362 automatic stay or of privacy laws.

**XI.**  **Certification**:

    A.  The debtor certifies that all post-petition Domestic Support Obligations have been paid in full on the date of this plan and will be paid in full at the time of the confirmation hearing. Debtor acknowledges that timely payment of such post-petition Domestic Support Obligations is a condition of plan confirmation pursuant to 11 USC § 1325(a)(8).

    B.  By signing this plan, the debtor and counsel representing the debtor certify that this plan does not alter the provisions of Local Bankruptcy Form 13-4, except as provided in Section XII below. Any revisions to the form plan not set forth in Section XII shall not be effective.

**XII.**  **Additional Case-Specific Provisions**: (must be separately numbered)

1.  Debtor will seek to (a) complete a modification of her first mortgage, (b) refinance her residence, or (c) obtain a fully executed purchase and sale agreement for her residence. She must have attained one of those three options no later than 180 days following confirmation. Any sale pursuant to the third option must close within 90 days of the agreement being executed. The money owing to Bayview Loan Servicing, LLC, if not otherwise dealt with through a finalized modification, will be paid in full from refinance or sale.

2.  Debtor will file an adversary action to determine what amount, if any, is owed on the second position deed of trust of Qualstar Credit Union on the residence. Unless or until Debtor is successful in avoiding Qualstar's lien through an adversary action, Qualstar will retain its lien on the residence and it will be paid through one of the three options set forth in provision XII.1.

3.  Debtor will file an adversary complaint against Bayview Loan Servicing, LLC, alleging improprieties on the part of the original lender at and/or after the time of the loan origination. The results of that proceeding may alter the amount owed on Bayview's claim and/or the extent of Bayview's lien.

4.  Qualstar Credit Union and Bayview Loan Servicing shall keep the monthly payments received under the plan regardless of any outcome of the adversary complaints.

5.  In the event that Debtor defaults on any of the terms of her plan, Qualstar Credit Union and Bayview Loan Servicing shall automatically have relief from stay to pursue any of their remedies.

| | | | |
|---|---|---|---|
| _/s/ Jeffrey B. Wells_ | /s/ Kim C. Kerrigan | 8663 | May 18, 2017 |
| Attorney for Debtor(s) | DEBTOR | Last 4 digits SS# | Date |
| | | | |
| May 18, 2017 | | | |
| Date | DEBTOR | Last 4 digits SS# | Date |

[Local Bankruptcy Form 13-4, eff. 12/16]

THE HONORABLE TIMOTHY W. DORE
Chapter 13
Ex Parte

THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

In re

KIM C. KERRIGAN,

                    Debtor.

Case No. 16-16219

EX PARTE APPLICATION FOR RULE
2004 EXAMINATION AND
PRODUCTION OF DOCUMENTS

COMES NOW Kim C. Kerrigan, the Debtor herein, by and through her attorneys Wells and Jarvis, P.S. and Jeffrey B. Wells, and hereby moves the Court for certain relief pursuant to Fed. R. Bank. P. 2004. This application is based upon the accompanying Declaration of William J. Pataalo and the exhibits attached thereto.

Federal Rule of Bankruptcy Procedure 2004 permits any party in interest, upon motion and court order, to examine any entity with respect to, among other things, any matter that may affect the administration of the Debtor's estate.

Here, Debtor respectfully requests that the Court enter an ex parte order directing officers or designated agents for Bayview Loan Servicing, LLC, M&T Bank, and Federal Home Loan Mortgage Corporation, to produce all documents set forth on **Exhibit B** to the accompanying declaration of William J. Pataalo, and to appear at Wells and Jarvis, P.S. 500 Union Street, Suite 502, Seattle, Washington 98101 in order for said individual(s) to be examined under oath on a day and time that is mutually agreeable to the parties.

Ms. Kerrigan is aware that the Court may have concerns about granting her unfettered

APPLICATION FOR 2004 EXAM - 1

Wells and Jarvis, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

Case 19-11828-TWD  Doc 34-68  Filed 09/10/19  Ent. 09/10/19 17:12:58  Pg. 111 of 193
Case 16-16219-TWD  Doc 68  Filed 11/15/17  Ent. 11/15/17 12:56:36  Pg. 1 of 3

1    authority to seek discovery from these creditors, given her two prior lawsuits and the fact that

2    both were dismissed and appeals are pending. In order to reassure the Court and the parties

3    that this application does not represent an effort to thwart creditors' rights against her

4    property but rather a specific request stemming from a report generated by an expert witness,

5    Ms. Kerrigan has included a declaration by her expert witness. By disclosing this information

6    and detailing the items to be produced, Ms. Kerrigan hopes to demonstrate that her discovery

7    requests are tailored to a specific purpose and will not be overly burdensome.

8

9        Ms. Kerrigan has continued to make her monthly Chapter 13 plan payments, for a

10   total of $30,400 to date according to the Chapter 13 trustee's website. Pursuant to the terms of

11   the chapter 13 plan, which was confirmed June 7, 2017, Ms. Kerrigan has 180 days from

12   confirmation in which to pay the holder of the first deed of trust on her residence through sale

13   or refinance, or else the lienholder will have relief from the automatic stay to pursue its rights

14   against the property. The present request pursuant to Federal Rule of Bankruptcy Procedure

15   2004 is not inconsistent with the timeline already established by the confirmed plan.

16

17        This request is not superfluous; it is relevant in that it directly relates to whether the

18   creditor(s) who filed a claim in the bankruptcy case have the proper standing to participate in

19   the case. The question of standing of the parties is relevant to the administration of the

20   bankruptcy because Debtor is to pay the proper lienholder through her confirmed plan.

21   Further, if the creditor(s) filed a proof of claim asserting standing where none existed, it is

22   within the jurisdiction of the bankruptcy court to enter an appropriate remedy.

23

24        If the responses reveal that no fraud is present and the asserted creditors have the

25   proper standing, then the confirmed plan will remain in place and the creditor(s) will not be

26   prejudiced. If questionable activity is found to be present, the Debtor would presumably file

27

APPLICATION FOR 2004 EXAM - 2

Wells and Jarvis, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

APP 000069

1  appropriate motions before the court, with the creditor(s) afforded an opportunity to respond

2  and be heard.

3      Wherefore, Debtor respectfully requests that the Court enter the associated order

4  granting her authority to request documents and set an examination date pursuant to Fed. R.

5  Bank. P. 2004.

6

7      DATED this 15th day of November, 2017.

8                                        WELLS AND JARVIS, P.S.

9                                        */s/ Jeffrey B. Wells*
                                          By: Jeffrey B. Wells, WSBA #6317
10                                       Attorneys for the Debtor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

APPLICATION FOR 2004 EXAM - 3

Wells and Jarvis, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

Case 19-11828-TWD Doc 34-68 Filed 09/10/19 Ent 09/10/19 18:08:36 Pg 113 of 193
Case 16-16219-TWD Doc 68 Filed 11/15/17 Ent 11/15/17 14:56:36 Pg 3 of 3

**Below is the Order of the Court.**



**Timothy W. Dore**
**U.S. Bankruptcy Court**
(Dated as of Entered on Docket date above)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

Case No. 16-16219

In re

KIM C. KERRIGAN,

Debtor.

EX PARTE ORDER AUTHORIZING
2004 EXAMINATION OF BAYVIEW
LOAN SERVICING, LLC, M&T
BANK, AND FEDERAL HOME LOAN
MORTGAGE CORPORATION

16
17
18
19
20
21
22
23
24
25
26
27

The Court has considered the ex parte application of Kim C. Kerrigan for an ex parte

order directing Bayview Loan Servicing, LLC, M&T Bank, and Federal Home Loan

Mortgage Corporation to appear for examination under oath, and has found that good cause

appears to grant the application. Now, Therefore, IT IS HEREBY ORDERED THAT:

1.      Bayview Loan Servicing, LLC shall produce documents pursuant to any valid

subpoena issued by the Debtor under FRBP 2004, ~~consistent with the attached~~ **Exhibit A**, and

an officer or designated agent shall appear and be examined under oath at a date and time

mutually agreeable to the parties, but in no event less than 20 days after service; and

2.      M&T Bank shall produce documents pursuant to any valid subpoena issued by

ORDER DIRECTING 2004 EXAMINATION

the Debtor under FRBP 2004, ~~consistent with the attached~~ **Exhibit A**, and an officer or

designated agent shall appear and be examined under oath at a date and time mutually

agreeable to the parties, but in no event less than 20 days after service; and

3.      Federal Home Loan Mortgage Corporation shall produce documents pursuant

to any valid subpoena issued by the Debtor under FRBP 2004, ~~consistent with the attached~~

~~Exhibit A~~, and an officer or designated agent shall appear and be examined under oath at a

date and time mutually agreeable to the parties, but in no event less than 20 days after service.

/// End of Order ///

Presented by:

*/s/ Jeffrey B. Wells*
Jeffrey B. Wells, WSBA #6317
Wells and Jarvis, P.S.
Attorney for the Debtor
500 Union Street, Ste. 502
Seattle, WA 98101
206-624-0088

ORDER DIRECTING 2004 EXAMINATION

1

2    THE HONORABLE TIMOTHY W. DORE
Hearing Date: December 5, 2018

3    Response Date: November 28, 2018
Hearing Time: 9:30 a.m.

4    Hearing Location: Seattle
Chapter 13

5

6

7

8    THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9    In re                                    CASE NO.  16-16219

10

11   KIM C. KERRIGAN,                          AMENDED OBJECTION TO PROOF
OF CLAIM NUMBER 1

12            Debtor.

13        COMES NOW Kim C. Kerrigan, the Debtor herein, by and through her attorney of

14   record, Jeffrey B. Wells, and files the following objection to proof of claim number 1 filed by

15   Bayview Loan Servicing, LLC on April 14, 2017.

16        This case was filed December 15, 2016. Local Bankruptcy Rule 3007-1 states that

17   "objections to claims in chapter 13 cases must be filed and served no later than 270 days from

18   the petition date, unless good cause is shown." The present objection has been filed outside of

19   this 270 day timeline, however good cause is present to support its late filing. Specifically, the

20   standing issues which are detailed below and form the basis for this declaration only came to

21   light after Ms. Kerrigan undertook a 2004 examination of the claimant earlier this year, after the

22   270 days had passed. This is especially true since Bayview Loan Servicing, LLC in its filed proof

23   of claim stated in box number 2 that the claimant had not acquired the claim from someone else.

24   This is now known to be false based on the 2004 examinations.

25

26

27   OBJECTION TO CLAIM - 1

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

1

2         In addition, it is respectfully submitted that an objection based solely on standing as set

3    forth below can be brought at any time, unlike normal objections such as to the amount of a

4    claim.

5                                    **I.     Standing**

6         On November 20, 2017, this Court authorized the taking of a 2004 examination of the

7    purported creditor who filed proof of claim number 1, i.e. Bayview Loan Servicing, LLC

8    (hereinafter "Bayview") and M&T Bank, who is also listed in the proof of claim. In addition, the

9    Court authorized an examination of Federal Home Loan Mortgage Corporation (who was

10   believed to be a party in interest).

11

12        As set forth in the declaration of William Pataalo that accompanies this objection, the

13   2004 examinations were held on or around June 28, 2018. Lauren Haberlan was the designated

14   30(b)(6) representative who appeared at the examination on behalf of all three entities.

15        Based upon those examinations, Debtor now objects to proof of claim 1. The claimant

16   has failed to show that it has standing to assert a claim.

17        The Supreme Court has made it clear that the burden of establishing standing rests on the

18   plaintiff (i.e. claimant). *DaimlerChrysler*, 547 U.S. at 342, n.3; *FW/PBS Incorporated v.*

19   *Dallas*, 493 U.S. 215, 231 (1990). At each stage of the litigation—from the initial pleading stage,

20   through summary judgment, and trial—the claimant must carry that burden**.** *Defenders of*

21   *Wildlife*, 504 U.S. at 561. Standing must exist on the date the complaint is filed and throughout

22   the litigation. *Davis v. Federal Election Commission*, 554 U.S. 724, 734 (2008). Moreover,

23   standing cannot be conferred by agreement and can be challenged at any time (e.s.) in the

24

25   litigation, including on appeal, by the defendants or, in some circumstances, by the court sua

26

27   OBJECTION TO CLAIM - 2

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

sponte. Courts of appeal are obliged to examine standing under all circumstances. *See e.g.Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 47 (D.C. Cir. 1999).

The case of *Bank of New York Mellon v. Lane*, 2018 Bankr. Lexis 2938 (9th Cir. B.A.P. 2018) provides a primer on the burden which claimants filing a proof of claim must meet in order for their claim to be given the prima facie presumption of validity under Federal Rule of Bankruptcy Procedure 3001(f).

The Panel indicated that "a claim objection based on lack of standing" is not merely a procedural formality, but rather, "absolutely concerns that claimant's ability to enforce the otherwise valid note or deed of trust." *Id.* at 13.

The Panel further stated that a claim objection based on standing is a substantial objection under section 502(b)(1) of the Bankruptcy Code. When faced with a substantive objection by a party in interest, the claimant must first establish that they hold enforceable claims against the respective debtor. The Panel, quoting *Pursley v. eCAST Settlement Corp.*, 451 B.R. 213, 231 (Bankr. M.D. Ga 2011), stated, "it *is* a substantive objection if a party claims not to owe money to another party; that goes directly to the validity of the claim … it is not enough that the debtor owes *someone* money; the issue is whether the debtor (and hence the bankruptcy estate) owes it to the party filing the proof of claim." *Id.* The Panel, quoting *Veal v. American Home Mortgage, Inc.*, 450 B.R. 897 (9th Cir. BAP 2011), stated:

> "In the context of a claim objection, both the injury-in-fact requirement of constitutional standing and the real party in interest requirement of prudential standing hinge on who holds the right to payment under the Note and hence the right to enforce the Note … Otherwise, the estate may pay funds to a stranger to the case; indeed, the primary purpose of the real party in interest doctrine is to ensure that such mistaken payments do not occur." *Id.* at 14.

Bottom line, "in the claim-objection context, standing is a prerequisite to the evidentiary benefits

OBJECTION TO CLAIM - 3

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

1    of Rule 3001(f), and the claim allowance process yields a final adjudication of the parties'

2    underlying rights." *Id.*

3        Similar to the debtor in *Bank of New York Mellon v. Lane*, *supra*, Kim Kerrigan does not

4

5    attack the validity of the underlying loan documents, does not dispute having received the initial

6    loan monies, and does not dispute that she owes someone money for the loan and that the debt

7    was secured by a first-position lien against her residence. What Ms. Kerrigan does dispute,

8    however, is whether Bayview Loan is the party entitled to enforce the note.

9                                    **II.    Rule 30(b)(6)**

10       Federal Rule of Civil Procedure 30(b)(6) requires a corporate defendant to "designate one

11   or more officers, directors, or managing agents, or designate other persons who consent to testify

12

13   on its behalf … about information known or reasonably available to the organization." Where a

14   corporate defendant cannot produce a knowledgeable current employee, it is "obligated to

15   prepare [one or more witnesses] so that they may give complete, knowledgeable and binding

16   answers on behalf of the corporation." *Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 126

17

18   (M.D.N.C. 1989). The testimony of the designee is admissible against the party that designates

19   the representative. *See* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal*

20   *Practice and Procedure* §2103 (2d ed. 1987 & Supp.2008).

21                            **III.    Declaration of William J. Paatalo**

22       This objection is based upon the Declaration of William J. Paatalo and supporting exhibits

23   which were all filed under seal at docket number 87, and which are incorporated herein by

24

25   reference. The declaration sets forth various shortcomings of the ability of Lauren Haberlan as

26   official Rule 30(b)(6) designee to establish the standing of Bayview Loan and/or M&T Bank to

27   OBJECTION TO CLAIM - 4

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

Case 19-11828-TWD Doc 34-9 Filed 09/10/19 Ent 09/10/19 18:10:17 Pg 119 of 193
Case 16-16219-TWD Doc 90 Filed 10/24/18 Ent 10/24/18 08:20:17 Pg 4 of 6

assert claim number 1 filed in the bankruptcy case. That declaration points out various anomalies, including the following:

    (1) A copy of a note was filed as an attachment to proof of claim 1. A copy of a note was also provided by Bayview in this case in a different context, specifically as an exhibit to its motion for relief from the automatic stay filed March 27, 2017. A copy of the latter version is Exhibit 8 attached to the Declaration of William Paatalo. That version has various markings, endorsements, and allonges which do not appear on the version of the note attached to proof of claim 1. Thus it appears that the note which the proof of claim purports to be based upon is in fact outdated.

    (2) There is nothing in the note or deed of trust attached to the proof of claim that provides any evidence that Bayview Loan is entitled to enforce the note.

    (3) The designee gave contradictory testimony regarding when and by whom the loan was transferred, at times stating the transfer occurred prior to the FDIC receivership and at times stating it occurred after.

    (4) The designee also stated that the loan was transferred to Freddie Mac, i.e. Federal Home Loan Mortgage Corporation. But she could not articulate how, or provide documentation that, the loan was transferred from Freddie Mac to Bayview Loan or M&T Bank.

    (5) The designee testified that JP Morgan Chase did not "own" the loan, yet acquired the loan from the FDIC, thereby contradicting her earlier statements that it was acquired by Freddie Mac. This puts into question the assignment of the beneficial interest of the Kerrigan deed of trust from JP Morgan Chase Bank to Bayview Loan.

OBJECTION TO CLAIM - 5

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

1

2    (6) There were unexplained gaps in the original custodial history of the note.

3    (7) The designee has never seen the original blue ink note, only numerous copies, all of

4        which are different. Therefore it is difficult to determine which is the current operative

5        version.

6    (8) The declaration of William Paatalo suggests that there have been alterations to the

7        endorsements and/or allonges, made after the fact in order to prove up standing. Mr.

8        Paatalo cites the case of *Palm Beach County, FL – Wells Fargo Bank, N.A. as Trustee*

9        *v. Riley*, 50-2016-CA-010759 as a basis for concluding these sorts of actions were

10       routine practice by JP Morgan Chase at one time.

11   In summary, the designee's testimony raises serious questions about whether Bayview

12

13   Loan and/or M&T Bank have any standing to assert a claim that they are the proper party to

14   enforce the note.

15   In light of Mr. Paatalo's declaration and the need for claimants to substantiate their

16   standing in order to receive the presumption of validity of their claim, an evidentiary hearing is

17   appropriate. If Bayview Loan and/or M&T Bank are not able to establish such standing at the

18   evidentiary hearing, this Court should deny in full claim number 1.

19       DATED this 24th day of October, 2018.

20

21       __/s/ Jeffrey B. Wells__

22       By: Jeffrey B. Wells, WSBA #6317
         Attorney for the Debtor

23

24

25

26

27   OBJECTION TO CLAIM - 6

WELLS AND JARVIS, P.S.
502 Logan Building
500 Union Street
Seattle, WA 98101-2332
206-624-0088 Fax 206-624-0086

Case 19-11828-TWD    Doc 34-9    Filed 09/10/19    Ent. 09/10/19 18:20:17    Pg. 121 of 193
Case 16-16219-TWD    Doc 90    Filed 10/24/18    Ent. 10/24/18 08:20:17    Pg. 6 of 6

THE HONORABLE TIMOTHY W. DORE
Hearing Date: December 5, 2018
Response Date: November 28, 2018
Hearing Time: 9:30 a.m.
Hearing Location: Seattle
Chapter 13

THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| In re | CASE NO. 16-16219 |
|-------|-------------------|
| KIM C. KERRIGAN, | DECLARATION OF WILLIAM J. PAATALO |
| Debtor. | |

COMES NOW Kim C. Kerrigan, the Debtor herein, and submits the Declaration of

William J. Paatalo, which is attached hereto along with the referenced exhibits.

Dated this 23rd day of October, 2018.

/s/ Jeffrey B. Wells
By: Jeffrey B. Wells, WSBA #6317
Attorney for Debtor

DECLARATION - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# DECLARATION OF PRIVATE INVESTIGATOR
## – WILLIAM J. PAATALO

I, William J. Paatalo, hereby declares as follows:

     1.    I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

     2.    I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this Declaration. I have personal knowledge of the matters declared herein, and if called to testify, I could and would competently testify thereto.

     3.    I have 17 years combined experience in law enforcement and the mortgage industry.  My Resume ("CV") is attached as "**Exhibit 1**."

     4.    I have worked exclusively over the last 8 - years investigating foreclosure fraud, chain of title, and issues related to the securitization of residential and commercial mortgage loans and have spent more than 15,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analyses.

     5.    I have performed such analyses for residential real estate located in many states, including, but not limited to Washington, Oregon, California, Arizona, Nevada, Florida, Ohio, Montana, New Jersey, Illinois, and several other states.

     6.    As of this date, I have conducted more than 1,200 investigations in this area.

1. Declaration of Private Investigator – William J. Paatalo

7.    Because of my education and experience I am familiar with and have sufficient training and expertise to qualify as an expert, and I have testified as an expert in state and federal judicial proceedings in various jurisdictions throughout the United States.

8.    Most recently, I testified at trial as an expert witness on August 6, 2018 in Re: _PennyMac Holdings, LLC v. Mario Carini, et. al., California Superior Court, County of San Diego, Case No. 37-2017-00039675-CL-UD-CTL._

9.    My specific areas of expertise that have been deemed qualified by the courts are as follows:

•    Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.

•    Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.

•    Knowledge and use of ABSNet / MBSData and the interpretation of its internal accounting data showing "advance payments" made to the certificate holders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.

•    Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically included mortgages, deeds of trust, assignment, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

10.    I was retained by Kim Kerrigan by and through counsel to review the chain of title (COT) to the Deed of Trust (DOT) which is the subject of this action, and to render any opinions regarding defects, deficiencies, or possible fraud regarding the COT should they exist.

2. Declaration of Private Investigator – William J. Paatalo

11.    The following documents were inspected and marked as exhibits:

**Exhibit 2** – Deposition Transcript & Exhibits - Lauren Haberlan – 30(B)(6) witness – Bayview Loan Servicing - 6/28/2018
**Exhibit 3** – Deposition Transcript & Exhibits - Lauren Haberlan – 30(B)(6) witness – Freddie Mac - 6/28/2018
**Exhibit 4** – Deposition Transcript & Exhibits - Lauren Haberlan – 30(B)(6) witness – M&T Bank - 8/17/2018
**Exhibit 5** – Deed of Trust
**Exhibit 6** – Assignment of Deed of Trust
**Exhibit 7** – Kerrigan Note Received in February 2008
**Exhibit 8** – Motion For Relief From Stay – Note Endorsement / Allonges
**Exhibit 9** – Deposition Transcript – Vermytris Jones
**Exhibit 10** – Order – Palm Beach County, FL – _Wells Fargo Bank, N.A. as Trustee v. Riley, Case No.: 50-2016-CA-010759-XXXX-MB_
**Exhibit 11** – Freddie Mac Custodian List as of May 18, 2018
**Exhibit 12** – POC 4/6/2017

12.    Within a reasonable degree of investigative certainty, it is my professional opinion that the chain of title to the subject DOT and the whereabouts of the original Note cannot be determined by any parties to this action, nor is there any explanation as to why two versions of the so-called "original" Note have been presented, one of which bears an altered endorsement. The testimony put forth by Bayview Loan Servicing, Freddie Mac, and M&T Bank by the same 30(B)(6) witness is not only uninformed and evasive, it demonstrates clear ineptitude and lack of knowledge which is indicia of fraud. The witness, an employee of Bayview Loan Servicing ("Lauren Haberlan") provided sworn testimony on behalf of all three entities which confirms a clouded and fatally defective chain of title. I personally attended the depositions of Ms. Haberlan on June 28, 2018 as the

3. Declaration of Private Investigator – William J. Paatalo

corporate representative of Bayview and Freddie Mac. Haberlan's testimony highlights the following:

(a) Haberlan testified that the Kerrigan loan was sold by Washington Mutual Bank to Freddie Mac before the FDIC's receivership of WaMu, but had no idea as to the date of this transaction. (**EX.2, P.19, L2-15**). Ms. Haberlan then contradicts herself by testifying that the Kerrigan loan was purchased by Freddie Mac after the FDIC's takeover of WaMu, yet provides no evidence to support any such transaction. (**EX.3, P.12, L14-25, P.13, L1-2**). And, there is nothing in Bayview's records to show that Freddie Mac ever sold the loan after its alleged purchase. Of note, no assignments of the DOT to/from Freddie Mac exist and there is no evidence in Freddie Mac's, Bayview's, or M&T's custody to confirm it ever purchased the Kerrigan loan.

(b) JPMorgan Chase did not "own" the loan, yet acquired the loan from the FDIC. (**EX.4, P.63, L11-25**). This testimony suggests that the assignment of beneficial interest of the Kerrigan DOT (**Exhibit 6**) from JPMorgan Chase Bank to Bayview Loan Servicing was materially false. Still, there is no evidence to show any sales transactions from Freddie Mac to JPMorgan Chase, nor from Freddie Mac to anyone post WaMu Receivership on September 25, 2008.

(c) Bayview Loan Servicing has no "ownership interest" in the Kerrigan loan. (**EX.2, Pgs. 26-27, L1-3**). This testimony clearly contradicts the fact that Bayview Loan Servicing, LLC claimed to be the "Creditor" in the Proof of Claim filed on April 6, 2017 and attached as **Exhibit 12.**

(d) There are unexplained gaps in the custodial history of the original Note. (**EX.3, P.14, L14-20**) & (**EX.3, P.41, L3-13**). Specifically, the whereabouts of the original note from origination on February 13, 2008 until July 20, 2009; long after WaMu failed.

(e) When asked how she knew Freddie Mac purchased the loan, Ms. Haberlan

4. Declaration of Private Investigator – William J. Paatalo

1  answered, "*Essentially just based on my limited knowledge of securitization.*"
2  (**EX.3, P.17, L1-3**). The only document produced and relied upon by Ms.
3  Haberlan to support Freddie Mac's ownership is language on the Kerrigan Note
4  itself – "*MULTISTATE FIXED RATE NOTE -Single Family-Fannie Mae / Freddie*
5  *Mac UNIFORM INSTRUMENT,*" and this language, according to Ms. Haberlan,
6  was notice to Kerrigan that the loan was a "government sponsored entity" (GSE)
7  loan. (**EX.3, Pgs. 46-48**). From experience in the mortgage industry, the language
8  used on the fixed rate note was customary whether loans were sold to government
9  sponsored entities such as Freddie Mac or not. Ms. Haberlan's answer is entirely
10 ignorant, as the language upon the note does not mean Freddie Mac purchased the
11 Kerrigan loan.
12   (f) As a representative of Bayview, M&T and Freddie Mac, Ms. Haberlan does
13 not know who is entitled to the foreclosure proceeds of the home if liquidated.
14 (**Ex.2, P. 28, L. 15-17**) & (**Ex. 3, P. 30, L. 1-3**).
15   (g) As a representative of Freddie Mac, Ms. Haberlan never contacted Freddie
16 Mac or relied on any documents from Freddie Mac. (**EX.3, P.16, L14-25**).
17   (h) The custodian of the original Note as of June 28, 2018 was
18 "Wilmington Trust," with no other know custodians since JPMorgan Chase
19 claimed its possession as custodian. (**EX.2, P.33, L23-25, P.24, L1-5**). When
20 Bayview and M&T took over the servicing from JPMorgan Chase, the original
21 Note never exchanged hands. (**EX.2, P.64, L16-25**). Yet, the "Affidavit of Note
22 Possession" produced for depositions attests that the original Note was sent from
23 JPMorgan Chase to M&T Bank on 11/22/13. As outlined further below,
24 Wilmington Trust was not an approved Freddie Mac Custodian as on May 2018.
25   (i) Ms. Haberlan has never seen the "original blue-ink note", only numerous
26 copies that are all different. (**Ex. 2, P.30, L. 8-10**), (**Ex. 2, P. 31, L. 4-17**), (**Ex. 2,
27 P. 33, L. 1-9**) & (**Ex. 2, P. 33, L. 17-22**).

5. Declaration of Private Investigator – William J. Paatalo

(j) Ms. Haberlan did not identify which version of the note, if any, is the real version or "operative" version, as she played coy in not understanding the question, "Which did you think was accurate?" **(Ex. 2, P. 31, L18-24) & (Ex. 2, P. 76, L1-8).**

(k) Ms. Haberlan cannot identify how she acquired the authority to testify on behalf of Freddie Mac and has never seen any power of attorney document with her name. **(Ex. 3, P. 33, L. 20-25. P.34, 1-26).** However, a "Sub-Servicing Agreement" with no attached "Loan Schedule" showing the Kerrigan loan or any other loan is provided as an attempt to show her alleged authority.

## <u>Evidence Shows Alteration Of The Blank Endorsement On The Kerrigan Note After September 25, 2008.</u>

13. Attached as **Exhibit 7** is a copy of the Kerrigan Note bearing an undated endorsement "in-blank" as follows:

*"Pay To The Order Of*
*----------------------------*
*Without Recourse,*
*Washington Mutual Bank*
*Robin E. Tange – Vice President"*

14. The note has two markings in the upper-right hand corner of page one that look like a "snail" and a swirl-shaped "bulls-eye." These markings are believed to be proprietary markings used by JPMC.

15. Attached as **Exhibit 9** is the deposition transcript of JPMorgan Chase employee "Vermytris Jones" who testified as follows in the matter of <u>Deutsche Bank National Trust Company v. Donna B. Ray, Et Al</u>, State of Wisconsin, County of Dane, Circuit Court Branch Nine, No. 12CV2466:

6. Declaration of Private Investigator – William J. Paatalo

(Pgs. 73-75)

Q Near the top right corner of "Exhibit 1? there is what appears to be a snail. Do you see that?

A Yes.
Q Are you familiar with that?
A Yes.
Q Okay. Internally, you call that a snail, don't you?
A Well, they change it. Back in the day it was a swirl or something like that, so—
Q Swirl?
A Yeah.
Q Now what's it called?
A I'm not for sure.
Q Okay.
A Yeah.
Q Is there any meaning to the swirl that you know of?
A Yes.
Q What meaning is assigned to that swirl?
A That this is the original note.
Q What company places that swirl on the note?
A I know the department is custody.
Q Okay. And that's custody at JPMorgan. Correct?
A Yes.

[JONES DISCUSSES CREATING ENDORSEMENTS AND ALLONGES BY EXPLAINING "VOIDS AND EXTRAS" on P.46-47]:

"Q No. Let me ask that a different way. Every exception that comes to you is a request to determine whether an endorsement or an allonge is needed. Correct?

A Yes.
Q And that's sent by custody. Correct?
A Yes.
Q Custody has custody of the collateral file. Correct?
A Yes.
Q Do you go to custody for every exception that you receive?
A No.

7. Declaration of Private Investigator – William J. Paatalo

1    Q So why would you go to custody to see if the documents had an endorsement or
2    an allonge already in the physical file when custody is telling you that that's
     needed?

3    A Well, we have a procedure that we do as far as endorsements or allonges that we
4    create–it's called voids and extras, and it's meaning that it's an endorsement out
5    there or there's an allonge already out there. I'm not saying that every exception
6    that we do we go over there to custody to verify that, but it's just a procedure that
     custody opened up, and we rely on custody to see if there's an endorsement or
7    allonge already out there. And if it is, who to say somebody might go over there
8    and void it out. Then that's when we take upon yourself to go ahead and create the
     allonge because if it's voided, it's no good. Now they need a current allonge or
9    endorsement that needs to be placed in a file.

10       16.       Attached as **Exhibit 8** is a second version of the Kerrigan Note
11   submitted in Bayview's Motion to Lift Stay on March 27, 2017. This version of the
12   note also contains the "snail/swirl" markings. However, this version shows an
13   alteration of the "blank endorsement" whereby it is converted to a direct
14   endorsement from WaMu to JPMorgan Chase Bank, N.A. There are no initials or
15   indications as to who filled in the endorsement and under what authority they had
16   to do so. Additional allonges also appear in relation to the note, but it is unclear if
17   they are/were affixed to the note. As outlined above, Ms. Haberlan admits to
18   having never seen the original Note, that she reviewed multiple versions of the
19   Note that were admittedly different, and that there is a gap in the custodial history
20   of the Note from the time of origination, through the FDIC takeover of WaMu,
21   until Chase claimed possession in July 2009.

22       17.       Pursuant to Ms. Kerrigan's recollection, the first version of the note
23   with the endorsement "in blank" was provided to her by WaMu on or about
24   February 1, 2008 prior to WaMu's failure on September 25, 2008. Because
25   JPMC's alleged proprietary markings are on this version of the note, it would mean
26   the note was in JPMC's custody after 09/25/2008 with the endorsement still "in
27   blank." Hence, the alteration occurred after the FDIC takeover of WaMu.

8. Declaration of Private Investigator – William J. Paatalo

18.      There is an abundance of information now in the public domain, as well as within the realm of my personal investigative experiences, to universally suggest that the largest servicers create note endorsements and/or allonges when missing, or if needed in litigation to prove-up "standing." These are commonly referred to in foreclosure proceedings as "ta-dah" endorsements / allonges, which are never dated or witnessed by anyone having personal knowledge as to any underlying transactions. Someone (unknown who and when) altered the blank endorsement of "Robin Tange" on the note by making it a direct endorsement to Chase. Not only are the details surrounding this altered endorsement unexplained, Ms. Haberlan testified that JPMorgan Chase <u>DID NOT</u> acquire ownership of the Kerrigan Note from the FDIC which would refute the direct endorsement to JPMorgan Chase.

**"Per Freddie Mac's Website, 'Wilmington Trust' Is Not A Freddie Mac Approved Custodian As Of May 18, 2018."**

19.      Attached as **Exhibit 11** is a document titled, "Document Custodians Accepting Third-Party Seller/Servicers - May 18, 2018." I retrieved this document from Freddie Mac's website at the following address: www.freddiemac.com/singlefamily/sell/pdf/Document_Custodians.pdf

20.      The document states,

This is a list, as of the date indicated, of Document Custodians that currently have active agreements to perform document custodial services for Freddie Mac Seller/Servicers and either currently provide document custodial services to third-party Seller/Servicers or have expressed interest in providing custodial services to third-party Seller/Servicers.

21.      Per Haberlan's testimony on June 28, 2018, the custodian of the Kerrigan Note was "Wilmington Trust." Per (**Ex.2, Pgs. 33-34**):

9. Declaration of Private Investigator – William J. Paatalo

1  *Q. So let's be real clear, I am only talking about the custodial file right now.*
2  *And you had told me that you have never seen the original custodial file,*
*is that correct?*
3  *A. I have never physically seen and held the original blue ink signature*
4  *Note and Deed of Trust.*
5  *Q. Okay. So, currently where is this Note?*
*A. With our custodian.*
6  *Q. And who is your custodian?*
7  *A. Wilmington Trust.*
*Q. Who is Williamson Trust?*
8  *A. Our custodian.*
9

10      22.     "Wilmington Trust" is not named on this list of Freddie Mac custodians
11  as of a month prior.
12

13  **"The Assignment Of Deed OF Trust To Bayview Loan Servicing Is Materially**
**False."**
14

15      23.     Attached as **Exhibit 6** is the publicly recorded assignment of the
16  Kerrigan DOT which purports that "*JPMorgan Chase Bank, National Association,*
17  *successor in interest by purchase from the Federal Deposit Insurance Company as*
18  *Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA*"
19  assigned "all beneficial interest" under the Kerrigan DOT to "*Bayview Loan*
20  *Servicing, LLC*" on 12/10/2013. Per the testimony of Ms. Haberlan cited above,
21  JPMorgan Chase did not acquire ownership of the Kerrigan DOT and Note, and as
22  such, this assignment of beneficial interest to Bayview as expressed is materially
23  false and did not happen. There is a pattern and practice of creating these
24  materially false assignments by JPMorgan Chase Bank as admitted by Chase's
25  own employee ("Darlene Marcott"). Attached as **Exhibit 10** is an Order entered on
26  December 13, 2017 in Re: *Palm Beach County, FL – Wells Fargo Bank, N.A. as*
27  *Trustee v. Riley, Case No.: 50-2016-CA-010759-XXXX-MB*. Per the Order:

10. Declaration of Private Investigator – William J. Paatalo

¶12,

*Ms. Marcott testified she had testified in many trials where similar Mortgage Assignments were introduced at trial as evidence as Plaintiffs standing to foreclose.*

¶'s 20-23,

*In this case, Defendant's second affirmative defense alleged the assignments were evidence of unclean hands because they represented a transaction that never happened.*

*At trial, Ms. Marcott admitted that any claim JP Morgan Chase ever owned or sold Defendant's note and mortgage was false. She testified that Defendant's note and mortgage were not assets of Washington Mutual after 2005. As such, the 2010 assignment could not truthfully document a transaction that JP Morgan Chase obtained Defendant's note and mortgage from Washington Mutual and sold it to the Plaintiff Trust. This transaction never happened.*

*Moreover, the 2015 assignment contains a materially false statement that JP Morgan purchased Defendant's note and mortgage from the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Washington Mutual.*

*The note and mortgage were not assets of Washington Mutual to be sold by the FDIC Receiver to JP Morgan Chase and or to be sold by JP Morgan Chase to the Plaintiff Trust. Plaintiff's Trial Witness admitted the statement that the FDIC sold this loan as Receiver to Washington Mutual to JP Morgan Chase who sold it to the Plaintiff is materially false.*

24.    The Haberlan testimony as highlighted above reveals a fatally defective

11. Declaration of Private Investigator – William J. Paatalo

chain of title that includes differing versions of the original Kerrigan Note that

cannot be explained, a materially false assignment, and not a shred of verifiable

evidence to support Haberlan's authority to represent Freddie Mac as its witness,

or Freddie Mac's assertion that it owns the Kerrigan loan. The testimony reveals

ownership of the Kerrigan DOT and Note was never acquired by JPMorgan Chase

via the FDIC, Bayview has no ownership interest in the Kerrigan DOT, Freddie

Mac has no documentation of ever purchasing the Kerrigan loan, and it is unknown

as to who is entitled to the liquidation proceeds of the Kerrigan property if

foreclosed and sold.

25.    Perhaps Ms. Haberlan's testimony sums it up best in (**Ex.2, P.19, L1
15):**


*A. Okay. The lender is stated on this Deed of Trust as Washington Mutual
Bank, so they would have originated the Deed of Trust.*
*Q. Okay. And are you aware of who acquired the Deed of Trust, if anyone, after
that date?*
*A. Can you please explain what you mean by acquired?*
*Q. Was that Deed of Trust sold, so far as you know?*
*A. I believe it was.*
*Q. To who?*
*A. To Freddie Mac.*
*Q. Do you know when?*
*A. I have no idea.*
*Q. Is there a way to find that out?*
*A. I do not know of a way to find out.*

26. In conclusion, the facts and assertions in this case reflect custom and

practice in the industry to obscure the divergence between the money trail (actual

transactions) and the proposed paper trail (documents asserting that transactions

actually occurred). As a private investigator, it would be negligent to accept self-

serving assertions and documents made to support the claims of enforcement or

12. Declaration of Private Investigator – William J. Paatalo

collection, inasmuch as such claims are inconsistent with the facts. Without actual proof of the movement of money, a clean opinion from an auditor would be impossible. This corroborates both my methodology and my opinion, to wit; at this point in the case the assertions and documents are not credible and therefore could not reasonably support any assumptions offered. The inconsistencies can only be resolved by actual proof without assumptions. Without that proof, the chain of title proffered by the parties claiming rights to enforce, administrate or collect money must be considered to lack foundation.

**I declare under penalty of perjury, under the laws of the State of Washington and the United States that the above is true and correct, and that this declaration was executed this 22nd day of October 2018.**

_____

William J. Paatalo
Private Investigator – Oregon PSID# 49411

13. Declaration of Private Investigator – William J. Paatalo

APP 000092

BP Investigative Agency
Exhibit 5



**Recording requested by: LSI**
**When recorded return to :**
**Custom Recording Solutions**
**2550 N. Redhill Ave.** 4\cu4p5
**Santa Ana, CA. 92705**


ORIGINAL DEED

Assessor's Parcel or Account Number: 292270071007
Abbreviated Legal Description:

[Include lot, block and plat or section, township and range]      Full legal description located on page 3
Trustee: Michael D. Hitt                                              Exhibit A

───────────── [Space Above This Line For Recording Data] ─────────────

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated      February 13, 2008
together with all Riders to this document.

(B) "Borrower" is Kim C Kerrigan, A Single Person

Borrower is the trustor under this Security Instrument.

(C) "Lender" is Washington Mutual Bank

0757266317

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3048  1/01

-6(WA) (0012)

Page 1 of 18      Initials: KCK

VMP MORTGAGE FORMS - (800)521-7291

20080226002217.0

Recording requested by: LSI
When recorded return to :
Custom Recording Solutions
2550 N. Redhill Ave.  *illegible*
Santa Ana, CA. 92705

Assessor's Parcel or Account Number: 292270071007
Abbreviated Legal Description:

[Include lot, block and plat or section, township and range].     Full legal description located on page 3
Trustee: Michael D. Hitt                                           Exhibit A

―――――――――――――― [Space Above This Line For Recording Data] ――――――――――――――

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     February 13, 2008
together with all Riders to this document.

(B) "Borrower" is Kim C Kerrigan, A Single Person

Borrower is the trustor under this Security Instrument.

(C) "Lender" is Washington Mutual Bank

0757266317

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3048 1/01

*VMP* -6(WA) (0012)
Page 1 of 15              Initials: *KCK*
VMP MORTGAGE FORMS - (800)521-7291

2008022600221.0

Lender is a **federal association**
organized and existing under the laws of The United States of America
Lender's address is 2273 N. Green Valley Parkway, Suite 14 , Henderson, NV
89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is Michael D. Hitt

(E) "Note" means the promissory note signed by Borrower and dated    February 13, 2008
The Note states that Borrower owes Lender Four Hundred Seventeen Thousand and No/100
                                                                                    Dollars
(U.S. $417,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      March 1, 2038
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _KCK_                    0757266317

⬤ -6(WA) (0012)            Page 2 of 15            Form 3048 1/01

20080226002217.00

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

See attached exhibit A

Parcel ID Number: 292270071007                which currently has the address of
8011 9th Ave Nw                                                              [Street]
Seattle                                        [City] , Washington 98117
("Property Address");                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _KCH_                0757266317

-6(WA) (0012)              Page 3 of 15              Form 3048 1/01

20080226002217.0

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community

Initials: _KCH_

0757266317

-6(WA) (0012).                    Page 4 of 15                    Form 3048  1/01

2008022600217.0

Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _KCK_

0757266317

-6(WA) (0012)                     Page 5 of 15                     Form 3048  1/01

20080226002217.0

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to

Initials: _KCK_

0757266317

-6(WA) (0012)  Page 6 of 15  Form 3048  1/01

20080226002217.0

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

0757266317

Initials: *KCK*

@@ -6(WA) (0012)    Page 7 of 16    Form 3048  1/01

20080226002217.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: _KCK_    0757266317

-6(WA) (0012)    Page 8 of 15    Form 3048    1/01

20080226002217.0

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials: _RCK_    0757256317

1240  6(WA) (0012)    Page 9 of 15    Form 3048   1/01

20080226002217.01

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's

0757266317

Initials: _N.C.K._

-6(WA) (0012).01

Page 10 of 15

Form 3048 1/01

20080226002217.01

notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

0757266317

Initials: _KCK_

-6(WA) (0012).01

Page 11 of 15

Form 3048  1/01

Order: Non-Order Search  Doc: KC:2008 20080226002217    Page 12 of 17    Created By: eeimunoz  Printed: 2/11/2015 8:51:38 AM PST

Case 18-15218-TWD   Doc 32-5  Filed 09/10/2018  Ent. 09/10/2018 10:34:09  Pg. 148 of 193

2008022600217.013

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

0757266317

Initials: _KCK_

20080226002217.014

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

0757266317

Initials: _N.C.K_

Form 3048   1/01

-6(WA) (0012).01                    Page 13 of 16

20080226002217.016

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          *Kim C. Kerrigan* _____ (Seal)
                                        Kim C Kerrigan   (2/13/2008) -Borrower

_____          _____ (Seal)
                                                                   -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                          -Borrower

0757266317

-6(WA) (0012).01                Page 14 of 16                Form 3048  1/01

20080226002217.018

STATE OF WASHINGTON            } ss:
County of King

   On this day personally appeared before me   Kim C Kerrigan

to me known to be the individual(s) described in and who executed the within and foregoing instrument,
and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the
uses and purposes therein mentioned.

   GIVEN under my hand and official seal this   13   day of Febr   2008

                     Notary Public in and for the State of Washington, residing at

                     My Appointment Expires on:
                              10/14/08

       Michael Paul Warnemuende

```
Notary Public
State of Washington
MICHAEL PAUL WARNEMUENDE
My Appointment Expires Oct 14, 2008
```

Prepared By: Melanie Dew
9451 Corbin Ave.
Northridge CA 91324

0757266317

Initials: KCK
2/

Form 3048   1/01

VMP®-6(WA) (0012).01            Page 15 of 15

20080226002217.017

APN: 292270071007

Order ID: 4106465
Loan No.: 0757266317

## EXHIBIT A
## LEGAL DESCRIPTION

The land referred to in this policy is situated in the State of WA, County of KING, City of SEATTLE and described as follows:

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page 21, records of King County, Washington; and the South 15 feet of Lot 43, All of Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of King County, Washington.

APN 292270071007

WITH THE APPURTENANCES THERETO.

APN: 292270071007

APP 000110

BP Investigative Agency
Exhibit 6

Electronically Recorded
# 20140115000469

SIMPLIFILE         A         34.00
Page 001 of 003
01/15/2014 12:18
King County, WA

After recording please return to:
PEIRSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

*[Space Above This Line For Recording Data]*

Loan No.: 1023214731

# WASHINGTON ASSIGNMENT OF DEED OF TRUST

Assessor's Property Tax Parcel or Account Number: 292270071007
Abbreviated Legal Description: SOUTH 15FT OF LOT 19, ALL OF LOT 20, AND NORTH 20FT OF LOT 21, BLK 4, GREENWOOD PARK ANNEX, VOL 18 OF PLATES, PG 21.
Full legal description located on page: 1

For Value Received, the undersigned holder of a Deed of Trust **JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA** (herein "Assignor") does hereby grant, sell, assign, transfer and convey, unto **BAYVIEW LOAN SERVICING, LLC,** (herein "Assignee"), whose address is **4425 PONCE DE LEON BLVD, CORAL GABLES, FL 33146,** all beneficial interest under a certain Deed of Trust dated **February 13, 2008** and recorded on **February 26, 2008,** made and executed by **KIM C. KERRIGAN,** to **MICHAEL D. HITT,** Trustee, upon the following described property situated in **KING** County, State of Washington:
Property Address: **8011 9TH AVE NW, SEATTLE, WA 98117**

**See exhibit "A" attached hereto and made a part hereof.**

such Deed of Trust having been given to secure payment of **Four Hundred Seventeen Thousand and 00/100ths ($417,000.00),** which Deed of Trust is of record in Book, Volume, or Liber No. N/A, at Page N/A (or as No. **20080226002217),** in the Office of the County Auditor of KING County, State of Washington.

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

---

Washington Assignment of Deed of Trust
JP Morgan Chase Bank N.A.

Page 1 of 2

L73108WA 01/12 Rev. 04/12



*1 0 2 3 2 1 4 7 3 1 *

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on 12/10/2013

Assignor:

**JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**

By: _Jaimeika Watson_

Its: **Vice President**

## ACKNOWLEDGMENT

State of **Louisiana**                    §
                                          §
Parish of **Ouachita**                    §

On this 10 day of December, 2013 before me appeared Jaimeika Watson to me personally known, who, being by me duly sworn (or affirmed) did say that he/she is the **Vice President**, of **JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**, and that the seal affixed to said instrument is the corporate seal of said national association and that the instrument was signed and sealed on behalf of the national association by authority of its board of directors and that Jaimeika Watson acknowledged the instrument to be the free act and deed of the national association.

Signature of Officer

Y K WILSON
Printed Name

Notary Public
Title of Officer

Monroe, LA Ouachita Parish
Place of Residence of Notary Public

My Commission Expires: L Rime

Y. K. WILSON
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 064399

(Seal)

**Washington Assignment of Deed of Trust**
**JP Morgan Chase Bank N.A.**               Page 2 of 2               L73108WA 01/12 Rev. 04/12

*10 3 2 1 4 7 3 1*

## EXHIBIT "A"

The land referred to in this policy is situated in the State of WA, County of KING, City of SEATTLE and described as follows:

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page 21, records of King County, Washington; and the South 15 feet of Lot 43, All of Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of King County, Washington.

APN 292270071007

WITH THE APPURTENANCES THERETO.

APN: 292270071007

BP Investigative Agency

Exhibit 7








# NOTE

February 13, 2008          Seattle                    Washington
    [Date]                 [City]                        [State]

8011 9th Ave Nw, Seattle, WA 98117

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 417,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Washington Mutual Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the First day of each month beginning on April 1, 2008 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2038 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P. O. Box 78148,
Phoenix, AZ 85062-8148 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,367.69 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

0757266317

VMP -5N (0207)          Form 3200 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3          Initials: KCK  2/13/2008

APP 000116

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

0757266317

-5N (0207)     Page 2 of 3     Form 3200 1/01
Initials: *XCX*
2/13/2008

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Kim C. Kerrigan_  2/13/2008 _____(Seal)    _____(Seal)
Kim C Kerrigan                     -Borrower                                              -Borrower

_____(Seal)    _____(Seal)
                               -Borrower                                              -Borrower

_____(Seal)    _____(Seal)
                               -Borrower                                              -Borrower

_____(Seal)    _____(Seal)
                               -Borrower                                              -Borrower

Pay to the order of

Without Recourse
Washington Mutual Bank

Robin E. Tange, Vice President

*[Sign Original Only]*

0757266317

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Kim C Kerrigan |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the : __Western__   District of | __Washington__ (State) |
| Case number | 16-16219-TWD |

Official Form 410

# Proof of Claim 04/16

Read the instructions before filling out this form. Use this form to make a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

The law requires that filers **must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Bayview Loan Servicing, LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| 2. Has this claim been acquired from someone else? | ☒ No<br>☐ Yes    From whom? |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure | **M&T Bank**<br>**P.O. Box 840**<br>**Buffalo, NY 14240-0840** | **M&T Bank**<br>**Attn: Payment Processing**<br>**P.O. Box 1288**<br>**Buffalo, NY 14240-1288** |
| | Contact phone | Contact phone |
| | Contact email | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4. Does this claim amend one already filed? | ☒ No<br>☐ Yes   Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
|---|---|---|
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No<br>☐ Yes   Who made the earlier filing? | |

Official Form 410

page 1

BP Investigative Agency
Exhibit 12

| Debtor 1 | Kim C Kerrigan | Case number 16-16219-TWD |
|---|---|---|
| | First Name   Middle Name   Last Name | |

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☐ No

☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 2502

**7. How much is the claim?**  $ 612,948.57 .

For leases state only the amount of default.

Does this amount include interest or other charges?

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No

☒ Yes. The claim is secured by a lien on property.

**Nature of property:**

☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

Describe:   8011 9th Ave NW, Seattle, WA 98117

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**   Recorded Deed of Trust

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $ _____

Amount of the claim that is secured:   $ 612,948.57

Amount of the claim that is unsecured: $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ 255,821.13

Annual Interest Rate (when case was filed) 5.500%

☒ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

**11. Does this claim involve a right to setoff?**

☒ No

☐ Yes. Explain: _____

| Debtor 1 | Kim C Kerrigan | Case number 16-16219-TWD |
|---|---|---|
| | First Name    Middle Name    Last Name | |

| 12. **Is all or part of the claim Entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

Official Form 410

page 3

| Part 3 | Sign Below |
|--------|-----------|

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box* |
| | ☐ I am the creditor |
| | ☒ I am the creditor's attorney or authorized agent. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date     04/06/2017
                     MM/DD/YYYY

/s/Heather D. Bock
    Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Heather D. Bock |
| | First name  Middle name    Last name |
| Title | Attorney |
| Company | McCalla Raymer Leibert Pierce, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1544 Old Alabama Road |
| | Number Street |
| | Roswell                                    GA      30076 |
| | City                                       State   ZIP Code |
| Contact Phone | 678-281-6444              Email   Heather.Bock@mccalla.com |

## Mortgage Proof of Claim Attachment

**(12/15)**

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

| Part 1: Mortgage and Case Information | | Part 2: Total Debt Calculation | | Part 3: Arrearage as of Date of the Petition | | Part 4: Monthly Mortgage Payment | |
|---|---|---|---|---|---|---|---|
| Case number: | 16-16219-TWD | Principal balance: | $402,164.36 | Principal & Interest due: | $194,150.58 | Principal & interest | $2,367.69 |
| Debtor 1: | Kim C Kerrigan | Interest due: | $151,994.90 | Prepetition fees due: | $20,122.27 | Monthly escrow: | $602.32 |
| Debtor 2: | | Fees, costs due: | $20,122.27 | Escrow deficiency for funds advanced: | $38,667.04 | Private mortgage insurance: | $0.00 |
| Last 4 digits to identify: | 2502 | Escrow deficiency for funds advanced: | $38,667.04 | Projected escrow shortage: | $2,881.24 | Total Monthly Payment | $2,970.01 |
| Creditor: | Bayview Loan Servicing, LLC | Less total funds on hand: | -$0.00 | Less funds on hand | - $0.00 | | |
| Servicer: | Bayview Loan Servicing, LLC | Total debt | $612,948.57 | Total prepetition arrearage | $255,821.13 | | |
| Fixed accrual/daily simple interest/other: | Fixed Accrual | | | | | | |

Case: 18-1341, Document: 15-14, Filed: 05/03/2019    Page 5 of 34    (162 of 573)

Case: 18-1341, Document: 15-14, Filed: 05/03/2019 Page 6 of 34 (183 of 375)

| Date | Contractual payment amount | Funds Received | Amount incurred | Description | Contractual Due Date | Prin, int & esc past due balance | Amount to Principal | Amount to interest | Amount to escrow | Amount to fees or charges | Unapplied funds | Principal Balance | Accrued interest balance | Escrow balance | Fees/Charges balance | Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances | | | | | | $0.00 | | | | | $0.00 | $402,164.36 | $0.00 | $913.00 | $0.00 | $0.00 |
| 3/1/2010 | $2,824.19 | | | Monthly Payment Due | | $2,824.19 | | | | | $0.00 | $402,164.36 | $0.00 | $913.00 | $0.00 | $0.00 |
| 3/9/2010 | | $2,824.19 | | Payment Applied | 3/1/2010 | $0.00 | $524.44 | $1,843.25 | $456.50 | | $0.00 | $401,639.92 | $0.00 | $1,369.50 | $0.00 | $0.00 |
| 3/17/2010 | | | | Payment Reversal | 3/1/2010 | $2,824.19 | -$524.44 | -$1,843.25 | -$456.50 | | $0.00 | $402,164.36 | $0.00 | $913.00 | $0.00 | $0.00 |
| 4/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $5,715.83 | | | | | $0.00 | $402,164.36 | $0.00 | $913.00 | $0.00 | $0.00 |
| 4/7/2010 | | | | County Taxes | 3/1/2010 | $5,715.83 | | | -$2,238.43 | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $0.00 | $0.00 |
| 4/9/2010 | | $2,824.19 | | Payment Applied | 3/1/2010 | $2,891.64 | $524.44 | $1,843.25 | $456.50 | | $0.00 | $401,639.92 | $0.00 | -$868.93 | $0.00 | $0.00 |
| 4/20/2010 | | | | Payment Reversal | 3/1/2010 | $5,715.83 | -$524.44 | -$1,843.25 | -$456.50 | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $0.00 | $0.00 |
| 5/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $8,607.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $0.00 | $0.00 |
| 5/16/2010 | | | $10.85 | Property Inspection | 3/1/2010 | $8,607.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $10.85 | $0.00 |
| 6/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $11,499.11 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $10.85 | $0.00 |
| 6/9/2010 | | | $14.00 | Property Inspection | 3/1/2010 | $11,499.11 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $24.85 | $0.00 |
| 7/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $14,390.75 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $24.85 | $0.00 |
| 7/15/2010 | | | $14.00 | Property Inspection | 3/1/2010 | $14,390.75 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $38.85 | $0.00 |
| 8/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $17,282.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $38.85 | $0.00 |
| 9/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $20,174.03 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,325.43 | $38.85 | $0.00 |
| 9/24/2010 | | | | County Taxes | 3/1/2010 | $20,174.03 | | | -$2,238.43 | | $0.00 | $402,164.36 | $0.00 | -$3,563.86 | $38.85 | $0.00 |
| 9/24/2010 | | | | County Taxes | 3/1/2010 | $20,174.03 | | | $2,144.88 | | $0.00 | $402,164.36 | $0.00 | -$1,418.98 | $38.85 | $0.00 |
| 10/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $23,065.67 | | | | | $0.00 | $402,164.36 | $0.00 | -$1,418.98 | $38.85 | $0.00 |
| 10/1/2010 | | | | Hazard Insurance | 3/1/2010 | $23,065.67 | | | -$725.90 | | $0.00 | $402,164.36 | $0.00 | -$2,144.88 | $38.85 | $0.00 |
| 11/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $25,957.31 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,144.88 | $38.85 | $0.00 |
| 12/1/2010 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $28,848.95 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,144.88 | $38.85 | $0.00 |
| 1/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $31,740.59 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,144.88 | $38.85 | $0.00 |
| 1/3/2011 | | | | Hazard Insurance | 3/1/2010 | $31,740.59 | | | -$761.00 | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $38.85 | $0.00 |
| 1/4/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $31,740.59 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $52.85 | $0.00 |
| 2/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $34,632.23 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $52.85 | $0.00 |
| 2/7/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $34,632.23 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $66.85 | $0.00 |
| 3/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $37,523.87 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $66.85 | $0.00 |
| 3/14/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $37,523.87 | | | | | $0.00 | $402,164.36 | $0.00 | -$2,905.88 | $80.85 | $0.00 |
| 3/29/2011 | | | | County Taxes | 3/1/2010 | $37,523.87 | | | -$2,301.40 | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 4/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $40,415.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 5/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $43,307.15 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 6/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $46,198.79 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 7/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $49,090.43 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 8/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $51,982.07 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $80.85 | $0.00 |
| 8/12/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $51,982.07 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $94.85 | $0.00 |
| 8/20/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $51,982.07 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $108.85 | $0.00 |
| 9/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $54,873.71 | | | | | $0.00 | $402,164.36 | $0.00 | -$5,207.28 | $108.85 | $0.00 |
| 9/23/2011 | | | | County Taxes | 3/1/2010 | $54,873.71 | | | -$2,301.39 | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $108.85 | $0.00 |
| 9/24/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $54,873.71 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $122.85 | $0.00 |
| 10/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $57,765.35 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $122.85 | $0.00 |
| 10/14/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $57,765.35 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $136.85 | $0.00 |
| 11/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $60,656.99 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $136.85 | $0.00 |
| 12/1/2011 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $63,548.63 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $136.85 | $0.00 |
| 12/3/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $63,548.63 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $150.85 | $0.00 |
| 12/14/2011 | | | $14.00 | Property Inspection | 3/1/2010 | $63,548.63 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $164.85 | $0.00 |
| 1/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $66,440.27 | | | | | $0.00 | $402,164.36 | $0.00 | -$7,508.67 | $164.85 | $0.00 |
| 1/1/2012 | | | | Hazard Insurance | 3/1/2010 | $66,440.27 | | | -$773.00 | | $0.00 | $402,164.36 | $0.00 | -$8,281.67 | $164.85 | $0.00 |
| 2/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $69,331.91 | | | | | $0.00 | $402,164.36 | $0.00 | -$8,281.67 | $164.85 | $0.00 |
| 3/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $72,223.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$8,281.67 | $164.85 | $0.00 |
| 3/17/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $72,223.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$8,281.67 | $178.85 | $0.00 |
| 3/27/2012 | | | | County Taxes | 3/1/2010 | $72,223.55 | | | -$2,398.74 | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $178.85 | $0.00 |
| 4/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $75,115.19 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $178.85 | $0.00 |
| 4/24/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $75,115.19 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $192.85 | $0.00 |
| 5/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $78,006.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $192.85 | $0.00 |
| 5/25/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $78,006.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $206.85 | $0.00 |
| 6/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $80,898.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $206.85 | $0.00 |
| 6/28/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $80,898.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $220.85 | $0.00 |
| 7/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $83,790.11 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $220.85 | $0.00 |
| 8/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $86,681.75 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $220.85 | $0.00 |
| 9/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $89,573.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $220.85 | $0.00 |

The table header spans: **PART V Loan Payment History from First Date of Default** — with groupings **Account Activity**, **How funds were applied/Amount incurred**, and **Balance after amount received or incurred**.

| Date | Payment | | Fee | Description | Date | Balance | | | | Adjustment | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/6/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $86,573.39 | | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $234.85 | $0.00 |
| 9/16/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $89,573.39 | | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $248.85 | $0.00 |
| 10/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $92,465.03 | | | | | | $0.00 | $402,164.36 | $0.00 | -$10,680.41 | $248.85 | $0.00 |
| 10/2/2012 | | | | County Taxes | 3/1/2010 | $92,465.03 | | | | -$2,398.73 | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $248.85 | $0.00 |
| 10/11/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $92,465.03 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $262.85 | $0.00 |
| 11/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $95,356.67 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $262.85 | $0.00 |
| 11/15/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $95,356.67 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $276.85 | $0.00 |
| 12/1/2012 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $98,248.31 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $276.85 | $0.00 |
| 12/15/2012 | | | $14.00 | Property Inspection | 3/1/2010 | $98,248.31 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,079.14 | $290.85 | $0.00 |
| 12/13/2012 | | | | Hazard Insurance | 3/1/2010 | $98,248.31 | | | | -$860.00 | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $290.85 | $0.00 |
| 1/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $101,139.95 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $290.85 | $0.00 |
| 1/18/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $101,139.95 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $304.85 | $0.00 |
| 2/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $104,031.59 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $304.85 | $0.00 |
| 2/21/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $104,031.59 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $318.85 | $0.00 |
| 3/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $106,923.23 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $318.85 | $0.00 |
| 3/12/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $106,923.23 | | | | | | $0.00 | $402,164.36 | $0.00 | -$13,939.14 | $332.85 | $0.00 |
| 3/26/2013 | | | | County Taxes | 3/1/2010 | $106,923.23 | | | | -$2,434.10 | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $332.85 | $0.00 |
| 4/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $109,814.87 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $332.85 | $0.00 |
| 4/10/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $109,814.87 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $346.85 | $0.00 |
| 5/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $112,706.51 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $346.85 | $0.00 |
| 5/24/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $112,706.51 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $360.85 | $0.00 |
| 6/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $360.85 | $0.00 |
| 6/7/2013 | | | $487.50 | Foreclosure Fee | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $848.35 | $0.00 |
| 6/7/2013 | | | $70.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $918.35 | $0.00 |
| 6/7/2013 | | | $1,310.72 | Title Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,229.07 | $0.00 |
| 6/7/2013 | | | $32.85 | Title Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,261.92 | $0.00 |
| 6/7/2013 | | | $32.85 | Title Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,294.77 | $0.00 |
| 6/7/2013 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,344.77 | $0.00 |
| 6/7/2013 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,394.77 | $0.00 |
| 6/7/2013 | | | $75.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,470.77 | $0.00 |
| 6/7/2013 | | | $445.40 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,916.17 | $0.00 |
| 6/7/2013 | | | $9.56 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,925.73 | $0.00 |
| 6/7/2013 | | | $0.44 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,926.17 | $0.00 |
| 6/7/2013 | | | $50.08 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,976.25 | $0.00 |
| 6/7/2013 | | | $5.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $2,981.25 | $0.00 |
| 6/7/2013 | | | $42.16 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,023.41 | $0.00 |
| 6/7/2013 | | | $42.16 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,065.57 | $0.00 |
| 6/7/2013 | | | $75.00 | Foreclosure Cost | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,140.57 | $0.00 |
| 6/15/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $115,598.15 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,154.57 | $0.00 |
| 7/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $118,489.79 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,154.57 | $0.00 |
| 7/2/2013 | | | $32.85 | Title Cost | 3/1/2010 | $118,489.79 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,187.42 | $0.00 |
| 7/12/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $118,489.79 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,201.42 | $0.00 |
| 8/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $121,381.43 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,201.42 | $0.00 |
| 8/13/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $121,381.43 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,215.42 | $0.00 |
| 9/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $124,273.07 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,215.42 | $0.00 |
| 9/5/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $124,273.07 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,229.42 | $0.00 |
| 10/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $127,164.71 | | | | | | $0.00 | $402,164.36 | $0.00 | -$16,373.24 | $3,229.42 | $0.00 |
| 10/3/2013 | | | | County Taxes | 3/1/2010 | $127,164.71 | | | | -$2,434.10 | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,229.42 | $0.00 |
| 10/5/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $127,164.71 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,243.42 | $0.00 |
| 11/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $130,056.35 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,243.42 | $0.00 |
| 11/8/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $130,056.35 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,257.42 | $0.00 |
| 11/19/2013 | | | $50.00 | NSF | 3/1/2010 | $130,056.35 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,307.42 | $0.00 |
| 11/27/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $130,056.35 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,321.42 | $0.00 |
| 12/1/2013 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $132,947.99 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,321.42 | $0.00 |
| 12/27/2013 | | | $14.00 | Property Inspection | 3/1/2010 | $132,947.99 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,335.42 | $0.00 |
| 1/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $135,839.63 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,335.42 | $0.00 |
| 1/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $135,839.63 | | | | | | $0.00 | $402,164.36 | $0.00 | -$18,807.34 | $3,453.80 | $0.00 |
| 1/24/2014 | | | | Hazard Insurance | 3/1/2010 | $135,839.63 | | | | -$924.00 | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,453.80 | $0.00 |
| 1/28/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $135,839.63 | | | | | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,467.80 | $0.00 |
| 2/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $138,731.27 | | | | | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,467.80 | $0.00 |
| 2/18/2014 | | | $118.38 | Late Charge | 3/1/2010 | $138,731.27 | | | | | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,586.18 | $0.00 |
| 3/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $141,622.91 | | | | | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,586.18 | $0.00 |
| 3/17/2014 | | | $118.38 | Late Charge | 3/1/2010 | $141,622.91 | | | | | | $0.00 | $402,164.36 | $0.00 | -$19,731.34 | $3,704.56 | $0.00 |
| 3/26/2014 | | | | County Taxes | 3/1/2010 | $141,622.91 | | | | -$2,710.29 | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,704.56 | $0.00 |
| 4/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $144,514.55 | | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,704.56 | $0.00 |
| 4/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $144,514.55 | | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,822.94 | $0.00 |

Case: 18-1341, Document: 15-14, Filed: 05/03/2019 Page 8 of 34 (165 of 5/3)

| Date | | | Amount | Description | Due Date | | Balance | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/18/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,836.94 | $0.00 |
| 4/18/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,850.94 | $0.00 |
| 4/24/2014 | | | -$14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,836.94 | $0.00 |
| 4/24/2014 | | | -$14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,822.94 | $0.00 |
| 4/24/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,836.94 | $0.00 |
| 4/24/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $144,514.55 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,850.94 | $0.00 |
| 5/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $147,406.19 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,850.94 | $0.00 |
| 5/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $147,406.19 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,969.32 | $0.00 |
| 6/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $3,969.32 | $0.00 |
| 6/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $4,087.70 | $0.00 |
| 6/17/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $4,101.70 | $0.00 |
| 6/25/2014 | | | $875.00 | Foreclosure Fee | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $4,976.70 | $0.00 |
| 6/25/2014 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,026.70 | $0.00 |
| 6/25/2014 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,076.70 | $0.00 |
| 6/27/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $150,297.83 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,090.70 | $0.00 |
| 7/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $153,189.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,090.70 | $0.00 |
| 7/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $153,189.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,209.08 | $0.00 |
| 7/30/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $153,189.47 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,223.08 | $0.00 |
| 8/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $156,081.11 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,223.08 | $0.00 |
| 8/29/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $156,081.11 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,237.08 | $0.00 |
| 9/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $158,972.75 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,237.08 | $0.00 |
| 9/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $158,972.75 | | | | | $0.00 | $402,164.36 | $0.00 | -$22,441.63 | $5,355.46 | $0.00 |
| 9/26/2014 | | | | County Taxes | 3/1/2010 | $158,972.75 | | -$2,710.29 | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,355.46 | $0.00 |
| 10/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $161,864.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,355.46 | $0.00 |
| 10/9/2014 | | | $312.50 | Foreclosure Fee | 3/1/2010 | $161,864.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,667.96 | $0.00 |
| 10/9/2014 | | | $72.00 | Foreclosure Cost | 3/1/2010 | $161,864.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,739.96 | $0.00 |
| 10/16/2014 | | | $118.38 | Late Charge | 3/1/2010 | $161,864.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,858.34 | $0.00 |
| 10/27/2014 | | | $14.00 | Property Inspection | 3/1/2010 | $161,864.39 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,872.34 | $0.00 |
| 11/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $164,756.03 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,872.34 | $0.00 |
| 11/17/2014 | | | $118.38 | Late Charge | 3/1/2010 | $164,756.03 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,990.72 | $0.00 |
| 12/1/2014 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $167,647.67 | | | | | $0.00 | $402,164.36 | $0.00 | -$25,151.92 | $5,990.72 | $0.00 |
| 12/30/2014 | | | | Hazard Insurance | 3/1/2010 | $167,647.67 | | -$944.00 | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $5,990.72 | $0.00 |
| 1/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $170,539.31 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $5,990.72 | $0.00 |
| 1/20/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $170,539.31 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $6,004.70 | $0.00 |
| 2/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $173,430.95 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $6,004.72 | $0.00 |
| 2/23/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $173,430.95 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $6,018.72 | $0.00 |
| 3/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $176,322.59 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $6,018.72 | $0.00 |
| 3/23/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $176,322.59 | | | | | $0.00 | $402,164.36 | $0.00 | -$26,095.92 | $6,032.72 | $0.00 |
| 3/27/2015 | | | | County Taxes | 3/1/2010 | $176,322.59 | | -$2,671.68 | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,032.72 | $0.00 |
| 4/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $179,214.23 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,032.72 | $0.00 |
| 4/20/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $179,214.23 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,046.72 | $0.00 |
| 5/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $182,105.87 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,046.72 | $0.00 |
| 5/20/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $182,105.87 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,060.72 | $0.00 |
| 6/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $6,060.72 | $0.00 |
| 6/15/2015 | | | $1,012.50 | Foreclosure Fee | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $7,073.22 | $0.00 |
| 6/15/2015 | | | $75.00 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $7,148.22 | $0.00 |
| 6/15/2015 | | | $949.00 | Title Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,097.22 | $0.00 |
| 6/15/2015 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,147.22 | $0.00 |
| 6/15/2015 | | | $50.00 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,197.22 | $0.00 |
| 6/15/2015 | | | $12.06 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,209.28 | $0.00 |
| 6/15/2015 | | | $54.45 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,263.73 | $0.00 |
| 6/15/2015 | | | $23.79 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,287.52 | $0.00 |
| 6/15/2015 | | | $5.61 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,293.13 | $0.00 |
| 6/15/2015 | | | $15.00 | Foreclosure Cost | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,308.13 | $0.00 |
| 6/22/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $184,997.51 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,322.13 | $0.00 |
| 7/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $187,889.15 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,322.13 | $0.00 |
| 7/24/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $187,889.15 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,336.13 | $0.00 |
| 8/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $190,780.79 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,336.13 | $0.00 |
| 8/26/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $190,780.79 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,350.13 | $0.00 |
| 9/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $193,672.43 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,350.13 | $0.00 |
| 9/14/2015 | | | $67.50 | Foreclosure Fee | 3/1/2010 | $193,672.43 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,417.63 | $0.00 |
| 9/22/2015 | | | $14.00 | Property Inspection | 3/1/2010 | $193,672.43 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $8,431.63 | $0.00 |
| 9/23/2015 | | | $609.40 | Foreclosure Cost | 3/1/2010 | $193,672.43 | | | | | $0.00 | $402,164.36 | $0.00 | -$28,767.60 | $9,041.03 | $0.00 |
| 9/28/2015 | | | | County Taxes | 3/1/2010 | $193,672.43 | | -$2,671.67 | | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,041.03 | $0.00 |
| 10/1/2015 | $2,891.64 | | | Monthly Payment Due | 3/1/2010 | $196,564.07 | | | | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,041.03 | $0.00 |
| 10/20/2015 | | | $74.00 | Foreclosure Cost | 3/1/2010 | $196,564.07 | | | | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,115.03 | $0.00 |

| Date | Payment | Fee/Cost | Description | Date | Balance | Adjustment | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/20/2015 | | $69.72 | Foreclosure Cost | 3/1/2010 | $196,564.07 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,184.75 | $0.00 |
| 10/29/2015 | | $14.00 | Property Inspection | 3/1/2010 | $196,564.07 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,198.75 | $0.00 |
| 11/1/2015 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $199,455.71 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,198.75 | $0.00 |
| 11/23/2015 | | $14.00 | Property Inspection | 3/1/2010 | $199,455.71 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,212.75 | $0.00 |
| 12/1/2015 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $202,347.35 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,212.75 | $0.00 |
| 12/21/2015 | | $200.00 | Foreclosure Cost | 3/1/2010 | $202,347.35 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,412.75 | $0.00 |
| 12/22/2015 | | $14.00 | Property Inspection | 3/1/2010 | $202,347.35 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,426.75 | $0.00 |
| 1/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $205,238.99 | | $0.00 | $402,164.36 | $0.00 | -$31,439.27 | $9,426.75 | $0.00 |
| 1/4/2016 | | | Hazard Insurance | 3/1/2010 | $205,238.99 | -$944.00 | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,426.75 | $0.00 |
| 1/22/2016 | | $14.00 | Property Inspection | 3/1/2010 | $205,238.99 | | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,440.75 | $0.00 |
| 2/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $208,130.63 | | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,440.75 | $0.00 |
| 2/24/2016 | | $14.00 | Property Inspection | 3/1/2010 | $208,130.63 | | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,454.75 | $0.00 |
| 3/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $211,022.27 | | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,454.75 | $0.00 |
| 3/24/2016 | | $14.00 | Property Inspection | 3/1/2010 | $211,022.27 | | $0.00 | $402,164.36 | $0.00 | -$32,383.27 | $9,468.75 | $0.00 |
| 3/29/2016 | | | County Taxes | 3/1/2010 | $211,022.27 | -$3,141.89 | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,468.75 | $0.00 |
| 4/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $213,913.91 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,468.75 | $0.00 |
| 4/21/2016 | | $14.00 | Property Inspection | 3/1/2010 | $213,913.91 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,482.75 | $0.00 |
| 5/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,482.75 | $0.00 |
| 5/9/2016 | | $31.25 | Foreclosure Cost | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,514.00 | $0.00 |
| 5/9/2016 | | $8.13 | Foreclosure Cost | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,522.13 | $0.00 |
| 5/9/2016 | | $5.81 | Foreclosure Cost | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,527.94 | $0.00 |
| 5/9/2016 | | $76.00 | Foreclosure Cost | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,603.94 | $0.00 |
| 5/9/2016 | | $50.00 | Foreclosure Cost | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,653.94 | $0.00 |
| 5/19/2016 | | $14.00 | Property Inspection | 3/1/2010 | $216,805.55 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,667.94 | $0.00 |
| 6/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $219,697.19 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,667.94 | $0.00 |
| 6/22/2016 | | $14.00 | Property Inspection | 3/1/2010 | $219,697.19 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,681.94 | $0.00 |
| 7/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $222,588.83 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,681.94 | $0.00 |
| 7/21/2016 | | $14.00 | Property Inspection | 3/1/2010 | $222,588.83 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,695.94 | $0.00 |
| 8/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $225,480.47 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $9,695.94 | $0.00 |
| 8/17/2016 | | $611.60 | Foreclosure Cost | 3/1/2010 | $225,480.47 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,307.54 | $0.00 |
| 9/1/2016 | $2,891.64 | | Monthly Payment Due | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,307.54 | $0.00 |
| 9/16/2016 | | $140.00 | Foreclosure Fee | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,447.54 | $0.00 |
| 9/20/2016 | | $14.00 | Property Inspection | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,461.54 | $0.00 |
| 9/20/2016 | | $50.13 | Foreclosure Cost | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,511.67 | $0.00 |
| 9/20/2016 | | $50.13 | Foreclosure Cost | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,561.80 | $0.00 |
| 9/30/2016 | | $14.00 | Property Inspection | 3/1/2010 | $228,372.11 | | $0.00 | $402,164.36 | $0.00 | -$35,525.16 | $10,575.80 | $0.00 |
| 9/30/2016 | | | County Taxes | 3/1/2010 | $228,372.11 | -$3,141.88 | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $10,575.80 | $0.00 |
| 10/1/2016 | $2,970.01 | | Monthly Payment Due | 3/1/2010 | $231,342.12 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $10,575.80 | $0.00 |
| 10/19/2016 | | $55.70 | Foreclosure Cost | 3/1/2010 | $231,342.12 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $10,631.50 | $0.00 |
| 10/31/2016 | | $2,596.00 | Foreclosure Fee | 3/1/2010 | $231,342.12 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $13,227.50 | $0.00 |
| 11/1/2016 | $2,970.01 | | Monthly Payment Due | 3/1/2010 | $234,312.13 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $13,227.50 | $0.00 |
| 11/28/2016 | | $3,852.00 | Foreclosure Fee | 3/1/2010 | $234,312.13 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $17,079.50 | $0.00 |
| 11/28/2016 | | $465.50 | Foreclosure Cost | 3/1/2010 | $234,312.13 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $17,545.00 | $0.00 |
| 11/30/2016 | | $2,516.00 | Foreclosure Cost | 3/1/2010 | $234,312.13 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $20,061.00 | $0.00 |
| 12/1/2016 | $2,970.01 | | Monthly Payment Due | 3/1/2010 | $237,282.14 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $20,061.00 | $0.00 |
| 12/2/2016 | | $61.27 | Foreclosure Cost | 3/1/2010 | $237,282.14 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $20,122.27 | $0.00 |
| 12/15/2016 | | | BK Filed | 3/1/2010 | $237,282.14 | | $0.00 | $402,164.36 | $0.00 | -$38,667.04 | $20,122.27 | $0.00 |

Case: 18-1341, Document: 15-14, Filed: 05/03/2019 Page 9 of 34 (186 of 573)

# NOTE

February 13, 2008        Seattle                         Washington
    [Date]              [City]                            [State]

8011 9th Ave Nw, Seattle, WA 98117

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $417,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Washington Mutual Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        5.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the First    day of each month beginning on April 1, 2008        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on      March 1, 2038       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 78148,
Phoenix, AZ 85062-8148                    or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,367.69        .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP®   5N (0207)              Form 3200 1/01
    VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3              Initials: KCK   2/13/2008

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                      5 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

VMP®5N (0207)                              Page 2 of 3

Form 3200 1/01
Initials: _KCK_
2/13/2008

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Kim C. Kerrigan_ 2/13/2008 _(Seal)_
Kim C Kerrigan                    -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

Pay to the order of
_____ (Seal)
                        -Borrower
Without Recourse
Washington Mutual Bank

Robin E. Tange, Vice President        *[Sign Original Only]*

VMP-5N (0207)                Page 3 of 3                Form 3200 1/01

**Electronically Recorded**
**20080226002217**

ACS-ERX                                    DT    59.00
Page 001 of 017
02/26/2008 04:22
King County, WA

RECORDING REQUESTED BY: LSI
WHEN RECORDED RETURN TO:
CUSTOM RECORDING SOLUTIONS
2550 N. REDHILL AVE.
SANTA ANA, CA 92705

CRS# ███████
## Document Title(s)

DEED OF TRUST

## Grantor(s) (Last, First and Middle Initial)

Kerrigan, Kim C.

_____                     _____
                                             Additional grantors on page

## Grantee(s) (Last, First and Middle Initial)

WASHINGTON MUTUAL BANK, F.A.
                                             Additional grantees on page

## Trustee(s) (Last, First and Middle Initial)

HITT, MICHAEL D.
                                             Additional trustees on page

## Legal Description (abbreviated form: i.e. lot, block, plat or section, township, range, quarter)

FULL LEGAL DESCRIPTION ON EXHIBIT A

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, Volume
18 of Plats, Page 21,

_____                     _____
                                             Additional legal is on page

## Assessor's Property Tax Parcel/Account Number

███████         _____         _____
                                             Additional parcel #s on page

The Auditor/Recorder will rely on the information provided on this form. The staff will not read the
document to verify the accuracy or completeness of the indexing information provided herein.

I am requesting an emergency nonstandard recording for an additional fee as provided in RCW 36.18.010. I
understand that the recording processing requirements may cover up or otherwise obscure some part of the
text of the original document.

_____
Signature of Requesting Party

Recording requested by: LSI
When recorded return to :
Custom Recording Solutions
2550 N. Redhill Ave.
Santa Ana, CA. 92705

Assessor's Parcel or Account Number:
Abbreviated Legal Description:

[Include lot, block and plat or section, township and range]       Full legal description located on page 3
Trustee: Michael D. Hitt                                                                          Exhibit A

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated       **February 13, 2008**       ,
together with all Riders to this document.
(B) "Borrower" is Kim C Kerrigan. A Single Person

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Washington Mutual Bank

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3048  1/01

VMP ®-6(WA) (0012)
Page 1 of 16       Initials: KCK
VMP MORTGAGE FORMS - (800)521-7291

Lender is a federal association
organized and existing under the laws of The United States of America
Lender's address is 2273 N. Green Valley Parkway, Suite 14, Henderson, NV
89014
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is Michael D. Hitt

**(E) "Note"** means the promissory note signed by Borrower and dated February 13, 2008
The Note states that Borrower owes Lender Four Hundred Seventeen Thousand and No/100
Dollars
(U.S. $417,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than March 1, 2038
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _KCK_

-6(WA) (0012)          Page 2 of 15          Form 3048  1/01

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of King

[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

See attached exhibit A

Parcel ID Number: 292270071007                      which currently has the address of
8011 9th Ave Nw                                                          [Street]
Seattle                                      [City] , Washington 98117          [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6(WA) (0012)                    Page 3 of 15          Initials: _KCK_          Form 3048  1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community

Initials: _KCK_

Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _KCK_

-6(WA) (0012)                     Page 6 of 15                     Form 3048   1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to

0757266317

Initials: _K.C.K_

-6(WA) (0012)          Page 6 of 15          Form 3048  1/01

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _KCK_

-6(WA) (0012)         Page 7 of 15         Form 3048 1/01

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: _KCK_

(VMP)  -6(WA) (0012)          Page 8 of 15          Form 3048   1/01

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials: _KCK_

Form 3048    1/01

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's



notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

Initials: _KCK_

-6(WA) (0012).01    Page 11 of 15    Form 3048  1/01

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

-6(WA) (0012).01      Page 12 of 15      Initials: _KCK_      Form 3048 1/01

APP 000143

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

Initials: _K C K_

-6(WA) (0012).01                    Page 13 of 15                    Form 3048    1/01

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____      _____ (Seal)
                               Kim C Kerrigan  (2/13/2008) -Borrower

_____      _____ (Seal)
                                                        -Borrower

_____ (Seal)      _____ (Seal)
                 -Borrower                               -Borrower

_____ (Seal)      _____ (Seal)
                 -Borrower                               -Borrower

_____ (Seal)      _____ (Seal)
                 -Borrower                               -Borrower

-6(WA) (0012).01                    Page 14 of 16                    Form 3048   1/01

**STATE OF WASHINGTON**
County of King
 }  ss:

On this day personally appeared before me   Kim C Kerrigan

to me known to be the individual(s) described in and who executed the within and foregoing instrument,
and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the
uses and purposes therein mentioned.

GIVEN under my hand and official seal this    1 3    day of Febry    2008 .

Notary Public in and for the State of Washington, residing at

My Appointment Expires on    10/14/08

Michael Paul Warnemuende

Notary Public
State of Washington
MICHAEL PAUL WARNEMUENDE
My Appointment Expires Oct 14, 2008

Prepared By: Melanie Dew
9457 Corbin Ave.
Northridge CA 91324

-6(WA) (0012).01                    Page 15 of 15            Initials: KCK          Form 3048   1/01
                                                                     2/

APN: 292270071007

Order ID
Loan No

## EXHIBIT A
## LEGAL DESCRIPTION

The land referred to in this policy is situated in the State of WA, County of KING, City of SEATTLE and described as follows:

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page 21, records of King County, Washington; and the South 15 feet of Lot 43, All of Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of King County, Washington.

APN 292270071007

WITH THE APPURTENANCES THERETO.

APN: 292270071007

**Electronically Recorded**
**20140115000469**

SIMPLIFILE                    A                    34.00
Page 001 of  003
01/15/2014 12:18
King County, WA

After recording please return to:
**PEIRSONPATTERSON, LLP**
**ATTN: RECORDING DEPT.**
**13750 OMEGA ROAD**
**DALLAS, TX 75244-4505**

————————————[Space Above This Line For Recording Data]————————————

Loan No. ████████

# WASHINGTON ASSIGNMENT OF DEED OF TRUST

**Assessor's Property Tax Parcel or Account Number: 292270071007**
Abbreviated Legal Description: SOUTH 15FT OF LOT 19, ALL OF LOT 20, AND NORTH 20FT OF LOT
21, BLK 4, GREENWOOD PARK ANNEX, VOL 18 OF PLATES, PG 21.
Full legal description located on page: 1

For Value Received, the undersigned holder of a Deed of Trust JPMorgan Chase Bank, National Association,
**successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of**
**Washington Mutual Bank F/K/A Washington Mutual Bank, FA** (herein "Assignor") does hereby grant, sell,
assign, transfer and convey, unto **BAYVIEW LOAN SERVICING, LLC,** (herein "Assignee"), whose address
is **4425 PONCE DE LEON BLVD, CORAL GABLES, FL 33146,** all beneficial interest under a certain Deed
of Trust dated **February 13, 2008** and recorded on **February 26, 2008,** made and executed by **KIM C.**
**KERRIGAN,** to **MICHAEL D. HITT,** Trustee, upon the following described property situated in **KING**
County, State of Washington:
Property Address: **8011 9TH AVE NW, SEATTLE, WA 98117**

**See exhibit "A" attached hereto and made a part hereof.**

such Deed of Trust having been given to secure payment of **Four Hundred Seventeen Thousand  and**
**00/100ths ($417,000.00),** which Deed of Trust is of record in Book, Volume, or Liber No. N/A, at Page N/A (or
as No. 20080226002217), in the Office of the County Auditor of KING County, State of Washington.

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to the
terms and conditions of the above-described Deed of Trust.

Washington Assignment of Deed of Trust
JP Morgan Chase Bank N.A.                    Page 1 of 2                    L73108WA 01/12 Rev. 04/12

████████████████████

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on 12|10|2013

Assignor:
**JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**

By: _Jameika Watson_

Its: **Vice President**

## ACKNOWLEDGMENT

State of Louisiana §
§
Parish of Ouachita §

On this 10 day of December, 2013 before me appeared Jameika Watson, to me personally known, who, being by me duly sworn (or affirmed) did say that he/she is the **Vice President**, of **JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Company as Receiver of Washington Mutual Bank F/K/A Washington Mutual Bank, FA**, and that the seal affixed to said instrument is the corporate seal of said national association and that the instrument was signed and sealed on behalf of the national association by authority of its board of directors and that Jameika Watson acknowledged the instrument to be the free act and deed of the national association.

_Y Kialison_
Signature of Officer

YKIALISON
Printed Name

Notary Public
Title of Officer

Monroe, LA Ouachita Parish
Place of Residence of Notary Public

My Commission Expires: L. Rhme

**Y. K. WILSON
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID# 064389**

(Seal)

Washington Assignment of Deed of Trust
JP Morgan Chase Bank N.A.    Page 2 of 2    L73108WA 01/12 Rev. 04/12

**EXHIBIT "A"**

The land referred to in this policy is situated in the State of WA, County of KING, City of SEATTLE and described as follows:

South 15 feet of Lot 19, all of Lot 20, and North 20 feet of Lot 21, Block 4, Greenwood Park Annex, according to plat recorded in Volume 18 of Plats, Page 21, records of King County, Washington; and the South 15 feet of Lot 43, All of Lot 44, and the North 20 feet of Lot 45, Block 13, Whitman Addition to the City of Seattle, according to plat recorded in Volume 12 of Plats, Page 39, Records of King County, Washington.

APN 292270071007

WITH THE APPURTENANCES THERETO.

APN: 292270071007